**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ECLIPSE GAMING SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | Demand for Jury Trial |
| | ) | |
| ANTHONY ANTONUCCI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT FOR VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT
AND VIOLATIONS OF ILLINOIS COMPUTER CRIME PREVENTION LAW,
TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, BREACH OF
FIDUCIARY DUTY AS AN EMPLOYEE, BREACH OF CONTRACT, BREACH OF
FIDUCIARY DUTY AS A MEMBER OF A TEXAS
LIMITED LIABILITY COMPANY, AND CONVERSION**

## INTRODUCTION

This is a suit by Plaintiff, Eclipse Gaming Systems, LLC ("Eclipse"), against its former

employee and current shareholder, Defendant, Anthony Antonucci ("Antonucci"), for violations

of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq*.; violations of the

Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51; tortious interference with

contractual relations; breach of fiduciary duty as an employee under Illinois and Georgia

common law; breach of contract under Georgia common law; breach of fiduciary duty as a

member of a limited liability company under Texas law; and conversion.

Eclipse was formed in 2008 to supply slot-style games to customers in the casino

gaming industry. Antonucci was both a founding member and employee of Eclipse. Antonucci

also is the owner of Digital Dynamics Software, Inc. ("Digital"), which provides casino-game

software and related solutions.

During his employment with Eclipse, Antonucci provided, among other things, security protocol software applications for use in its slot-style gaming machines. Antonucci provided this software in two ways: by developing the software as an employee of Eclipse or by licensing the software to Eclipse through his company, Digital. For Eclipse's or Digital's software to operate on Eclipse's gaming machines, the machines require external devices be plugged-in. These external devices, commonly known as dongles, contain "security keys," which consist of software code that communicates with the software on the gaming machines. Without these keys, the gaming machine software will not operate, and if the gaming machine software becomes inoperable, so do Eclipse's gaming machines.

In spring 2016, Antonucci approached Eclipse to request a buy-out of his membership interest in Eclipse. In June 2016, when the parties failed to agree to a buy-out amount, Antonucci retaliated by secretly installing a "time bomb" into a software application Digital licensed to Eclipse. Eclipse would later learn that this time bomb required Eclipse to buy a new security key controlled by Digital or else Eclipse's gaming machines would effectively be shut down because the Digital software application running on the machines would stop working. At the time, Digital's software operated on 366 of Eclipse's gaming machines.

In November 2016, approximately three weeks before the time bomb was set to go off, Antonucci notified Eclipse of the time bomb and attempted to extort approximately $300,000 from Eclipse. To avoid the shut-down of its machines, Eclipse was forced to file a lawsuit and seek a temporary restraining order in Illinois state court. In addition to the expenses Eclipse incurred to obtain the temporary restraining order, Eclipse was required to pay Antonucci thousands of dollars in exchange for the keys to stop the time bomb. Eclipse then implemented emergency procedures to prevent the shut-down of its gaming machines, but despite the effort,

time, and money expended by Eclipse implementing these procedures, some of Eclipse's gaming machines still shut down, resulting in substantial loss of revenue.

Furthermore, Antonucci has prevented Eclipse from obtaining the dongles that contain security keys that allow Eclipse to operate its gaming machines. Specifically, Antonucci incorrectly told the third-party manufacturer of these dongles, Gemalto NV ("Gemalto"), that Digital is the owner of these keys. Based on his improper claim of ownership of the security keys, Antonucci instructed Gemalto that Eclipse does not have authorization to purchase the dongles. Accordingly, Gemalto has refused to fulfill Eclipse's orders for the dongles.

## PARTIES

1.      Eclipse is a limited liability company organized under the laws of the State of Texas, with its office located at 3237 Satellite Blvd #120, Duluth, Georgia 30096.

2.      Antonucci is an individual who resides at 25875 Cresthill Drive, Barrington, Cook County, Illinois 60010.

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Eclipse raises a claim under the CFAA, 18 U.S.C. § 1030(g). The Court further has supplemental jurisdiction over Eclipse's state law claims in accordance with 28 U.S.C. § 1367 because these claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.

4.      The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states as Antonucci is a citizen of Illinois and Eclipse is incorporated in Texas and has its headquarters in Georgia, and the amount in controversy exceeds $75,000.

5.      This Court has personal jurisdiction over Antonucci because, among other things, he is a citizen of Barrington, Illinois, and violated the CFAA and engaged in the tortious acts and breaches alleged in this complaint while in Illinois.

6.      Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district, and Antonucci resides in this judicial district.

