**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ECLIPSE GAMING SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:17–CV–00196 |
| | ) | |
| v. | ) | Hon. Virginia M. Kendall, Presiding |
| | ) | |
| ANTHONY ANTONUCCI, | ) | Mag. Judge Sidney I. Schenkier |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ANTHONY ANTONUCCI, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ECLIPSE GAMING SYSTEMS, LLC, | ) | |
| GREG DREW, DAVID LAWRENCE, and | ) | |
| BORIS AMEGADJIE, | ) | |
| | ) | |
| Counter-Defendants. | ) | |

**COUNTER-DEFENDANTS' ANSWER TO
ANTHONY ANTONUCCI'S COUNTERCLAIMS**

Counter-Defendants Eclipse Gaming Systems, LLC ("Eclipse Gaming"), Greg Drew, David Lawrence, and Boris Amegadjie (collectively, the "Eclipse Defendants"), in answer to Counter-Plaintiff Anthony Antonucci's ("Antonucci") counterclaim [Dkt. 25–1], state as follows:

**ANSWERS TO ANTONUCCI'S COUNTERCLAIM ALLEGATIONS**

The Eclipse Defendants, by undersigned attorneys and in accordance with Federal Rule of Civil Procedure 8(b), provide the following answers to the allegations in Antonucci's Counterclaim. The Eclipse Defendants respond in this Answer to the best of their current knowledge and information and consistent with the applicable rules. The Eclipse Defendants'

investigation in this matter continues and they reserve the right to supplement or modify any portion of this Answer, including the affirmative and other defenses.

The Eclipse Defendants' response to the allegations in any paragraph includes a response footnote associated with that paragraph. The Eclipse Defendants deny all allegations, if any, contained in headings. For the avoidance of doubt, the Eclipse Defendants generally deny all allegations except for those specifically admitted herein.

**COUNT ONE**
**MEMBER DERIVATIVE ACTION AGAINST**
**OFFICERS, DIRECTORS, AND MAJORITY OWNERS**
**OF ECLIPSE GAMING SYSTEMS, LLC**

1.     This derivative action is brought on behalf of Eclipse Gaming Systems, LLC ("Eclipse") and Antonucci, individually, pursuant to the Texas Business Organizations Code §101.463(c)(1) and (2), to remedy and to recover damages sustained as a result of breaches of fiduciary duty and corporate waste by members of Eclipse's Board of Directors, majority owners, and senior executives.

> **ANSWER:**  The Eclipse Defendants admit that Antonucci purports to characterize his counterclaim in the manner described in this paragraph but deny that there exists any basis in law or fact for Antonucci to do so.  Except as expressly admitted herein, the allegations of this paragraph are denied.

2.     Counter Plaintiff is a resident of Lake County, Illinois, and at all times relevant herein was an owner and member of Eclipse. At all times relevant herein, Counter Plaintiff has been an owner and member of Eclipse. Antonucci is the beneficial owner of 17.18% of Eclipse.

> **ANSWER:**  The Eclipse Defendants admit that Antonucci is a resident of Lake County, Illinois and that he is currently a member of Eclipse Gaming.  The Eclipse Defendants further admit that Antonucci currently owns a 17.18% interest in Eclipse Gaming—11.10% as an individual and 6.08% through Digital Dynamics Software Inc. ("DIGDYN").  Except as expressly admitted herein, the allegations of this paragraph are denied.

3.     Nominal Defendant, Eclipse, is a limited liability company organized under the laws of the State of Texas with business offices located in Duluth, Georgia 30096. Its current Chief Executive Officer is Boris Amegadjie.  David Lawrence became its manager in July of 2017.  Prior to that Greg Drew was its manager.  Eclipse is in the electronic gaming machine business and generates revenue by placing electronic gaming machines in Casinos and other locations.  Eclipse was formed on or about March 11, 2008, for the purpose of developing and manufacturing games and systems for the gaming industry.

> **ANSWER:**  The Eclipse Defendants admit that, at all times relevant hereto, Eclipse Gaming has been a limited liability company organized under the laws of the State of Texas and that Eclipse Gaming maintained its principal place of business in Lawrenceville, Georgia prior to March 2016.  The Eclipse Defendants further admit that Eclipse Gaming was formed in March 2008 and that Eclipse Gaming is in the business of supplying slot-style games, systems, and middleware to the worldwide gaming industry and also provides gaming services and support.  Except as expressly admitted herein, the allegations of this paragraph are denied.

4.     Defendants, identified below, are officers, majority owners, and/or directors of Eclipse.  At all times relevant hereto, such Defendants held positions with Eclipse as follows:

BORIS AMEGADJIE, Chief Executive Officer

GREG DREW, Manager of Eclipse Gaming Systems, LLC from June, 2015 until July 2017, and one-half owner of Elite Gaming, LLC

DAVID LAWRENCE, Manager from July 2017 forward and one-half owner of Elite Gaming, LLC

(these Defendants are collectively referred to herein as the "Director Defendants").

> **ANSWER:**  The Eclipse Defendants admit that (a) Boris Amegadjie is the Chief Executive Officer of Eclipse Gaming; (b) Greg Drew was the manager of Eclipse Gaming between approximately June 2015 and July 2017; and (c) David Lawrence has been the manager of Eclipse Gaming since July 2017.  The Eclipse Defendants further admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC, and (b) David Lawrence has a beneficial interest

in a trust that maintains a 50% interest in Elite Games LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

5.      This Court has jurisdiction over these Counter Claims pursuant to 28 U.S.C. §1367

in that they are ancillary to the Claims asserted in Plaintiff's Complaint.

> **ANSWER:** The Eclipse Defendants admit that this Court may exercise supplemental jurisdiction over Antonucci's counterclaims. Except as expressly admitted herein, the allegations of this paragraph are denied.

6.      Venue is proper in the United States District Court for the Northern District of

Illinois pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to these

Counterclaims occurred in this district – contracts were entered into in the County of Cook, monies

were due and owing in the County of Cook, and services were performed in the County of Cook –

all of which lies within the Northern District of Illinois.

> **ANSWER:** The Eclipse Defendants admit that, to the extent that this Court exercises supplemental jurisdiction over Antonucci's counterclaims, venue is proper in the U.S. District Court for the Northern District of Illinois under 28 U.S.C. § 1391. Except as expressly admitted herein, the allegations of this paragraph are denied.

7.      Demand on the Eclipse Board of Directors or upon its manager to bring this suit

against individual Defendants herein would be a futile and useless act, in that Defendants

committed the wrongs complained of herein, profited from the wrongs, and would not sue

themselves or cause Eclipse to file suit against themselves. The Director Defendants own, either

individually or beneficially, the controlling interests of Eclipse and the Director Defendants

participated in, were aware of, or approved the unlawful activities complained of and therefore are

not independent and disinterested. The acts that are complained of in the Counter Claims constitute

violations of fiduciary duties owed to Eclipse and its members, and these acts are incapable of

ratification.

**ANSWER:** Denied.

8.     Each of the Director Defendants has acted wrongfully and/or participated in, had knowledge of, intentionally disregarded, and/or benefited from such wrongful conduct in one or more of the following ways:

**ANSWER:** Denied.

A. The Director Defendants caused or permitted revenue which was due and owing to Eclipse from the Speaking Rock Casino account to be diverted or paid to Elite Gaming, LLC ("Elite Gaming"). Elite Gaming is owned one-half by David Lawrence and one-half by Greg Drew. Counter Plaintiff has requested financial information and reports concerning the financial obligations owed by Elite Gaming to Eclipse concerning the Speaking Rock Casino account and Eclipse has refused to produce any such information. Upon information and belief, the Speaking Rock Casino produced profits of $150,000 per week. This profit is generated from the operation of 625 to 650 gaming machines in the Speaking Rock Casino located in El Paso, Texas. Eclipse, by and through its CEO, Boris, has taken the position during calendar year 2017 that Eclipse will have to "live without" the Speaking Rock revenue, including any revenue due and owing from Elite Gaming. Upon information and belief, substantial funds have been diverted from Eclipse to Elite Gaming and for the direct benefit of its two owners, David Lawrence and Greg Drew.

**ANSWER:** The Eclipse Defendants admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC, and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC. The Eclipse Defendants further admit that Antonucci has requested financial information concerning, *inter alia*, Eclipse Gaming and Elite Games LLC. The Eclipse Defendants further admit that, pursuant to the software licensing agreement between Eclipse Gaming and Elite Games LLC, Eclipse Gaming earns licensing fees calculated based on a percentage of the Net Hold—*i.e.*, the gross revenue generated by play of any electronic gaming machines operated by the

software less winners paid.  The Eclipse Defendants further admit that the Net Hold and number of gaming machines are not fixed, but vary from time to time.  Except as expressly admitted herein, the allegations of this paragraph are denied.