**FACTS COMMON TO ALL COUNTS**

7.      Antonucci has been the owner of Digital since its inception.

8.      On information and belief, Digital is in the business of providing casino gaming solutions, custom software development, and services for the implementation of gaming industry communications protocols.

9.      While working at Digital, Antonucci developed the SAS Gateway and SAS Engine software (collectively, "Software").

10.     In 2008, Eclipse was formed. Eclipse is in the business of supplying slot-style games and systems to the worldwide gaming industry, including major tribal gaming properties throughout the United States. Eclipse also provides gaming services and support for gaming systems.

11.     Eclipse has contracts with its customers to provide gaming machines. These contracts require operators and suppliers, including Eclipse, to receive prior approval from the gaming regulatory authorities before remotely accessing a gaming machine, configuring/reconfiguring a gaming machine's software, or removing a game from operation.

12.     Antonucci was one of the founding members of Eclipse. From 2008 until August 2016, he was employed by Eclipse and served as Eclipse's Vice President of Systems, a title later changed to Chief Technical Officer.

13.     Antonucci currently owns a 17.18% interest in Eclipse—11.10% as an individual, and 6.08% through Digital.

14.     As an owner and former employee of Eclipse, Antonucci has knowledge of Eclipse's contracts with its customers.

15.     As an employee of Eclipse, Antonucci developed software for Eclipse's gaming machines, including security protocol software that prevents unauthorized access to Eclipse's gaming machines.

16.     After the formation of Eclipse in 2008, Antonucci's company, Digital, granted a license to Eclipse for the Software.

17.     From 2008 through 2014, Digital licensed the Software to Eclipse through an oral agreement.

18.     Digital licenses the Software to other companies and typically charges a one-time base or "upfront" fee of $35,000 and a fee of $125 or $150 per unit fee for each machine that operates the Software.

19.     Because Antonucci was an owner and the Chief Technical Officer of Eclipse, he waived the standard "upfront" fee and only charged Eclipse $100 per machine that used the Software.

20.     Since the Software was first licensed, it has been installed on 668 of Eclipse's machines. The Software is still active on approximately 366 machines for approximately twenty customers at approximately thirty separate locations in a minimum of five states.

21.     Between October 2010 and March 2015, Eclipse paid Digital $33,200 under the license, or $100 per machine for 332 of Eclipse's machines using the Software.

22.     On March 14, 2015, Eclipse and Digital entered into a written contract, the Master License Agreement ("License Agreement"), for Eclipse's use of the Software.  A true and correct copy of the fully executed License Agreement is attached hereto as Exhibit A.

23.     The License Agreement states the terms of Eclipse's use of the Software.

24.     Section 2.1 of the License Agreement grants Eclipse a "limited, nonexclusive license during the term of [the License Agreement] to use, sell, import, export, distribute, transmit, reproduce and publicly display copies of Software as electronic files as an integrated part of Licensee's Designated Software for implementation in a particular machine in which the SAS protocol is enabled."

25.     In exchange for the license to use the Software, Section 1.4 of the License Agreement provides for Eclipse's payment obligations.

26.     The one-time SAS Engine Base Cost is denoted as "PAID."  Because Digital's owner, Antonucci, was also an owner of Eclipse, the one-time SAS Engine Base Cost or upfront fee was waived.

27.     Section 1.4 of the License Agreement also states the "run-time license fees" are $100/unit, paid once per unit, and the "maintenance fees" are $5,000 per quarter.

28.     The License Agreement requires Digital to submit invoices for run-time license fees and maintenance fees pursuant to Sections 6.1.2 and 6.1.3 of the License Agreement. Digital has never submitted invoices pursuant to the License Agreement.

29.     Although Digital never invoiced Eclipse, pursuant to a court order entered December 5, 2016, Eclipse paid Digital, through Antonucci, a sum of $50,000 towards license fees under the License Agreement.

30.     To date, Eclipse has paid Antonucci approximately $83,200 in license fees.

31.     In the spring of 2016, Antonucci contacted representatives of Eclipse to offer a buy-out of his interest in Eclipse.  Eclipse did not accept Antonucci's offer.

32.     On June 16, 2016, Digital filed a lawsuit in the Circuit Court of Cook County, Illinois, Chancery Division (Case No. 16-CH-08102), and sought a declaration that the License Agreement between the parties concerning the Software was null and void, and that he was the sole owner of the Software.  A true and correct copy of the Verified Complaint for Declaratory Relief is attached as Exhibit B.  This action is still pending.

33.     Unbeknownst to Eclipse, on June 17, 2016, the day after Digital filed its complaint in the State of Illinois, Antonucci created an updated version of the Software (Version Seven).  This updated version of the Software incorporated an expiration date or a "time bomb," whereby the Software would stop working and render any gaming machine it was installed on inoperable on a certain date.