    B.  The Director Defendants caused or permitted revenue which was due and owing to Eclipse from the Speaking Rock Casino account to be diverted or paid to Accelerated Marketing Solutions, LLC ("AMS").  AMS is owned one-half by David Lawrence and one-half by Greg Drew.  Counter Plaintiff has requested financial information and reports concerning the financial obligations owed by AMS to Eclipse for the Speaking Rock Casino account and Eclipse has refused to produce any such information. Upon information and belief, the Speaking Rock Casino produced profits of $150,000 per week. This profit is generated from the operation of 625 to 650 gaming machines in the speaking rock casino located in El Paso, Texas. Eclipse, by and through its CEO, Boris, has taken the position during calendar year 2017 that Eclipse will have to live without the Speaking Rock revenue, including any revenue due and owing from AMS. Upon information and belief, substantial funds have been diverted from Eclipse to AMS and for the direct benefit of its two owners, David Lawrence and Greg Drew.

**ANSWER:**  The Eclipse Defendants admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Accelerated Marketing Solutions, LLC ("AMS"), and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in AMS.  The Eclipse Defendants further admit that Antonucci has requested financial information concerning, *inter alia*, AMS.  The Eclipse Defendants further admit that, pursuant to a software licensing agreement between Eclipse Gaming and AMS, for a period of time, Eclipse Gaming earned licensing fees that were calculated based on a percentage of the Net Hold—*i.e.*, the gross revenue generated by play of any electronic gaming machines operated by the software less winners paid.  The Eclipse Defendants further admit that the Net Hold and number of gaming machines was not fixed, but instead varied from time to time.  The Eclipse Defendants further admit that Eclipse Gaming and AMS ceased conducting business following the federal court decision in the *State of Texas v. Ysleta Del Sur Pueblo* case.  Except as expressly admitted herein, the allegations of this paragraph are denied.

C.    Eclipse has paid excessive and unnecessary expenses to provide Boris, Greg, and David with personal gifts including season tickets to professional sporting events, expensive golf outings, and personal watches and jewelry.

**ANSWER:** Denied.

D. At all times prior to June of 2015, AMS and Elite Gaming were distributors of Eclipse gaming machines and paid 9.5% of the gross revenue received from various casino accounts, including a cash paying casino account in Alabama, for the use of Eclipse games. From and after the removal of Saltiel, Lozano, and Antonucci as employees, Eclipse has failed and refused to provide financial information to Antonucci, including information concerning cash payments received from various casino accounts. Upon information and belief, David Lawrence personally picks up cash payments from one of the Alabama Casino accounts and in a weekly amount of approximately $25,000 - $30,000. Upon information and belief, Eclipse has not received its agreed upon fees for the use of Eclipse gaming machines in the Alabama casinos and Eclipse has refused to provide accounting or other financial information to allow Antonucci to verify that Eclipse is receiving proper revenue from AMS and Elite Gaming sites. On information and belief funds due and owing to Eclipse from these weekly cash payments are not being paid to Eclipse and have not been reported by David Lawrence or the Director Defendants to the members of Eclipse. Annually, these payments are equal to the sum of $1.2 to $1.44 million and Eclipse is entitled to between $114,000 and $136,8000 as and for its 9.5% fee on gross casino revenue earned on Eclipse gaming machines.

**ANSWER:** The Eclipse Defendants admit that Eclipse Gaming has earned licensing fees pursuant to its software licensing agreements with Elite Games LLC or AMS which was calculated pursuant to a percentage of the Net Hold—*i.e.*, the gross revenue generated by play of any electronic gaming machines operated by the software less winners paid. The Eclipse Defendants further admit that the Net Hold and number of gaming machines in any of the casinos was not fixed, but instead varied from time to time. Except as expressly admitted herein, the allegations of this paragraph are denied.

E.     Elite Gaming, LLC is maintaining its gaming machines and servers using the personnel and employees of Eclipse without payment to Eclipse.

**ANSWER:** Denied.

F.     Accelerated Marketing Solutions, LLC is maintaining its gaming machines and servers using the personnel and employees of Eclipse without payment to Eclipse.

**ANSWER:** Denied.

G.     Both Greg Drew and David Lawrence received salaries in the amount of $100,000 per year from Eclipse without performing any employment duties or responsibilities and without having any day-to-day work responsibilities to Eclipse. The other members are not similarly compensated.

**ANSWER:** The Eclipse Defendants admit that Greg Drew and David Lawrence have received salaries of $100,000 per year from Eclipse Gaming. Except as expressly admitted herein, the allegations of this paragraph are denied.

H.     Eclipse maintains excessively large and extravagant offices, including offices in the Chicago area which are nearly vacant, for the sole purpose of increasing expenses in order to avoid paying any profits to its minority members, including Antonucci.

**ANSWER:** Denied.

I.     The Director Defendants, and each of them, have otherwise breached their fiduciary duties to Eclipse by act or omission and have otherwise secured personal financial benefit at the expense of Eclipse and its minority members, including Antonucci.

**ANSWER:** Denied.

9.     Eclipse has suffered financial loss, including the loss of revenue, the loss of the use of its employees, and has incurred unnecessary and unreasonable expenses to pay the personal expenses of the Director Defendants, as a direct result of the acts and omissions of Greg Drew, David Lawrence, and/or Boris Amegadjie.

**ANSWER:** Denied.

10.     The Director Defendants are majority owners and/or executives of Eclipse and are fiduciaries of Eclipse and of all of its members and owe each of them the duty to conduct the business of Eclipse loyally, faithfully, carefully, diligently, and prudently.

> **ANSWER:** The Eclipse Defendants admit that, as its CEO, Boris Amegadjie owes certain fiduciary duties to Eclipse Gaming. The Eclipse Defendants further admit that Greg Drew owed certain fiduciary duties to Eclipse Gaming during the time when he was its Manager. The Eclipse Defendants further admit that, as its Manager, David Lawrence owes certain fiduciary duties to Eclipse Gaming. The Eclipse Defendants further admit that those fiduciary duties are circumscribed by contract and/or law. Except as expressly admitted herein, the allegations of this paragraph are denied.

11.     The Director Defendants became aware, or should have become aware through reasonable inquiry and diligence, of the adverse facts alleged herein, but did nothing to correct them and thereby breached their duty of care, loyalty, accountability, and disclosure to the members of Eclipse by failing to act as an ordinary prudent person would have acted in a like position.

**ANSWER:** Denied.

12.     The Director Defendants have been responsible for the gross and/or intentional mismanagement of Eclipse in connection with its management of customer accounts and its receipt and accounting of payments, including cash payments, and in other matters entrusted to their responsibility.     Said Counter Defendants abdicated their corporate responsibilities by mismanaging Eclipse in at least the following ways:

**ANSWER:** Denied.

A. They diverted customers and revenue to Elite Gaming;

**ANSWER:** Denied.

B. They diverted customers and revenue to AMS;

**ANSWER:** Denied.

C. They failed to institute adequate cash control measures;

**ANSWER:** Denied.

D. They failed to protect customer payments or to institute strict accounting and reporting measures concerning cash payments by customers. Instead, cash payments were gathered into large plastic garbage bags and stored in closets or other rooms;

**ANSWER:** Denied.

E. They concealed from Eclipse and its minority members the truth regarding Eclipse's sales and revenue and failed to institute adequate internal controls to prevent the loss of revenue and to prevent the Director Defendants from taking company funds and company opportunities.

**ANSWER:** Denied.

F. They intentionally caused Eclipse's revenue to fall and expenses to rise all to the financial detriment of Antonucci and other minority members by leasing unnecessary office space, paying personal expenses of majority owners, and transferring corporate opportunities and revenue to other business entities.

**ANSWER:** Denied.

G. Greg, David, and Boris were otherwise responsible for the gross and/or intentional mismanagement of Eclipse.

**ANSWER:** Denied.

13.     As a result of the wrongful conduct and wrongful actions of the Director Defendants, Eclipse has suffered and will continue to suffer considerable damage.

**ANSWER:** Denied.

14.     The Director Defendants, singly and in concert, engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of their fiduciary duties to Eclipse and conspired to, and did, abuse the control vested in them by virtue of their high-level positions in Eclipse.

**ANSWER:** Denied.

15.     By reason of the foregoing, the Director Defendants have breached their fiduciary obligations to Eclipse and its members.

**ANSWER:** Denied.

16.     Eclipse and its members have been injured by reason of the Director Defendants' intentional breach and/or reckless disregard of their fiduciary duties to Eclipse. Plaintiff, as a member and representative of Eclipse, seeks damages and other relief for monetary damages and in such amounts as are demonstrated by the proofs offered at the time of trial.

**ANSWER:** The Eclipse Defendants admit that Antonucci purports to seek "damages and other relief for monetary damages and in such amounts as are demonstrated by the proofs offered at the time of trial," but deny that there is any basis in fact or law for any such relief. Except as expressly admitted herein, the allegations of this paragraph are denied.