34.     At that time, Antonucci did not inform anyone at Eclipse that he had programmed a time bomb into the updated version of the Software.

35.     Antonucci had never set an expiration date on former versions of the Software licensed to Eclipse.  Further, because the license between Eclipse and Digital was perpetual, Eclipse could not have expected that Antonucci would include an expiration date in the updated version of the Software.

36.     Without knowledge of the time bomb, on August 25, 2016, Eclipse terminated Antonucci's employment.

37.     On or around September 9, 2016, Eclipse discovered a bug in the Software. Antonucci submitted an emergency patch of the Software (Version Ten).  Similar to Version Seven, Version Ten also included a time bomb created by Antonucci.

38.     Over two months later, on November 18, 2016, Eclipse's counsel received a letter from Antonucci's counsel, Robert G. Riffner, demanding Eclipse pay Antonucci $300,000 or else Eclipse's gaming machines would become inoperable the first week of December, 2016.  The letter did not specify how the machines would become inoperable, but did allude to some dongles that were purportedly necessary for the functioning of the gaming machines.  At the time, Eclipse had no knowledge of the time bomb, and was unaware that any Software update or dongles were necessary for the continuing operation of the gaming machines.

39.     On November 23, 2016, Eclipse responded to the letter notifying Antonucci and his counsel, Mr. Riffner, of the repercussions of such a threatened Software disruption and requesting written confirmation that the Software would not be disrupted.

40.     On November 30, 2016, Mr. Riffner called Eclipse's counsel.  During that call, Eclipse's counsel asked for confirmation that the Software would not shut down.  Mr. Riffner refused to confirm that the Software would not shut down.  He also stated that if Eclipse did not comply with Antonucci's demands, Eclipse's gaming machines would shut down.

41.     On November 30, 2016, Eclipse filed a complaint for declaratory judgment, anticipatory breach, and specific performance in anticipation of its motion for a temporary restraining order in Illinois state court.

42.     While Eclipse was filing its motion for a temporary restraining order to stop the disruption of the Software, Antonucci's counsel called Eclipse's counsel and stated that the Software would shut down at the end of that week, or by the close of business the following day, if Eclipse failed to pay Antonucci the $300,000.

43.     With the threat of the shut-down occurring the next business day, Eclipse's counsel obtained an *ex parte* temporary restraining order against Digital to prevent the shut-down of the Software.

44.     An immediate shut-down of the Software would have caused Eclipse to breach its contracts with its customers, violate gaming regulations, and suffer losses of approximately $20,000 per day in revenue.

45.     On December 5, 2016, the Court heard Eclipse's motion for a temporary restraining order.  Both Antonucci and his counsel were present for that hearing.

46.     During a recess at the hearing, Eclipse learned that:

    a.  a dongle (a plug-in device containing security keys, which are comprised of software code) was required to override the time bomb;

    b.  Antonucci had brought with him 2,000 of the required dongles;

    c.  Antonucci had submitted two updates (Versions Seven and Ten) to the Software: one, in June, 2016, and the second shortly after his employment was terminated; and

    d.  both of these updates contained the time bomb.

47.     At the time, Eclipse believed approximately 500 gaming machines were running the Software Version Seven or higher.  Eclipse thus believed it needed 500 dongles for the continued operation of the gaming machines.

48. Upon return to the court, Eclipse agreed to pay Digital $50,000 for outstanding fees owed under the Software license agreement, and $15,000 for 500 dongles. The court ordered this payment in lieu of a bond.

49. Immediately after Eclipse received the dongles from Antonucci, it implemented emergency procedures to address the impending shut-down of its gaming machines, including:

    a. conducting tests to determine exactly when the time bomb was installed, how the time bomb would work, and when it would go off. It was during these tests that Eclipse confirmed the dates of the Versions Seven and Ten updates, and the December 7th time-bomb-trigger date;

    b. Eclipse's CEO contacting clients and warning them of the potential inoperability of its gaming machines;

    c. sending software technicians to casino locations around the country to install the dongles on hundreds of gaming machines;

    d. attempting to uninstall the Software Versions Seven and Ten from certain machines; and

    e. deploying personnel on-site at client locations for approximately 24 hours to monitor the operation of the gaming machines.

50. Despite these emergency procedures, after December 7, 2016, some of Eclipse's gaming machines nevertheless shut down for approximately seven days due to Antonucci's time bomb.