17.     At all times relevant herein, the Texas Business Organizations Code provided in relevant part, at 3(c)(1) and (2) as follows:

"CLOSELY HELD LIMITED LIABILITY COMPANY. (a) In this section, "closely held limited liability company" means a limited liability company that has:
(1) fewer than 35 members; and
(2) no membership interests listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association.
(b) Sections 101.452-101.459 do not apply to a closely held limited liability company.
(c) If justice requires:
(1) a derivative proceeding brought by a member of a closely held limited liability company may be treated by a court as a direct action brought by the member for the member's own benefit; and
(2) a recovery in a direct or derivative proceeding by a member may be paid directly to the plaintiff or to the limited liability company if necessary to protect the interests of creditors or other members of the limited liability company."

**ANSWER:** The Eclipse Defendants admit that Section 101.463 of the Texas Business Organizations Code, effective September 1, 2007, includes the language quoted in this paragraph. Except as expressly admitted herein, the allegations of this paragraph are denied.

WHEREFORE, Counter Plaintiff, Anthony Antonucci, individually and derivatively for the benefit of Eclipse Gaming Systems, LLC, prays that this Honorable Court enter judgment in their favor and against the Counter Defendants, Greg Drew, David Lawrence, and Boris Amegadjie, jointly and severally, as follows:

A.     Against each Counter Defendant for restitution and/or damages in favor of Counter Plaintiff and awarding punitive and exemplary damages as appropriate, plus prejudgment interest.

B.     Extraordinary equitable and/or injunctive relief as permitted by law and equity, so as to assure that Counter Plaintiff and Eclipse Gaming Systems, LLC have an effective remedy.

C.  For judgment against Greg Drew, David Lawrence, and Boris Amegadjie for the return or disgorgement of their salary or other compensation paid from Eclipse during the times in which they breached their fiduciary duties to Eclipse Gaming Systems, LLC.

D.  Awarding Counter Plaintiff, Anthony Antonucci, the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

E. Awarding such other relief as the Court may deem just and proper.

> **ANSWER:** The Eclipse Defendants deny that Antonucci is entitled to any of the relief he seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

## COUNT TWO - RESCISSION
## MLA IS UNENFORCEABLE
## FAILURE OF CONDITION PRECEDENT

1.  Digital Dynamics Software, Inc. ("DIGDYN") filed a civil action in the Circuit Court of Cook County, Chancery Division, known as case number 2016 CH 08122. In that declaratory judgment action, Digital Dynamics Software, Inc., seeks a declaration for rescission and reformation finding that the certain document dated March 14, 2015 and commonly known as the Master Licensing Agreement ("MLA") is void and unenforceable.

**ANSWER:** Admitted.

2.  Plaintiff's Complaint in these proceedings again alleges in paragraphs 22 through 30 that Eclipse is entitled to enforce the MLA. It is Counter Plaintiff's position that the MLA is void and unenforceable and that the MLA is and should be declared void and unenforceable. Counter Plaintiff claims that the MLA is void and unenforceable because the parties understood and agreed that the MLA could only be used if, and only if, Ainsworth Game Technology, Inc., an Australian company ("Ainsworth"), purchased 100% of Eclipse Gaming Systems, LLC. The

parties understood and agreed that if the acquisition was not consummated that the MLA was void and unenforceable.

> **ANSWER:** The Eclipse Defendants admit that Eclipse Gaming's Complaint [Dkt. 1] contains various allegations that refer to the Master License Agreement dated March 14, 2015. The Eclipse Defendants further admit that it is Antonucci's position is that the MLA is void and unenforceable and that the MLA is and should be declared void and unenforceable. The Eclipse Defendants further admit that Antonucci contends that the MLA is void and unenforceable because the parties understood and agreed that the MLA could only be used if, and only if, Ainsworth Game Technology, Inc., an Australian company ("Ainsworth"), purchased 100% of Eclipse Gaming Systems, LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

3.      At all times relevant hereto, DIGDYN has been an Illinois corporation having a principal place of business in Schaumburg, Cook County, Illinois.

> **ANSWER:** On information and belief, the Eclipse Defendants admit that DIGDYN is an Illinois corporation having a principal place of business in Lake Zurich, Lake County, Illinois. Except as expressly admitted herein, the allegations of this paragraph are denied.

4.      At all times relevant hereto, DIGDYN has been in the business of providing a variety of solutions for casino gaming communications, including SAS and GAP protocols. DIGDYN specializes in providing custom software development and implementation of gaming industry communications protocols.

> **ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph but admit that some of DIGDYN's business involved providing casino gaming communications solutions and custom software development and implementation of gaming industry communications protocols. Except as expressly admitted herein, the allegations of this paragraph are denied.

5.      DIGDYN is owned by Anthony Antonucci ("Antonucci"). Antonucci owns 2% of DIGDYN personally and is the beneficial owner of the other 98% through his interest in the Orion Trust.

**ANSWER:** The Eclipse Defendants admit that Antonucci owns DIGDYN but lack knowledge or information sufficient to form a belief about the veracity of the remaining allegations in this paragraph. Except as expressly admitted herein, the allegations of this paragraph are denied.

6.　　　At all times relevant hereto, Eclipse has been a Limited Liability Company organized under the laws of the State of Texas. Eclipse previously maintained its principal place of business in Lawrenceville, Georgia and now maintains that office in Duluth, Georgia.

**ANSWER:** The Eclipse Defendants admit that, at all times relevant hereto, Eclipse Gaming has been a limited liability company organized under the laws of the State of Texas and that Eclipse Gaming maintained its principal place of business in Lawrenceville, Georgia prior to March 2016. Except as expressly admitted herein, the allegations of this paragraph are denied.

7.　　　Eclipse designs, manufactures and markets slot machine games and slot machine management systems.

**ANSWER:** The Eclipse Defendants admit that Eclipse Gaming is in the business of supplying slot-style games, systems, and middleware to the worldwide gaming industry and also provides gaming services and support. Except as expressly admitted herein, the allegations of this paragraph are denied.

8.　　　Antonucci is also an owner of Eclipse in that he owns (individually or through other entities) a 17.18% Membership Interest in Eclipse.

**ANSWER:** The Eclipse Defendants admit that Antonucci currently owns a 17.18% interest in Eclipse Gaming—11.10% as an individual and 6.08% through Digital Dynamics Software Inc. Except as expressly admitted herein, the allegations of this paragraph are denied.

9.　　　While working at DIGDYN, Antonucci developed source code and software systems for DIGDYN. Between 2003 and 2006, DlGDYN developed two (2) gaming software systems commonly referred to as the SAS Engine and the SAS Gateway. During calendar year 2003 Antonucci developed source code for what is known as the SAS Engine software application and during calendar year 2006 he developed the source code for the SAS Gateway software

application (collectively the "Source Code"). Digital Dynamics Software, Inc. has always been the sole and exclusive owner of the Intellectual Property rights including the Source Code for these software systems.

> **ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph. Accordingly, the allegations in this paragraph are denied.

10. At all times relevant hereto, Antonucci has been the sole owner and President of DIGDYN. Antonucci was the sole designer of the SAS Engine and the SAS Gateway and the sole drafter of the Source Code and all other documentation pertaining to the SAS Engine and the SAS Gateway (including all manuals, user documentation and other related materials pertaining to that software).

> **ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph. Accordingly, the allegations in this paragraph are denied.

11. It is DIGDYN's business model to charge users of the SAS Engine an upfront fee of $35,000 and a one-time fee of $150.00 per machine.

> **ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph. Accordingly, the allegations in this paragraph are denied.

12. In 2008, Antonucci became one of the founding members of Eclipse Gaming Systems, LLC. At that time, he also became the Vice President of Systems – a title that was later revised to Chief Technical Officer of Eclipse. In 2008, DIGDYN verbally granted to Eclipse a license to use the SAS Engine and SAS Gateway software applications. In 2008, DlGDYN allowed Eclipse to use the SAS Engine and SAS Gateway products in their gaming systems. After a trial use, Eclipse ceased using the SAS Gateway application. However, Eclipse has been using the SAS

Engine since 2008. The verbal licensing agreement between DIGDYN and Eclipse did not provide Eclipse with any access or other rights in or to the Source Code for either the SAS Engine or SAS Gateway applications. At no time has Plaintiff provided Eclipse or any of Plaintiff's approximately 30 other licensees with copies of the Source Code for the SAS Engine or the SAS Gateway software applications. Plaintiff's Source Code is valuable, confidential and proprietary.

> **ANSWER:** The Eclipse Defendants admit that in 2008, Antonucci became one of the founding members of Eclipse Gaming Systems, LLC and that at that time, he also became the Vice President of Systems – a title that was later revised to Chief Technical Officer of Eclipse. The Eclipse Defendants further admit that it has used the SAS Engine software in its gaming machines and systems since 2008 and no longer uses the SAS Gateway software. The Eclipse Defendants further admit that DIGDYN has not provided Eclipse Gaming with copies of the source code for the SAS Engine or SAS Gateway software applications. The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of whether DIGDYN provided source code to other licensees, and accordingly deny these allegations. Except as expressly admitted herein, the allegations of this paragraph are denied.