51. As a result of Antonucci's time bomb, Eclipse incurred substantial expense in implementing remedial measures, as well as harm to its goodwill and reputation with its customers. Eclipse also suffered loss in revenue when its gaming machines shut down.

52.     This time bomb further put Eclipse at risk of breaching contracts with its customers and violating gaming regulations, the latter of which require gaming operators to receive prior approval before configuring/reconfiguring a gaming machine's software or removing a gaming machine from operation.

**FACTS COMMON TO CLAIMS FOR BREACH OF FIDUCIARY DUTY AS EMPLOYEE UNDER ILLINOIS COMMON LAW (COUNT V), BREACH OF FIDUCIARY DUTY AS EMPLOYEE UNDER ILLINOIS COMMON LAW (COUNT VI) BREACH OF EMPLOYMENT AGREEMENT (COUNT VII), BREACH OF FIDUCIARY DUTY AS MEMBER OF A TEXAS LIMITED LIABILITY COMPANY (COUNT VIII), AND CONVERSION (COUNT IX)**

53.     Antonucci has been an employee of Eclipse since its inception in 2008.

54.     On January 15, 2015, Antonucci entered into a written employment agreement with Eclipse ("Employment Agreement").  A true and correct copy of this Employment Agreement is attached hereto as Exhibit C.

55.     The Employment Agreement is a valid, enforceable, and fully-integrated contract between Eclipse and Antonucci.

56.     Section 2.3 of the Employment Agreement provides Antonucci's duties as an employee of Eclipse.  It states, in relevant part:

> [Antonucci] will devote his entire business time, attention, skill, and energy exclusively to the business of the Employer, will use his best efforts to promote the success of the Employer's business, and will cooperate fully with the Manager in the advancement of the best interests of the Employer.

57.     As an employee of Eclipse, Antonucci was given the authority to act on Eclipse's behalf, including, among other things, authorizing a third-party manufacturer of dongles, Gemalto, to make four dongles containing security keys that interact with software on Eclipse's gaming machines.

58.     Each of the four dongles consists of a plug-in hardware device (essentially, a USB or "thumb" drive) containing a copy of a software security key specifically written for Eclipse's gaming machines.  These dongles are plugged into Eclipse's gaming machines.  The machines check for the presence of the software security keys contained on the dongles; if these keys are not present, the machines cease operation, or have limited functionality.  Three of the security keys interact with Eclipse-owned software.  The fourth key interacts with Digital's Software on Eclipse's gaming machines in addition to Eclipse-owned software.

59.     Eclipse purchases dongles containing the keys from Gemalto when Eclipse needs them and, before this dispute, Antonucci was responsible for ordering the keys on behalf of Eclipse.

60.     On information and belief, while acting as an employee and agent of Eclipse, Antonucci told Gemalto that his company, Digital, was the owner of all keys contained on dongles manufactured by Gemalto for Eclipse's gaming machines, even though Digital only owned the Software.

61.     On November 3, 2016, Eclipse submitted a routine purchase order to Gemalto for several hundred dongles containing the MAMMC and RWIID security keys.  The MAMMC security-key dongle is one of the three dongle types manufactured by Gemalto for Eclipse-owned software.  The RWIID key is the security key manufactured for Digital's Software, but one that also interacts with Eclipse-owned software.

62.     In November 2016, Antonucci instructed Gemalto not to sell any dongles to Eclipse.

63.     On December 2, 2016, Gemalto informed Eclipse that Eclipse was no longer authorized to purchase dongles containing Eclipse's three security keys and, therefore, Gemalto would not fill Eclipse's outstanding order for dongles containing the keys.

64.     On December 5, 2016, at the hearing for Eclipse's temporary restraining order, Antonucci, through his counsel, acknowledged that he was aware that Eclipse had attempted to order the dongles from Gemalto, and admitted that he had instructed Gemalto not to sell the dongles to Eclipse.

65.     On December 29, 2016, Eclipse, through its CEO, emailed Antonucci requesting that Antonucci tell Gemalto that it may fulfill Eclipse's current and future orders for the dongles manufactured for software owned by Eclipse.  Eclipse requested a response from Antonucci by January 5, 2017.

66.     On January 4, 2017, Antonucci replied to Eclipse's demand and stated that Digital owns the three security keys placed on dongles manufactured for Eclipse-owned software. Antonucci stated that he spoke with Gemalto and that due to Gemalto's company policy, only Digital can order the security keys and the dongles must be sent directly to Digital's office.

67.     Gemalto has reported to Eclipse, however, that the reason it cannot sell the dongles to Eclipse is because Digital has rescinded its authorization.