13. It is Antonucci's custom and practice to charge a licensing fee for his software. The fee includes a base cost of $35,000 plus a fee of $150 for each machine using the SAS Engine software ("Standard Licensing Fees"). Upon information and belief, Eclipse operates 1000 machines with the SAS Engine. In addition, Eclipse has provided the SAS Engine to machines owned or operated by Elite Gaming, LLC, a business entity owned in whole or in part by the majority owners of Eclipse – Greg Drew and/or his father, Robert Drew. Elite Gaming, LLC owns or operates 650 machines in El Paso, Texas and it owns or operates 230 or more gaming machines in Alabama all using the SAS Engine software. Upon information and belief, Eclipse has provided the SAS Engine to additional machines. Eclipse has failed or refused to account for the number of machines using the SAS Engine and it has failed to pay licensing fees due and owing to DIGDYN.

> **ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of Antonucci's custom and practice for licensing fees for his software. Accordingly, those allegations are denied. The Eclipse

Defendants admit that Elite Games, LLC owns gaming machines (which do not use the SAS Engine software) that Elite Games, LLC leases to customers in El Paso, Texas and in Alabama, but the number of gaming machines is not fixed and instead varies from time to time. Except as expressly admitted herein, the allegations of this paragraph are denied.

14.     As recently as January 15, 2015, Eclipse acknowledged that it had no ownership interest in the SAS Engine or the SAS Gateway inventions as those were DIGDYN's property from a time prior to the relationship between Eclipse and DIGDYN.

**ANSWER:** The Eclipse Defendants admit that Eclipse Gaming does not own the SAS Engine or SAS Gateway software. The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of whether SAS Engine or the SAS Gateway were DIGDYN's property from a time prior to the relationship between Eclipse Gaming and DIGDYN, and accordingly, that allegation is denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

15.     In the first quarter of 2015, Eclipse became involved in negotiations with Ainsworth Game Technology, Inc., commonly known as Ainsworth North America ("Ainsworth") concerning its acquisition of the ownership rights to Eclipse. In 2015, Antonucci was approached by Jack Saltiel, the manager of Eclipse, and other principals from Eclipse and told that there was a potential buyer who was considering acquiring Eclipse Gaming Systems. It was explained to him that the buyer would only consider the acquisition of Eclipse Gaming Systems if it had access to the source code for the software applications being used in many of the systems supported by Eclipse, including the Source Code developed and owned by DIGDYN.

**ANSWER:** The Eclipse Defendants deny that Eclipse Gaming became involved in negotiations with Ainsworth. The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of the remaining allegations in this paragraph, and accordingly, those allegation is denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

16.     As explained to Antonucci and DIGDYN, Ainsworth was proposing to pay approximately $30 million to acquire 100% of Eclipse Gaming Systems, LLC.

**ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph. Accordingly, the allegations in this paragraph are denied.

17.  Eclipse explained to Antonucci that the only way that Ainsworth would consider the acquisition of Eclipse was if DIGDYN agreed to enter into a written Master License Agreement for the SAS Engine and SAS Gateway, including Source Code.

**ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph. Accordingly, the allegations in this paragraph are denied.

18.  Eclipse and DIGDYN prepared a written Master License Agreement ("MLA") and orally agreed that the document would only and solely be used if Eclipse consummated a sale of its business to Ainsworth. The parties understood and agreed that the MLA would be void and unenforceable if Ainsworth did not acquire 100% of Eclipse and on terms acceptable to Antonucci. To facilitate the potential sale of Eclipse, the MLA was executed in March of 2015. Counter Plaintiff offered to provide a signed MLA for use solely with the Ainsworth acquisition and on the condition that the MLA would be void if the Ainsworth acquisition was not consummated. All parties understood and agreed that the MLA would only become effective if, and only if, Ainsworth purchased 100% of Eclipse. The discussions and agreements reached relating to the MLA were between Jack Saltiel as the manager of Eclipse and Tony Antonucci on behalf of DIGDYN and himself.

**ANSWER:** The Eclipse Defendants admit that the MLA was prepared. Except as expressly admitted herein, the allegations of this paragraph are denied.

19.  If the transaction with Ainsworth would have come to fruition, Antonucci/DlGDYN would have received roughly $6 million based on their 17.18% membership interest in Eclipse. That is the only reason that Antonucci/DIGDYN entered into the MLA.

- 19 -

**ANSWER:** Denied.

20.     The transaction with Ainsworth never came to fruition.

**ANSWER:** The Eclipse Defendants admit that Ainsworth did not purchase Eclipse Gaming.  Except as expressly admitted herein, the allegations of this paragraph are denied.

21.     Sometime in September of 2015, Eclipse rejected the purchase terms offered by Ainsworth and the acquisition discussions were terminated. Subsequently and as previously agreed by Eclipse and DIGDYN, Counter Plaintiff and Counter Defendant, Eclipse, simply disregarded the MLA.  Neither party took any action set forth in the MLA and Eclipse did not make any of the payments required under the MLA. From that point forward, both DIGDYN and Eclipse ignored the MLA as it was understood that such would only be effective if there was a sale of Eclipse.

**ANSWER:**  Defendants admit that the purchase discussions with Ainsworth terminated in September of 2015. Except as expressly admitted herein, the allegations of this paragraph are denied.

22.     After the sale of Eclipse to Ainsworth failed, Eclipse removed Jack Saltiel as its manager, fired its management team, and installed Greg Drew as the new manager of Eclipse ("New Manager").  The decision to install Greg Drew as the New Manager was made by Greg Drew and his father as the majority owners of Eclipse. Since and following the execution of the MLA, Eclipse never made a single payment that was set forth in the MLA as both Eclipse and DIGDYN understood that the only reason and purpose for the Agreement was to induce Ainsworth to purchase 100% of Eclipse.

**ANSWER:** The Eclipse Defendants admit Eclipse Gaming removed Jack Saltiel as its manager sometime in 2015 and that the decision to hire Greg Drew as manager was made by vote by the majority ownership of Eclipse Gaming in accordance with its operating agreement.  Except as expressly admitted herein, the allegations of this paragraph are denied.

23.     In 2016, Antonucci proposed that Eclipse buy out his membership interest in the Limited Liability Company and that Eclipse and DIGDYN enter into a formal master licensing agreement so that Eclipse could continue to use the SAS Engine and SAS Gateway software applications in its gaming systems. In May of 2016, Antonucci forwarded to Eclipse a proposal that Eclipse buyout his 17.18% membership interest.

> **ANSWER:**   The Eclipse Defendants admit in May 2016 Antonucci sent a counterproposal to other members of Eclipse Gaming to buy out his 17.18% interest.  Except as expressly admitted herein, the allegations of this paragraph are denied.

24.     In response thereto, on May 26, 2016, Antonucci received from Eclipse's CEO, Boris Amegadjie, an e-mail questioning when DIGDYN would be transferring to Eclipse the source code for the SAS Engine and the SAS Gateway as referenced in the MLA. Prior to this email, the Parties acted as if and otherwise treated the MLA as a void and unenforceable document and took no action in reliance upon the MLA. It was only after Antonucci proposed that his interest in Eclipse be bought out and that a formal master license agreement be entered into between DIGDYN and Eclipse that the CEO, Boris Amegadjie took the position that Eclipse was already entitled to receive the Source Code for the SAS Engine and SAS Gateway applications based on the 2015 MLA. DIGDYN has advised Eclipse that it is not entitled to the Source Code and Eclipse has terminated Antonucci's employment with Eclipse.

> **ANSWER:**   The Eclipse Defendants admit that on May 26, 2016, Antonucci received from Eclipse Gaming's CEO, Boris Amegadjie, an e-mail questioning when DIGDYN would be transferring to EGS the source code for the SAS Engine and the SAS Gateway as referenced in the MLA.  Except as expressly admitted herein, the allegations of this paragraph are denied.

25.     On information and belief, Eclipse has adopted the position that the MLA is in full force and effect because:

     A.     Antonucci seeks to have his Membership Interest in Eclipse bought back by the Company and Eclipse is attempting to gain leverage over Antonucci in that scenario;

     B.     Antonucci has asked for access to the financial books and records of Eclipse - which is his right as an owner. These requests have been denied;

     C.     Antonucci has sought to review the contracts currently in place between Eclipse and its customers to determine the profitability associated with each of the Contracts as he is being told that the Company is making very little, if any, profit on many of its transactions.  Again, this request has been denied; and

     D.     Antonucci has questioned the expenditure of Eclipse funds on expenses designed to benefit the other owners/employees personally rather than the Company.

     E.     Eclipse owes substantial licensing fees for its use of the SAS Engine software. It has failed and refused to pay fees owing to DIGDYN for machines used by Eclipse or for machines used by Elite Gaming, LLC which Eclipse has provided with the SAS Engine software. Eclipse has further failed to identify or account for the total number of machines using the SAS Engine software.