68.     As a result of Antonucci assuming control over the security keys necessary for the operation of Eclipse's gaming machines, Eclipse is unable to obtain the dongles containing the security keys for Eclipse's software from Gemalto without Antonucci's approval.

## FACTS PERTAINING TO BREACH OF FIDUCIARY DUTY AS A MEMBER OF A TEXAS LIMITED LIABILITY COMPANY (COUNT VIII)

69.     The members of Eclipse, including Antonucci, operate under a Third Amended and Restated Company Agreement effective May 7, 2010 ("Operating Agreement").

-13-

70. Under Section 13.11, "[t]he laws of the State of Texas shall govern the validity of [the Operating] Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members."

71. Antonucci owns membership interests in Eclipse. He also served as Chief Technical Officer of Eclipse and, among other things, had access to the servers and computer systems controlling Eclipse's gaming machines. Eclipse placed trust and confidence in Antonucci because of his roles as an owner and officer of Eclipse, especially one with access to Eclipse's central computer systems.

## COUNT I
## VIOLATION OF CFAA § 1030(a)(5)(A)

72. Eclipse re-alleges Paragraphs 1-52 as if fully set forth herein.

73. Eclipse's gaming machines were protected computers within the meaning of the CFAA § 1030(e)(2) because they are gaming machines used in or affecting interstate commerce and various tribal jurisdictions.

74. Antonucci knowingly and intentionally transmitted a software time bomb into Eclipse's gaming machines by submitting a software update that altered the code of the Software.

75. Antonucci's transmission of the time bombs in Versions Seven and Ten of the Software was unauthorized because:

   a. When Antonucci transmitted the time bomb in Version Seven, he was an employee with adverse interests;

   b. When Antonucci transmitted the time bomb in Version Ten, Antonucci's employment with Eclipse had recently been terminated and Antonucci, therefore, did not have authority from Eclipse to transmit the time bomb or authorize access to Eclipse's gaming machines; and

    c.    Antonucci, through Digital, had provided Eclipse with a perpetual license for the Software.

76.    Antonucci's software updates constitute an intentional transmission of a time bomb that would shut down Eclipse's gaming machines and thus harm Eclipse and its business.

77.    The time bomb caused Eclipse to incur significant damage because the function of its gaming machines was interrupted.

78.    Eclipse also suffered loss by way of the costs it paid for the dongles to override the time bomb, its expenses in implementing emergency procedures, and the costs and fees in seeking the temporary restraining order. These losses were a direct result of the time bomb.

79.    The amount of loss and damage suffered by Eclipse aggregates in excess of $5,000 in a one-year time period.

## COUNT II
## VIOLATION OF CFAA § 1030(a)(7)

80.    Eclipse re-alleges Paragraphs 1-52 and 72-79 as if fully set forth herein.

81.    Antonucci, through his counsel, threatened that Eclipse's gaming machines would become inoperable if Eclipse did not pay him $300,000.

82.    Antonucci intended to extort money from Eclipse because he demanded payment from Eclipse and threatened to damage Eclipse's protected computers.

## COUNT III
## VIOLATION OF THE ILLINOIS COMPUTER
## CRIME PREVENTION LAW, 720 ILCS §5/17-51

83.    Eclipse re-alleges Paragraphs 1-52 and 72-79 as if fully set forth herein.

84.    Antonucci, knowingly and without authorization, inserted time bombs in the Software used with Eclipse's gaming machines.

85.     When Antonucci inserted the time bombs in Versions Seven and Ten of the Software, he had knowledge that the time bomb would command the Software to become inoperable on a specific date, December 7, 2016.

86.     Antonucci knew that rendering the Software inoperable would cause damage to Eclipse's gaming machines by rendering them inoperable, as well as cause significant loss to Eclipse and its business.

87.     As a result of the aforementioned acts, Eclipse suffered loss by expending resources to obtain the temporary restraining order and implement remedial measures, as well as harm to its goodwill and reputation with its customers in seeking to implement such measures on an emergency basis.  Eclipse also suffered loss as a result of the time bomb rendering some of its gaming machines inoperable for a period of seven days despite Eclipse's remedial efforts.

## COUNT IV
## TORTIOUS INTERFERENCE WITH
## CONTRACTUAL RELATIONS UNDER ILLINOIS LAW

88.     Eclipse repeats and re-alleges the allegations contained in Paragraphs 1-52 as if fully set forth herein.

89.     Eclipse has valid and existing contracts with its customers throughout the United States to provide operable gaming machines.

90.     As an employee and Chief Technical Officer of Eclipse, Antonucci was aware that Eclipse had contracts with its customers.