     F. Eclipse desires to obtain the valuable Source Code for free and without lawful basis.

**ANSWER:**  The Eclipse Defendants admit that (a) Antonucci seeks to have his Membership Interest in Eclipse Gaming bought back; (b) Antonucci has asked for access to the financial books and records of Eclipse Gaming; (c) Antonucci has sought to review the contracts currently in place between Eclipse Gaming and its customers; and (d) Antonucci has questioned various Eclipse Gaming expenditures. Except as expressly admitted herein, the allegations of this paragraph (including its subparagraphs) are denied.

26.     It is the source code that holds the actual value for any software application.

**ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph. Accordingly, the allegations in this paragraph are denied.

27.     Digital Dynamics has licensed the SAS Engine and SAS Gateway software applications to approximately thirty (30) other clients and not one of those other clients has been given or granted access to the Source Code.

**ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of all of the allegations in this paragraph. Accordingly, the allegations in this paragraph are denied.

28.     DIGDYN and Eclipse, through its manager, Jack Saltiel, reached an agreement that Antonucci on behalf of DIGDYN would execute the MLA, on or about March 14, 2015, and that Eclipse would hold said agreement only for use if the proposed sale of Eclipse to Ainsworth closed and on terms acceptable to Antonucci and DIGDYN. The nature of Plaintiff's offer was to provide the MLA solely for the purpose of consummating the proposed sale of Eclipse to Ainsworth. At no time did Plaintiff offer to provide the MLA to Eclipse for its use outside of the sale transaction to Ainsworth. The parties understood and agreed that if the sale to Ainsworth was not consummated that the MLA would be of no force or effect and would not thereafter be legally binding upon DIGDYN. The understanding and agreement reached by DIGDYN and Eclipse, through its manager, Jack Saltiel, created a condition precedent to the formation of a contract with respect to the MLA. The condition precedent was the successful consummation of the sale of Eclipse to Ainsworth on terms acceptable to DIGDYN and Antonucci.

**ANSWER:** Denied.

29.     Based upon the agreement between DIGDYN and Eclipse, Antonucci executed the MLA and entrusted it to the possession of Eclipse to be used only if the sale to Ainsworth was successfully closed.

**ANSWER:** Denied.

30.     Based upon the mutual understanding and agreement of the parties, the MLA is not a legally binding contract because the sale to Ainsworth was not consummated. As such, Plaintiff seeks a finding and order from this Honorable Court that the written MLA is void and unenforceable because the sale by Eclipse to Ainsworth was terminated. The mutual understanding of the Parties, as expressed in their oral agreement, was that the written MLA is void and unenforceable unless and until the sale between Eclipse and Ainsworth was consummated.

**ANSWER:** Denied.

31.     The MLA was never delivered to Eclipse for its own use. Rather, the MLA was tendered to Eclipse to be held solely for use if the sale to Ainsworth was successfully closed and Ainsworth paid significant sums of money to or for the benefit of DIGDYN and Antonucci. That eventuality did not occur. DIGDYN did not agree to provide the MLA for use by Eclipse except if the Ainsworth sale concluded and Eclipse was not authorized by DIGDYN to deliver the MLA to Eclipse for its own use. As such, the MLA is not a legally binding contract.

**ANSWER:** Denied.

32.     Eclipse has made demand upon DIGDYN for access to and use of the Source Code. Upon information and belief, Eclipse claims it is entitled to the Source Code based upon the terms and conditions of the MLA. DIGDYN denies that Eclipse has any lawful right, title or interest in or to the Source Code.

33.     At all times relevant herein, the MLA was tendered to Eclipse to be held for use in the sale of Eclipse to Ainsworth and for no other purpose. Eclipse was not authorized by DIGDYN to deliver the MLA to Eclipse for its own use or benefit unless and until the sale of Eclipse to Ainsworth was concluded. As such, the MLA is not legally binding upon DIGDYN even though Eclipse is in possession of the physical document.

> **ANSWER:** The Eclipse Defendants admit that Eclipse Gaming previously made a demand on DIGDYN for access to and use of the source code, that it is entitled to the source code based on the MLA, and that DIGDYN believes Eclipse Gaming does not have a lawful right, title, or interest in the source code, but Eclipse Gaming asserts that it no longer has any interest in the SAS Engine or SAS Gateway software, including access to the source code for these software applications. Except as expressly admitted herein, the allegations of this paragraph are denied.

34.     The expressed condition precedent did not occur because Eclipse was not sold to Ainsworth.

> **ANSWER:** Denied.

35.     Because a condition precedent to contract formation has not occurred and will not occur, the MLA is void and unenforceable.

> **ANSWER:** Denied.

36.     Because the MLA is not enforceable and is not legally binding upon DIGDYN or Antonucci and because the sale of Eclipse to Ainsworth is no longer possible, the MLA should be rescinded in its entirety. Restoring the parties to the pre-MLA status quo will not cause any damage to Defendant because Eclipse does not have a right to use the SAS Engine for free and they will be allowed and permitted to use the SAS Engine software upon payment of the licensing fees due and owing.

> **ANSWER:** The Eclipse Defendants deny the allegations in this paragraph but assert that Eclipse Gaming no longer has any interest in the SAS Engine or SAS

Gateway software, including access to the source code for these software applications.

WHEREFORE, Counter Plaintiff, Anthony Antonucci, an individual, prays for entry of judgment in his favor and against the Counter Defendant, Eclipse Gaming Systems, LLC, as follows:

A. Entry of an order rescinding the ''Master Licensing Agreement" between Digital Dynamics Software, Inc. and Eclipse Gaming Systems, LLC dated March 14, 2015 and an order enforcing the oral agreement between Digital Dynamics Software, Inc, Anthony Antonucci, and Eclipse Gaming Systems, LLC, that the MLA was void and unenforceable unless Ainsworth acquired 100% ownership of Eclipse;

B. Entering an award of attorneys' fees and costs in favor of Counter Plaintiff and against Counter Defendant, Eclipse Gaming Systems, LLC; and

C. Awarding any other relief necessary to support this declaratory judgment and deemed further just and appropriate.

**ANSWER:** The Eclipse Defendants deny that Antonucci is entitled to any of the relief he seeks. Except as expressly admitted herein, the allegations of this paragraph are denied.

## COUNT THREE
## BREACH OF EMPLOYMENT AGREEMENT
## WRONGFUL DISCHARGE

1.      Counter Plaintiff is a resident of Cook County, Illinois, and at all times relevant herein was an owner and member of Eclipse. Antonucci is the beneficial owner of 17.18% of Eclipse.

**ANSWER:** The Eclipse Defendants lack knowledge or information sufficient to form a belief about the veracity of Antonucci's allegation that he is a resident of Cook County, Illinois. The Eclipse Defendants admit that Antonucci currently owns a 17.18% interest in Eclipse Gaming—11.10% as an individual and 6.08%

through Digital Dynamics Software Inc. Except as expressly admitted herein, the allegations of this paragraph are denied.

2.     Counter Defendant, Eclipse, is a limited liability company organized under the laws of the State of Texas with business offices located in Duluth, Georgia 30096. Its current Chief Executive Officer is Boris Amegadjie. David Lawrence became its manager in July of 2017. Prior to that Greg Drew was its manager. Eclipse is in the electronic gaming machine business and generates revenue by placing electronic gaming machines in Casinos and other locations.

> **ANSWER:** The Eclipse Defendants admit that, at all times relevant hereto, Eclipse Gaming has been a limited liability company organized under the laws of the State of Texas and that Eclipse Gaming maintained its principal place of business in Lawrenceville, Georgia prior to March 2016. The Eclipse Defendants further admit that its current Chief Executive Officer is Boris Amegadjie, that David Lawrence became its manager in July of 2017, and from approximately June 2015 to July 2017, Greg Drew was its manager. The Eclipse Defendants further admit that Eclipse Gaming is in the business of supplying slot-style games, systems, and middleware to the worldwide gaming industry and also provides gaming services and support. Except as expressly admitted herein, the allegations of this paragraph are denied.

3.     In 2008, Antonucci became one of the founding members of Eclipse Gaming Systems, LLC and began working for Eclipse on, or about, the date of March 31, 2008. Antonucci was initially the Vice President of Systems – a title that was later revised to Chief Technical Officer of Eclipse. Subsequently, on, or about, the date of January 15, 2015, Antonucci and Eclipse entered into a written Employment Agreement ("Employment Agreement"). A true and accurate copy of the Employment Agreement is attached hereto as Exhibit A and incorporated herein by reference.

> **ANSWER:** The Eclipse Defendants admit that in 2008, Antonucci became one of the founding members of Eclipse Gaming and that at that time, he also became the Vice President of Systems – a title that was later revised to Chief Technical Officer of Eclipse. The Eclipse Defendants also admit that Antonucci and Eclipse entered into a written Employment Agreement ("Employment Agreement") dated January 15, 2015. The Eclipse Defendants further admit that a true and accurate copy of

the Employment Agreement appears to be attached as Exhibit A to Antonucci's Counterclaim. Except as expressly admitted herein, the allegations of this paragraph are denied.