91.     On information and belief, Antonucci was aware that Eclipse's contracts with its customers required operators, including Eclipse, to receive prior approval from the gaming regulatory authorities before remotely accessing a gaming machine, configuring/reconfiguring a gaming machine's software, or removing a game from operation.

92.     By creating the time bomb in Versions Seven and Ten of the Software, Antonucci directly caused Eclipse to breach at least one contractual customer obligation because some of Eclipse's gaming machines were inoperable for seven days.

93.     Because Eclipse did not become aware of the time bomb, when the Software would expire, or how to override it until two days before the Software expiration date, Eclipse was not able to provide its customers with sufficient advance notice of any down-time of its gaming machines.

94.     Additionally, because Eclipse obtained the dongles to override the time bomb only a couple of days before the time bomb went off, Eclipse did not have sufficient time to fix all of its gaming machines currently in operation.

95.     Antonucci's time bomb caused damage to Eclipse because some of Eclipse's machines were shut down for a period of seven days, which forced Eclipse to breach at least one of its contractual obligations.

96.     Not only did Eclipse suffer loss in revenue for the period of inoperability, but Eclipse's goodwill and reputation with its customers was damaged as a result of such inoperability and the need for Eclipse to implement emergency remedial measures.

97.     Eclipse would not have breached at least one of its contractual obligations nor incurred loss in revenue and harm to its goodwill and reputation but for Antonucci creating the time bomb in Versions Seven and Ten of the Software.  Therefore, Eclipse's contractual breach was directly caused by Antonucci.

98.     Antonucci's actions constitute willful, wanton, and malicious conduct; he took these actions to extort $300,000 from Eclipse and gain leverage in buy-out negotiations while

having full knowledge, as Eclipse's Chief Technical Officer, that great harm would result from the shut-down of Eclipse's gaming machines.

**COUNT V**
**BREACH OF FIDUCIARY DUTY AS EMPLOYEE**
**UNDER ILLINOIS LAW COMMON LAW**

99.     Eclipse repeats and re-alleges the allegations contained in Paragraphs 1-68 as if fully set forth herein.

100.    As an employee of Eclipse, Antonucci was given the authority to act on behalf of Eclipse, thus establishing an agency relationship between Antonucci and Eclipse.

101.    As an employee and agent of Eclipse, Antonucci had a fiduciary duty to Eclipse to act fairly, honestly, in good faith, with undivided loyalty, to avoid conflicts of interest, and to refrain from any act, or omission to act, calculated or likely to injure Eclipse or interfere with Eclipse's business interests.

102.    Antonucci breached his fiduciary duty to Eclipse by:

a.    installing a time bomb set to disrupt the Software and shut down Eclipse's machines, thereby causing harm to Eclipse's business;

b.    improperly informing Gemalto that only he and Digital can authorize the manufacture of dongles containing Eclipse's three security keys that allow Eclipse's gaming machines to operate; and

c.    using the misinformation communicated to Gemalto to prevent Eclipse from ordering these dongles from Gemalto.

103.    Eclipse would not have implemented remedial measures, sought a temporary restraining order, or had its gaming machines shut down but for Antonucci's installation of a time bomb in the Software.

104.    Eclipse would be able to obtain dongles containing its security keys from Gemalto without needing Antonucci's approval but for Antonucci's false claim of ownership over Eclipse's security keys.

105.    As a result of Antonucci's breach of his fiduciary duty as an employee, Eclipse suffered damage in implementing remedial measures and seeking a temporary restraining order, and harm to its goodwill and reputation with customers.  Eclipse was also damaged when some of its gaming machines were inoperable for a period of seven days.

106.    Antonucci's actions constitute willful, wanton, and malicious conduct; he took these actions to extort $300,000 from Eclipse and gain leverage in buy-out negotiations while knowing, as Eclipse's Chief Technical Officer, that great harm would result from the shut-down of Eclipse's gaming machines.

107.    Therefore, Antonucci breached his fiduciary duty as an employee of Eclipse under Illinois common law.

## COUNT VI
## BREACH OF FIDUCIARY DUTY AS EMPLOYEE
## UNDER GEORGIA COMMON LAW

108.    Eclipse repeats and re-alleges the allegations contained in Paragraphs 1-68 as if fully set forth herein.

109.    As an employee of Eclipse, Antonucci was given the authority to act on behalf of Eclipse, thus establishing an agency relationship between Antonucci and Eclipse.

110.    As an employee and agent of Eclipse, Antonucci had a fiduciary duty to Eclipse to act fairly, honestly, in good faith, with undivided loyalty, to avoid conflicts of interest, and to refrain from any act, or omission to act, calculated or likely to injure Eclipse or interfere with Eclipse's business interests.