4. When the Employment Agreement was executed and entered into, Jack Saltiel was the Manager of Eclipse.

**ANSWER:** Admitted.

5. Pursuant to the provisions of paragraph 2.2 of the Employment Agreement, the term of Antonucci's employment under the Employment Agreement was for five years ("Initial Term"), beginning on the effective date of the Employment Agreement.

**ANSWER:** The Eclipse Defendants admit that paragraph 2.2 of the Employment Agreement provides:

> 2.2 Term. Subject to the provisions of Section 6, the term of the Executive's employment under this Agreement will be five years (the "Initial Term"), beginning on the Effective Date and ending on the fifth anniversary of the Effective Date. At the end of the Initial Term, the Employer, with the mutual agreement of the Executive, shall have the option to extend the term for an additional two-year term (the "Second Term"), beginning on the fifth anniversary of the Effective Date and ending on the seventh anniversary of the Effective Date. At the end of the Second Term, the Employer, with the mutual agreement of the Executive, shall have the option to extend the term for an additional two-year term (the "Third Term"), beginning on the seventh anniversary of the Effective Date and ending on the ninth anniversary of the Effective Date.

Except as expressly admitted herein, the allegations of this paragraph are denied.

6. As set forth at page two of the Employment Agreement, Antonucci was eligible for retirement benefits from Eclipse. The Employment Agreement provided, in relevant part, that: "Retirement Eligibility" has the following meaning. An Executive is eligible for retirement and any benefits that may accrue from such retirement if the sum of full years of service and the Executive's age in full years meet or exceed 66, with at least 6 years of service."

**ANSWER:** The Eclipse Defendants admit that "Retirement Eligibility" is defined on page 2 of the Employment Agreement as having the following meaning: "An Executive is eligible for retirement and any benefits that may accrue from such retirement if the sum of full years of service and the Executive's age in full years meet or exceed 66, with at least 6 years of service." Except as expressly admitted herein, the allegations of this paragraph are denied.

7.      Section 3 of the Employment Agreement provided that Antonucci was entitled to

Compensation from Eclipse. The Employment Agreement provided, in pertinent part, as follows:

"3.1 Salary. The Executive will be paid an annual salary of $160,000, subject to adjustment as provided below (the "Salary"), which will be payable in equal periodic installments according to the Employer's customary payroll practices, but no less frequently than monthly. The Salary will be reviewed by the Manager not less frequently than annually, and may be adjusted upward or downward in the sale discretion of the Manager, but in no event will the Salary be less than the initial rate show above. In the absence of any other adjustment the Executive's Salary will increase at a rate of 6%, every year, starting on January 1, 2016.

3.1.1 Higher Salary Adjustment. If the Company meets the objectives set forth in section 3.1.2 then the Executive's Salary will be adjusted as of January 15 as follows:
      (a) 10% if 85-120% of the goal is accomplished;
      (b) 15% if more than 120% of the goal is accomplished.
3.1.2 Performance Goal. The Performance Goal will be to increase EBITDA and Net Earnings by 20% over the previous year.

3.2 Benefits. The Executive will, during the Employment Period, be permitted to participate in such pension, profit sharing, bonus, life insurance, hospitalization, major medical, disability, and other employee benefit plans of the Employer that may be in effect from time to time to the extent the Executive is eligible under the terms of those plans (collectively, the "Benefits"). In addition at the discretion of The Manager, an allowance for a company paid vehicle may be paid to the employee. The vehicle allowance, once started, may only be ended through termination, not including Change of Ownership or Control as defined in 6.6.

3.3 Bonus. The Executive will be entitled to participate in the Company's Bonus Pool, to be determined by the Manager based on performance goals set for the company on an annual basis. Nominal performance (100%) against the predetermined goals (which have been jointly agreed by the Manager and the Executive) will enable the Executive to earn a bonus equal to 35% of his Salary as of year-end. The Bonus schedule will allow the Bonus to be scaled up or down depending upon performance achieved against the predetermined goals. THESE GOAJLS WILL BE DEFINED BY THE MANAGER NO LATER THAN APRIL 1, of each calendar year."

**ANSWER:** The Eclipse Defendants admit the language block quoted in this paragraph appears in the Employment Agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

8.    The Employment Agreement also contained provisions governing the obligations of Eclipse to Antonucci in the event of a Change in Control, as that term is defined in the Employment Agreement. The Change of Control provisions provide, in relevant part, as follows:

> 6.6 Definition of Change of Ownership or Control. Change of ownership is defined as (i) any aggregate transaction in which the owners/stockholders of Eclipse as of the Effective Date would own, in the aggregate, less than 75% of the total combined voting power of all classes of capital stock of the surviving entity normally entitled to vote for the election of directors/officers/managers of the surviving entity; or
> (ii) the sales by Eclipse of all or substantially all of Eclipse's assets in one or a series of related transactions.
>
> Change of control is defined as any change whereby either the current (as of the Effective Date) Manager, CEO, COO and/or VP Systems Development are no longer with the Company or are in positions lower than their current position or any of their individual responsibilities and/or authority are in any way diminished.

> **ANSWER:** The Eclipse Defendants admit the language block quoted in this paragraph appears in the Employment Agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

9.    The Employment Agreement provides that Antonucci is entitled to compensation upon the occurrence of a Change of Control event. The Employment Agreement provides:

> 6.7 Termination Pay. (f) Change of ownership or control. The Executive will have the option to either (i) receive up to three years compensation as defined by this agreement or compensation for the remainder of this agreement, including all benefits; or (ii) execute a new employment agreement with the Company.

> **ANSWER:** The Eclipse Defendants admit the language block quoted in this paragraph appears in the Employment Agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

10.    Prior to June 12, 2015, Mr. Saltiel was the Manager of Eclipse and Mr. Lozano was the COO. On or about June 12,2015, Greg Drew (the owner of Elite, which holds 40% of the

member interests in Eclipse) and his father Bob Drew (owner of 12.18% of the member interests

in Eclipse) removed Mr. Saltiel as Manager of Eclipse and replaced him with Greg Drew.

> **ANSWER:** The Eclipse Defendants admit that Saltiel was Manager of Eclipse
> Gaming and Lozano was its COO until June 2015. The Eclipse Defendants further
> admit that the decision to hire Greg Drew as manager was made by vote by the
> majority ownership of Eclipse Gaming in accordance with its operating agreement.
> Except as expressly admitted herein, the allegations of this paragraph are denied.

11.    On, or about, September 15, 2015, Greg Drew terminated the employment of Mr.

Saltiel and Mr. Lozano. Mr. Saltiel was the CEO and manager. Mr. Lozano was the COO. The

termination of the CEO, Manager and the COO constitute a Change of Control event as provided

in the Employment Agreement. Despite the occurrence of a Change of Control event, Eclipse failed

to pay Change of Control monies or benefits to Antonucci.

> **ANSWER:** The Eclipse Defendants admit that Saltiel's employment as CEO and
> manager and Lozano's employment as COO was terminated in September 2015.
> Except as expressly admitted herein, the allegations of this paragraph are denied.

12.    Under the Employment Agreement, Antonucci was entitled to receive Retirement

Benefits. The Employment Agreement provided at paragraph 6.7 that:

> (g) Retirement. In the event that the Executive chooses to retire and is eligible as defined
> in Section 1, the Executive will receive the following benefits:
> (i) 65% of his then current salary for the remainder of his contract or for three full years,
> whichever is greater.
> (ii) all of his benefits for same period as in (i) including, but not limited to: health insurance,
> 401(k), car allowance and any other benefits that might have regularly accrued to said
> Executive.

> **ANSWER:** The Eclipse Defendants admit that paragraph 6.7(g) of the
> Employment Agreement contains the language block quoted in this paragraph.
> Except as expressly admitted herein, the allegations of this paragraph are denied.

13.    Antonucci's employment was terminated in on August 25, 2016. Said termination

was motivated, in part, by Eclipse's desire to prevent Antonucci from receiving Retirement

Benefits. The Employment Agreement defines "Retirement Eligibility" as being the sum of the full years in your age, plus the full years of service that Antonucci spent with Eclipse. Antonucci was born in July of 1959. Based on his March 31, 2008 start date with Eclipse, Antonucci was eligible for Retirement Benefits commencing on the date of March 31 of 2017.

> **ANSWER:** The Eclipse Defendants admit that Antonucci's employment was terminated on or about August 25, 2016. Except as expressly admitted herein, the allegations of this paragraph are denied.

14. Eclipse terminated Antonucci's employment in August of 2016 and such termination was wrongful and without justification or good cause. At the time of the termination, Antonucci was paid a salary of $160,000 per year. Under the terms of the Employment Agreement, Antonucci was entitled to salary increases at the minimum rate of 6% per annum from and after January 1, 2016.

> **ANSWER:** The Eclipse Defendants admit that Antonucci's employment was terminated on or about August 25, 2016 and that his annual salary was $160,000 (excluding other remuneration). The Eclipse Defendants further admit that paragraph 3.1 of the Employment Agreement included the sentence, "In the absence of any other adjustment the Executive's Salary will increase at a rate of 6%, every year, starting on January 1, 2016." Except as expressly admitted herein, the allegations of this paragraph are denied.