111. Antonucci breached his fiduciary duty to Eclipse by:

    a. installing a time bomb set to disrupt the Software and shut down Eclipse's machines, thereby causing harm to Eclipse's business;

    b. improperly informing Gemalto that only he and Digital can authorize the manufacture of dongles containing Eclipse's three security keys that allow Eclipse's gaming machines to operate; and

    c. using the misinformation communicated to Gemalto to prevent Eclipse from ordering these dongles from Gemalto.

112. Eclipse would not have implemented remedial measures, sought a temporary restraining order, or had its gaming machines shut down but for Antonucci's installation of a time bomb in the Software.

113. Eclipse would be able to obtain dongles containing its security keys from Gemalto without needing Antonucci's approval but for Antonucci's improper claim of ownership over Eclipse's security keys.

114. As a result of Antonucci's breach of his fiduciary duty as an employee, Eclipse suffered damage in implementing remedial measures, seeking a temporary restraining order, and harm to its goodwill and reputation with customers. Eclipse was also damaged when some of its gaming machines were inoperable for a period of seven days.

115. Antonucci's actions constitute willful, wanton, and malicious conduct; he took these actions to extort $300,000 from Eclipse and gain leverage in buy-out negotiations while knowing, as Eclipse's Chief Technical Officer, that great harm would result from the shut-down of Eclipse's gaming machines..

116. Therefore, Antonucci breached his fiduciary duty as an employee of Eclipse under Georgia common law.

## COUNT VII
## BREACH OF EMPLOYMENT AGREEMENT
## UNDER GEORGIA COMMON LAW

117. Eclipse repeats and re-alleges the allegations contained in Paragraphs 1-68 as if fully set forth herein.

118. Pursuant to the Employment Agreement, Antonucci had a duty to use his best efforts to promote the success of Eclipse and to advance the best interests of Eclipse.

119. Antonucci worked against the success and best interests of Eclipse by:

   a. installing a time bomb set to disrupt the Software and shut down Eclipse's machines, thereby causing harm to Eclipse's business;

   b. improperly informing Gemalto that only he and Digital can authorize the manufacture of dongles containing Eclipse's three security keys that allow Eclipse's gaming machines to operate; and

   c. using the misinformation communicated to Gemalto to prevent Eclipse from ordering these dongles from Gemalto.

120. As a result of Antonucci's breach of his employment contract, Eclipse suffered damage in implementing remedial measures and seeking a temporary restraining order, and harm to its goodwill and reputation with customers. Eclipse was also damaged when some of its gaming machines were inoperable for a period of seven days.

121. Therefore, Antonucci breached the Employment Agreement under Georgia common law.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY OF A TEXAS LIMITED LIABILITY COMPANY
## UNDER TEXAS COMMON LAW

122.    Eclipse repeats and re-alleges the allegations contained in Paragraphs 1-71 as if fully set forth herein.

123.    Antonucci owns membership interests in Eclipse.  He also served as Chief Technical Officer of Eclipse and, among other things, had access to the servers and computer systems controlling Eclipse's gaming machines.  Eclipse placed trust and confidence in Antonucci because of his roles as an owner and officer of Eclipse, especially one with access to Eclipse's central computer systems, which created a fiduciary duty of loyalty owed by Antonucci to Eclipse.

124.    Antonucci's fiduciary duty of loyalty requires that he act towards Eclipse fairly, honestly, in good faith, with undivided loyalty, to avoid conflicts of interest, and to refrain from any act, or omission to act, calculated or likely to injure Eclipse or interfere with Eclipse's business interests.

125.    Antonucci worked against the interests of Eclipse by:

    a.  installing a time bomb set to disrupt the Software and shut down Eclipse's machines, thereby causing harm to Eclipse's business;

    b.  improperly informing Gemalto that only he and Digital can authorize the manufacture of dongles containing Eclipse's three security keys that allow Eclipse's gaming machines to operate; and

    c.  using the misinformation communicated to Gemalto to prevent Eclipse from ordering these dongles from Gemalto.

126.   Eclipse would not have implemented remedial measures, sought a temporary restraining order, or had its gaming machines shut down but for Antonucci's installation of a time bomb in the Software.

127.   Eclipse would be able to obtain dongles containing its security keys from Gemalto without needing Antonucci's approval but for Antonucci's improper claim of ownership over Eclipse's security keys.

128.   As a result of Antonucci's breach of his fiduciary duty as a member, Eclipse suffered damage in implementing remedial measures and seeking a temporary restraining order, and harm to its goodwill and reputation with customers.  Eclipse was also damaged when some of its gaming machines were inoperable for a period of seven days.