15. Pursuant to the terms and conditions of the Employment Agreement, Eclipse was obligated to pay Antonucci salary, severance, a change of control bonus, and retirement benefits upon vesting. Eclipse has failed to pay Antonucci as required by the terms of the Employment Agreement and Antonucci has been harmed and damaged by Eclipse's breach of its Employment Agreement obligations.

> **ANSWER:** Denied.

WHEREFORE, Counter Plaintiff, Anthony Antonucci, respectfully prays that this Honorable Court enter judgment in his favor and against the Counter Defendant, Eclipse Gaming Systems, LLC., as follows:

A.  Judgment in the sum of $602,490.00 as and for unpaid salary with annual increases from the date of August 25, 2016 to the date of January 15, 2020;

B.  Judgment for the value of all benefits as defined in paragraph 3.2 of the Employment Agreement for the period of June 15, 2015 to the date of January 15, 2020 and as established by the proof offered at the time of trial;

C.  For judgment in the sum of $863,178.62 as and for payments Change of Control payments due for the 4 years and 4 months for the period from September 15, 2015 to the date of January 15, 2020 as stated in the Employment Agreement;

D.  For an award of Retirement Benefits as defined in the Employment Agreement and as established by the proofs offered at the time of trial; and

E.  For such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

**ANSWER:**  The Eclipse Defendants deny that Antonucci is entitled to any of the relief he seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

**COUNT FOUR**
**IMPOSITION OF CONSTRUCTIVE TRUST AND TO AVOID**
**TRANSFER OF MEMBERSHIP INTERESTS NOT AUTHORIZED BY**
**THE ECLIPSE THIRD AMENDED**
**AND RESTATED COMPANY OPERATING AGREEMENT**

1.  From and after the date of May 7, 2010, Eclipse was a Texas limited liability company governed by the terms and conditions of its Third Amended and Restated Company Agreement ("Operating Agreement").

**ANSWER:** The Eclipse Defendants admit that Eclipse Gaming is a Texas limited liability company. The Eclipse Defendants further admit that Eclipse Gaming is governed by, *inter alia*, the terms and conditions of the Third Amended and Restated Company Agreement as it has been amended. Except as expressly admitted herein, the allegations of this paragraph are denied.

2.     A true and accurate copy of the Operating Agreement is attached hereto as Exhibit

B and incorporated herein by reference.

**ANSWER:** The Eclipse Defendants admit that Exhibit B to Antonucci's Counterclaim is a true and accurate copy of part of the Third Amended And Restated Company Agreement of Eclipse Gaming Systems, LLC. The Eclipse Defendants deny that Exhibit B to Antonucci's Counterclaim is a complete copy of the governing document because it does not include all of the amendments to that instrument. Except as expressly admitted herein, the allegations of this paragraph are denied.

3.     Section Nine of the Operating Agreement sets forth the terms and conditions

governing the transfer of any membership interest in Eclipse.

**ANSWER:** The Eclipse Defendants admit that Section IX of the Third Amended and Restated Company Agreement of Eclipse Gaming Systems, LLC includes terms concerning, *inter alia*, transfers of interests and the rights, powers and obligations of members. Except as expressly admitted herein, the allegations Except as expressly admitted herein, the allegations of this paragraph are denied.

4.     At all time relevant herein, paragraph 9.1 stated in pertinent part as follows:

9.1 Restrictions on Transfer of Interests. None of the issued and outstanding Interests in the Company nor any portion thereof may be sold, assigned, pledged or otherwise transferred or hypothecated by operation of law or otherwise except with written consent of the Manager in accordance with the terms and conditions of this SECTION IX. Any purported transfer not made in compliance with the terms of this SECTION IX shall be null and void and the Company shall not recognize or give effect to such transfer without the written consent to the transfer given by the Manager and a Majority in Interest of the Members. In addition, no Interests may be transferred to any person or entity, whether or not the other terms of this Agreement are complied with, unless and until the transferee has executed a Joinder Agreement to this Agreement and agreed to be bound by the terms hereof in all respects.

**ANSWER:** The Eclipse Defendants admit the language block quoted in this paragraph appears in paragraph 9.1 of the Third Amended and Restated Company

Agreement of Eclipse Gaming Systems, LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

5.     At all time relevant herein, paragraph 9.8 stated in pertinent part as follows:

9.8 Right of First Refusal. (a) Except as set forth in Section 9.8(c), a Member desiring to sell, Transfer or assign all or any part of such Member's Interests in the Company will give notice in writing to the Company stating that the Selling Member has a bona fide, good faith offer for the purchase of such Member's Interests (a "Bona Fide Offer"), the number of Interests to be sold pursuant to the Bona Fide Offer, the name and address of each person proposing to purchase such Interests and the sales price and terms of payment of the Bona Fide Offer. Such notice will constitute an offer to the Company, valid for 30 days following the Company's receipt of notice thereof to sell the Interests subject to such Bona Fide Offer to the Company upon the price and terms proposed in the Bona Fide Offer. If at the end of such 30-day period, the Company has not elected to purchase all of the Selling Member's Interests that is subject to the Bona Fide Offer, the Selling Member will make the same offer with respect to the Interests that the Company did not elect to acquire to the Non-selling Members by notice giving the same information with respect to the Bona Fide Offer as was given to the Company. The Nonselling Members shall then have the option to purchase all or a portion of such Interests for a period of 30 days from receipt of the notice. If the aggregate number of Interests that the Non-selling Members desire to purchase, as stated in the Non-selling Members' option exercise notice to the Company, is more in the aggregate than the number of Interests available for purchase, then each Non-selling Member shall have the right to purchase a proportionate amount of such Interests available for purchase based on his or her relative ownership of Interests then owned by all of the Non-selling Members desiring to purchase such Interests. If at the end of such second 30-day period the Nonselling Members have not elected to purchase all of the remaining Interests of the Selling Member that is subject to the Bona Fide Offer, then neither the Company nor the Nonselling Members shall be entitled to purchase any of such Interests and the Selling Member may sell all of the Interests that were subject to the Bona Fide Offer pursuant to the terms of the Bona Fide Offer for a period of 60 days from notice that the option granted pursuant to this Section 9.8 is not being exercised, but only in compliance with the provisions of Section 9.8(b).

(b) Any material modification of a Bona Fide Offer made subsequent to the terms of such Bona Fide Offer being disclosed to the Company and the Non-selling Members will be deemed to be a new Bona Fide Offer and must be re-submitted to the Company and the Non-selling Members pursuant to this Section 9.8.

(c) The provisions of this Section 9.8 shall not apply to a Transfer by a Member to a Permitted Transferee, but the Transfer restrictions contained in this Section 9 shall be fully applicable to all Transfers by any such Permitted Transferee.

**ANSWER:**   The Eclipse Defendants admit the language block quoted in this paragraph appears in paragraph 9.8 of the Third Amended and Restated Company

Agreement of Eclipse Gaming Systems, LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

6.     Permitted Transferee is defined at page six of the Operating Agreement as follows:

""Permitted Transferee" means, with respect to a Member, (i) a trust solely for the benefit of such Member or a descendant of such Member of which the Member is the trustee, (ii) a corporation or limited liability company wholly-owned by such Member, (iii) a partnership in which such Member is directly or indirectly the sole general or managing partner, or (iv) another Member or the Company. "

> **ANSWER:**   The Eclipse Defendants admit the Third Amended and Restated Company Agreement of Eclipse Gaming Systems, LLC contains the following definition for "Permitted Transferee":
>
> > [W]ith respect to a Member, (i) a trust solely for the benefit of such Member or a descendant of such Member of which the Member is the trustee, (ii) a corporation or limited liability company wholly-owned by such Member, (iii) a partnership in which such Member is directly or indirectly the sole general or managing partner, or (iv) another Member or the Company.

Except as expressly admitted herein, the allegations of this paragraph are denied.

7.     At all times relevant herein, paragraph 9.13 stated in pertinent part as follows:

9.13 Nonrecognition of an Unauthorized Transfer. The Company will not be required to recognize the interest of any Assignee or transferee who has obtained Interests as the result of a Transfer or assignment that is not authorized by this Agreement. If there is a doubt as to ownership of Interests or who is entitled to a distribution or liquidating proceeds, the Manager may accumulate said distribution or liquidation proceeds until the issue is resolved to the Manager's satisfaction.

**ANSWER:**   The Eclipse Defendants admit the language block quoted in this paragraph appears in paragraph 9.13 of the Third Amended and Restated Company Agreement of Eclipse Gaming Systems, LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

8.     Robert Drew sold membership interests to Elite Gaming and/or Greg Drew without notice to the other members and required by the provisions of section Nine of the Operating Agreement and in violation of the transfer restrictions. Upon information and belief, the membership interest of Robert Drew was not offered for sale to Eclipse or was offered to Eclipse and rejected. In no event was Antonucci provided notice of any such proposed sale and in no event was Antonucci provided an opportunity, as set forth in paragraph 9.8(a) of the Operating Agreement, to purchase such interests.