129.   Antonucci's actions constitute willful, wanton, and malicious conduct; he took these actions to extort $300,000 from Eclipse and gain leverage in buy-out negotiations while knowing, as Eclipse's Chief Technical Officer, that great harm would result from the shut-down of Eclipse's gaming machines.

130.   Therefore, Antonucci breached his fiduciary duty of loyalty to Eclipse as a member of Eclipse under Texas common law.

## COUNT IX
## CONVERSION UNDER ILLINOIS COMMON LAW

131.   Eclipse repeats and re-alleges the allegations contained in Paragraphs 1-68 as if fully set forth herein.

132.   Eclipse owns three security keys used to protect and ensure the operation of its gaming machines.  The keys are placed on dongles by a third party, Gemalto.

133.    Eclipse has the right to authorize Gemalto to manufacture dongles containing these keys, as well as dongles containing the RWIID security key that in part interacts with Eclipse-owned software.

134.    Eclipse has requested that Gemalto fulfill an order for dongles that Gemalto denied because Antonucci instructed Gemalto not to sell the dongles to Eclipse.

135.    Further, Eclipse recently demanded that Antonucci permit Gemalto to fulfill its current and future orders for the dongles, and Antonucci has ignored Eclipse's request.  Any additional demand on Antonucci would be futile because Antonucci was and continues to be aware that Eclipse sought the dongles, as acknowledged by Antonucci through his counsel on December 5, 2016, and as demonstrated by Eclipse's demand on Antonucci in its December 29, 2016 email.

136.    Antonucci wrongfully assumed control of Eclipse's keys by identifying Digital as the owner of the security keys.  Antonucci continues to wrongfully assert control over the keys by continuing to identify Digital as the owner of the security keys and preventing Eclipse from ordering dongles containing the keys from Gemalto.

137.    Eclipse would be able to obtain dongles containing its security keys from Gemalto without needing Antonucci's approval but for Antonucci's improper claim of ownership over Eclipse's security keys.

138.    As a result of Antonucci's conversion of Eclipse's right in ordering the dongles, Eclipse has suffered and will suffer damage in harm to its goodwill and reputation with its customers and in the shut-down of its gaming machines.

139.    Antonucci's actions constitute willful, wanton, and malicious conduct because, as Chief Technical Officer, Antonucci knew of the gravity of the harm that would result if Eclipse

could not purchase the dongles from Gemalto and he took these actions to threaten harm to Eclipse's business and gain leverage in buy-out negotiations.

## PRAYER FOR RELIEF

WHEREFORE, Eclipse prays that this Court enter a judgment:

1.     In favor of Eclipse against Antonucci;

2.     That Eclipse recover its actual damages against Antonucci in an amount to be determined, together with interest, including, but not limited to:

    a.   $15,000 for the dongles purchased from Antonucci;

    b.   damages for lost revenue incurred while Eclipse's machines were shut down;

    c.   damage for loss of Eclipse's goodwill and damage to its reputation that resulted from Antonucci's implementation of the time bomb;

    d.   damages for expenses incurred by Eclipse in implementing remedial measures; and

    e.   damages for expenses incurred in seeking and obtaining a temporary restraining order in the Illinois state court action.

3.     Ordering equitable relief in the form of:

    a.   disgorgement of Antonucci's compensation from June 17, 2016, through August 25, 2016, or the breaching period of his Employment Agreement, and

    b.   full forfeiture of Antonucci's membership interest in Eclipse.

4.     Enjoining Antonucci from:

    a.   assuming control over Eclipse-owned security keys;

      b.    preventing Gemalto from manufacturing dongles containing security keys that interact with Eclipse-owned software; and

      c.    improperly maintaining the Eclipse-owned security keys under Digital's account with Gemalto.

5.     That Eclipse recover its cost of this suit, including reasonable attorneys' fees and litigation expenses;

6.     Ordering punitive damages be awarded for all willful, wanton, and malicious actions taken by Antonucci; and

7.     That Eclipse be granted such other relief as the Court may deem just and proper.


Dated:  <u>January 10, 2017</u>         PATTISHALL, McAULIFFE, NEWBURY,
                           HILLIARD & GERALDSON LLP


               By: <u>/s/ Phillip Barengolts</u>
                   Phillip Barengolts
                   Ashly I. Boesche
                   Kristine A. Bergman
                   200 South Wacker Drive
                   Suite 2900
                   Chicago, Illinois 60606
                   (312) 554-8000

               Attorneys for Plaintiff, Eclipse Gaming Systems, LLC