> **ANSWER:** The Eclipse Defendants admit that, pursuant to a Membership Transfer Agreement, in 2015, Bob Drew assigned, conveyed, transferred and delivered his 12.18% membership interest in Eclipse Gaming to Elite Games, LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

9.     As provided in paragraph 9.13 of the Operating Agreement, the membership interests acquired by Elite Gaming and/or Greg Drew from Robert Drew should not be recognized.

**ANSWER:** Denied.

10.     By virtue of his purchase of Bob Drew's membership interest, Greg Drew was able to assert a majority stake or interest in Eclipse and proceeded to remove Jack Saltiel as manager, fire Jack Saltiel, fire the COO, Mr. Lozano, wrongfully terminate Antonucci, transfer accounts and revenue away from Eclipse to other business entities controlled or owned by Greg, including Elite Games, LLC and Accelerated Marketing Solutions, LLC. Greg Drew used his dominant position to harm the financial interests of minority members including the interests of Anthony Antonucci.

**ANSWER:** Denied.

WHEREFORE, Counter Plaintiff, Anthony Antonucci, respectfully prays for the entry of an order finding and declaring that the sale of Bob Drew's membership interest to Greg Drew was in violation of the terms and contions of Section 9 of the Operating Agreement. Counter Plaintiff

prays that this Honorable Court further find and order that such ownership interests is subject to a Constructive Trust and the membership interests shall be held for the benefit of the minority members until they shall have a reasonable period of time to purchase such ownership interests. Counter Plaintiff further prays for judgment as follows:

A.      Against Greg Drew for restitution and/or damages in favor of Counter Plaintiff for the loss of the ownership interest not made available for purchase by Anthony Antonucci and awarding punitive and exemplary damages as appropriate, plus prejudgment interest.

B.      Extraordinary equitable and/or injunctive relief as permitted by law and equity, so as to assure that Counter Plaintiff has an effective remedy.

C.      For judgment against Greg Drew for the return of his salary or other compensation paid from Eclipse during the times in which he wrongfully asserted a majority ownership interest over Eclipse.

D.      Awarding Counter Plaintiff, Anthony Antonucci, the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

E.      For the imposition of a Constructive Trust over the ownership intere

E.      Awarding such other relief as the Court may deem just and proper.

**ANSWER:**  The Eclipse Defendants deny that Antonucci is entitled to any of the relief he seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

## COUNT FIVE
## VIOLATION OF THE MINORITY OPPRESSION DOCTRINE

1-17.   Counter Plaintiff re-alleges and incorporates by reference paragraphs 1-17 of Count One as if set forth herein in their entirety.

**ANSWER:** The Eclipse Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

18.     By virtue of the above-described conduct, the Director Defendants, Greg Drew, David Lawrence, and Boris Amegadjie have abused their authority over Eclipse with the intent to harm the interests of the minority members and owners.

**ANSWER:** Denied.

19.     The actions of the Director Defendants did not comport with the honest exercise of business judgment.

**ANSWER:** Denied.

20.     Such conduct is unlawfully oppressive to the minority members and owners, including Anthony Antonucci, and as a result, the minority members and Anthony Antonucci have suffered irreparable harm, injury, and damage.

**ANSWER:** Denied.

21.     The Minority Owners are entitled to a rehabilitative receivership over Eclipse based upon the actions of the Director Defendants.

**ANSWER:** Denied.

WHEREFORE, Counter Plaintiff, Anthony Antonucci, respectfully prays for the entry of judgment in his favor and against Eclipse Gaming Systems, LLC; Greg Drew; David Lawrence; and Boris Amegadjie as follows:

A.     That the Court order Eclipse Gaming Systems, LLC to make an accounting to Anthony Antonucci and that Eclipse be compelled to account for and document all

customer accounts, all customer contracts, and all company revenue, including all cash receipts;

B.   That the Director Defendants be ordered to pay restitution to Anthony Antonucci for all Eclipse revenue diverted to any other business and for all improper expenses paid or incurred by Eclipse and in such sums and amounts as this Court deems just and appropriate under the circumstances;

C.   That this Honorable Court compel Eclipse Gaming Systems, LLC to buy-out the ownership Interest of Anthony Antonucci as a fair value and after adjustment for the financial losses caused by Defendants;

D.   That this Court order the removal of David Lawrence as the manager of Eclipse Gaming Systems, LLC and appoint a qualified and impartial expert to act as manager during any buyout period or as this Honorable Court otherwise deems just and appropriate.

E.   Counter Plaintiff prays for such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

**ANSWER:**  The Eclipse Defendants deny that Antonucci is entitled to any of the relief he seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

## <u>AFFIRMATIVE DEFENSES</u>

The Eclipse Defendants give notice that they may rely upon one or more of the following defenses to the extent that they bear the legal burden of pleading and proving such defenses as an affirmative matter.  In further factual support of their Affirmative Defenses, the Eclipse Defendants incorporate the allegations in their *Complaint for Violations of the Computer Fraud And Abuse Act, Etc.*, Dkt. 1 (the "<u>Complaint</u>"), as if fully stated herein.

## FIRST AFFIRMATIVE DEFENSE

### (Mootness)

Count II of Antonucci's counterclaim is moot because Eclipse Gaming no longer seeks a copy of the source code that it is entitled to under the MLA.

## SECOND AFFIRMATIVE DEFENSE

### (Parol Evidence)

Count II of Antonucci's counterclaim is barred because Antonucci's allegations to support this claim relies on inadmissible parol evidence. The MLA contains an integration clause that states that the terms of the MLA are limited to those on its face.

## THIRD AFFIRMATIVE DEFENSE

### (Unclean Hands)

Based on the facts alleged in Eclipse Gaming's Complaint, Counts I, III, IV, and V in Antonucci's counterclaim and all equitable relief Antonucci seeks are barred by the doctrine of unclean hands. For the reasons alleged in Eclipse Gaming's Complaint, Antonucci's membership interest in Eclipse Gaming is subject to forfeiture.

## FOURTH AFFIRMATIVE DEFENSE

### (Estoppel)

Based on the facts alleged in Eclipse Gaming's Complaint, Antonucci is estopped from seeking relief for the actions about which he complains in Counts I, IV, and V of his counterclaim.

Antonucci is also estopped from seeking relief for the allegations he alleges in Counts I, IV, and V of his counterclaim insofar as the actions about which he complains were done with his knowledge while he was employed by Eclipse Gaming.

Antonucci is also estopped from seeking the relief he seeks in Counts IV because the transaction about which Antonucci complains occurred with Antonucci's knowledge.

## FIFTH AFFIRMATIVE DEFENSE

### (Waiver)

Counts IV of Antonucci's counterclaim is barred by the doctrine of waiver because the transaction about which Antonucci complains occurred with Antonucci's knowledge. Accordingly, Antonucci has waived any right to complain about that transaction.

## SIXTH AFFIRMATIVE DEFENSE

### (For Cause Termination)

Count III of Antonucci's counterclaim is barred because Antonucci was terminated as an employee "for cause" under the Employment Agreement because he interfered with Eclipse's business relationships with Gemalto, NV, and attempted to sabotage Eclipse's business by tampering with software used in Eclipse's gaming machines.

## SEVENTH AFFIRMATIVE DEFENSE

### (Business Judgment Rule)

Counts I and V in Antonucci's counterclaim are barred by the business judgment rule because the actions about which Antonucci complains were proper exercises of the Eclipse Defendants' business judgment and legally justified.

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure to State Claim)

Counts II of Antonucci's counterclaim fails to state a claim because Antonucci is not a party to the MLA, which is an agreement between Eclipse Gaming and DIGDYN.

Counter IV of Antonucci's counterclaim fails to state a claim because Antonucci has failed to allege any actual or constructive fraud to allow for the imposition of a constructive trust under Texas law.

Count V of Antonucci's counterclaim fails to state a claim because Texas law does not recognize a common law cause of action for minority shareholder oppression. *Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014); *Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 791 (Tex. 2014).

## PRAYER FOR RELIEF

WHEREFORE, Counter-Defendants Eclipse Gaming Systems, LLC, Greg Drew, David Lawrence, and Boris Amegadjie pray for judgment dismissing Counter-Plaintiff Anthony Antonucci's counterclaim on the merits, in its entirety and with prejudice, and awarding Counter-Defendants their costs and disbursements incurred in this action, and awarding such additional relief as the Court may deem just and appropriate.

DATED: September 12, 2017

Respectfully submitted,

Eclipse Gaming Systems, LLC, *et al.*

By:   /s/ Suyash Agrawal
Suyash Agrawal
Paul Berks
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, Illinois 60602
(312) 283-1590
sagrawal@masseygail.com
pberks@masseygail.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on all counsel of record via ECF this 12th day of September 2017.

*/s/ Suyash Agrawal*