**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ECLIPSE GAMING SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 17 C 196 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| ANTHONY ANTONUCCI, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| DIGITAL DYNAMICS SOFTWARE, INC., | ) | |
| and ANTHONY ANTONUCCI, | ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ECLIPSE GAMING SYSTEMS, LLC, GREG | ) | |
| DREW, and DAVID LAWRENCE, | ) | |
| | ) | |
| Counter-Defendants. | ) | |

## MEMORANDUM ORDER AND OPINION

In response to a suit from Plaintiff/Counter-Defendant Eclipse Gaming Systems, LLC ("Eclipse") alleging violation of the Computer Fraud and Abuse Act ("CFAA") and other state and common law claims, Defendant/Counter-Plaintiff Anthony Antonucci, Eclipse's former employee, founding member, and shareholder, and Antonucci's wholly owned software company, Counter-Plaintiff Digital Dynamics Software, Inc. ("Digital"), filed an eight-count amended countercomplaint against Eclipse and two of its prior managers and current members, Counter-Defendants Greg Drew and David Lawrence. (Dkt. 51). Counter-Defendants Eclipse, Drew, and Lawrence have moved to dismiss five of the amended counterclaims for failure to state a claim. (Dkt. 53). For the reasons set forth below, the motion to dismiss is granted.

## BACKGROUND[1]

Digital is in the business of providing software solutions for casino gaming machines. In 2003, Antonucci developed the source code for gaming software known as the Slot Accounting System ("SAS") Engine for Digital. In 2006, Antonucci developed the source code for the SAS Gateway software for Digital. (Dkt. 51) at ¶¶ 8–9. In 2008, Antonucci and others formed Eclipse, a Texas limited liability company, to develop, manufacture, and market electronic gaming machines and systems; Antonucci served as the Chief Technology Officer. His has a 17/18% membership interest in Eclipse. *Id*. at ¶¶ 3, 12, 14, 42.

### A.    The Licensing Agreements

In 2008, Digital and Eclipse entered into an oral licensing agreement, whereby Digital granted a license for use of the SAS Engine and SAS Gateway software applications on Eclipse's gaming machines in exchange for a fee of $100 per machine plus the cost of a "license dongle"—an external device required for the software to function. *Id*. at ¶¶ 38–39, 42. In early 2015, Ainsworth Game Technology, Inc. ("Ainsworth") expressed interest in acquiring the ownership rights of Eclipse for approximately $30 million. *Id*. at ¶¶ 44, 45. In connection with the negotiations, Eclipse's manager at that time, Jack Saltiel, and other principals of the company approached Antonucci and relayed that Ainsworth would only consider the acquisition "if it had access to the source code for the software applications being used in many of the systems supported by Eclipse, including the Source Code developed and owned by [Digital]." *Id*. at ¶ 44. Eclipse represented that a written licensing agreement for the SAS Engine, SAS Gateway, and source code was necessary for the acquisition. *Id*. at ¶ 46. Accordingly, in March 2015, Digital and Eclipse entered into a written licensing agreement, the Master License Agreement ("MLA"),

---

[1] The Court assumes as true all well-pleaded allegations set forth in the counterclaim. *See Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

that Eclipse and Digital both prepared. *Id*. at ¶¶ 47, 53; (Dkt. 51-1) (March 14, 2015 Master License Agreement).

As relevant to the claims between the parties, the MLA provides that "Upon [Eclipse's] payment of the one-time SAS Engine Base Cost, and subject in each instance to [Eclipse's] subsequent timely payment of the applicable Run-time licensing fee [of $100.00/unit], [Digital] hereby grants to [Eclipse] a limited, nonexclusive license during the term of this MLA to use, sell, import, export, distribute, transmit, reproduce and publicly display copies of Software as electronic files . . . ." (Dkt. 51-1) at § 2.1. "Software" is defined in the MLA as "the SAS Engine software, and SAS Gateway, in current form as of the Effective Date, in machine readable object code form, and in source code with build instructions . . . ." *Id*. at 1, § 1.1. As already stated, in exchange for the license, Eclipse agreed to pay a SAS Engine Base Cost and Run-time license fees for each machine on which it uses the Software; Eclipse also agreed to pay maintenance fees of $5,000 per quarter. *Id*. at §§ 1.4, 6.1.3. The Base Cost was due on or within 15 days of the Effective Date of the MLA, March 14, 2015, and it was listed in the MLA as "PAID." *Id*. at §§ 1.4, 6.1.1. The Run-time license fees are due "within 30 days of [Eclipse's] receipt of [Digital's] invoice after the end of the calendar quarter in which such copy if first used . . . ."; the maintenance fees are due "within 45 days of [Eclipse's] receipt of [Digital's] invoice after the end of each succeeding calendar quarter" after the first quarter maintenance payment. *Id*. at §§ 6.1.2, 6.1.3.

The MLA includes a specific provision addressing how the MLA would be affected if Eclipse was sold. Under § 6.1.4, if Eclipse "sell[s] its business or substantially all of its assets to an independent third-party purchaser," it may assign the MLA to the purchaser with Digital's consent. *Id*. §§ 6.1.4, 14, 22. In that event, "the License Fees shall be waived and said third

party shall be entitled to all right, title and interest in this MLA; and the license to use the source code in use by the Licensee at the time of closing." *Id*. § 6.1.4.

In the MLA, Digital and Eclipse "each represent[ed] and warrant[ed] for itself that it has the full power and authority to enter into this Agreement and that this Agreement, when it is executed and delivered, will constitute a valid and legally binding obligation, enforceable in accordance with its terms . . . ." *Id*. at § 9.7. And the MLA contains an integration clause:

> This Agreement and the Mutual Non Disclosure Agreement (NDA, as an appendix) together with any exhibits contain the entire understanding and agreement between the parties respecting the subject matter hereof. This Agreement may not be supplemented, modified, amended, released or discharged except by an instrument in writing in a document signed by each party's duly authorized representative and which refers to this MLA by name and date.

*Id*. at § 21. Each of the 13 pages of the MLA is initialed and dated by agents of Eclipse (Saltiel) and Digital (Antonucci) and it is executed by both agents. *See id*. at 1–13. Finally, the MLA states that it was effective as of March 14, 2015 "and shall remain in full force and effect, unless otherwise terminated as provided herein. *Id*. at 1; *see also id*. at § 12 (listing default and termination procedures under the MLA).

According to the counterclaim, however, at the same time that the parties prepared the MLA, they "orally agreed that the document would only and solely be used" if the Ainsworth acquisition came to fruition; if not, the MLA would be void and unenforceable. (Dkt 51) at ¶ 53. Specifically, the parties orally agreed that Antonucci would execute the MLA on behalf of Digital and then Eclipse would "hold" the MLA "only for use if the proposed sale of Eclipse to Ainsworth closed and on terms acceptable to Antonucci and [Digital]." Thus, Digital agreed to the MLA "for the sole purpose of consummating a sale of Eclipse to Ainsworth," not for use outside of the transaction with Ainsworth. (Dkt. 51) at ¶¶ 47–50. If the Ainsworth acquisition did not close, "the parties understood and agreed . . . that the MLA would be of no force or effect

and would not thereafter be legally binding upon [Digital]." *Id*. at ¶ 48; *id*. at ¶ 52 ("Saltiel, acting as the duly authorized manager of Eclipse, expressly agreed with Antonucci, acting as the authorized representative of [Digital], that the MLA was for the sole and exclusive use of Ainsworth and that the MLA would only become effective following the purchase of Eclipse by Ainsworth on terms accepted and approved by Antonucci and [Digital].").

In July 2015, the management of Eclipse changed; Saltiel was replaced by Counter-Defendant Greg Drew. *Id*. at ¶ 56. A few months later, Drew rejected the Ainsworth purchase terms and the negotiations ended. *Id*. at ¶¶ 55–56. Following this event, Digital and Antonucci allege that the parties "disregarded the MLA." Specifically, Eclipse did not make any payments under the contract or take any other action thereunder. In May 2016, Antonucci proposed a buyout of his membership interest in Eclipse. *Id*. at ¶ 58. In Eclipse's response rejecting the proposal, Eclipse inquired as to when Digital would be transferring the software source code pursuant to the MLA. *Id*. at ¶ 59. Digital advised that Eclipse was not entitled to the code, and Antonucci's employment with Eclipse was terminated in August 2016.

### B. Procedural History

On June 16, 2016, after Eclipse demanded the source code and before Antonucci was fired, Digital brought suit against Eclipse in the Circuit Court of Cook County seeking a declaratory judgment that the MLA was null and void and unenforceable on account of the same oral understanding alleged here—that the MLA would only apply in the specific instance of an acquisition by Ainsworth. (Dkt. 22-1). Not long thereafter, Eclipse brought its own suit against Digital on account of an impending software disruption threatened by Digital. In that suit, Eclipse sought to enforce the MLA and brought claims for breach and specific performance. *See* (Dkt. 22-2). After the software disruption occurred, Eclipse sued Antonucci in this Court

alleging violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51, and various other aspects of state and common law.  (Dkt. 1).

On January 29, 2018, Counter-Plaintiffs Antonucci and Digital filed an amended countercomplaint, which brings the following claims:  a member derivative action against Drew and Lawrence, the past managers and majority owners of Eclipse, based on Drew's and Lawrence's alleged breach of fiduciary duties to Eclipse by way of their failure to produce information to Antonucci and their diversion of Eclipse revenue to two other LLCs owned by Drew and Lawrence (Elite Games, LLC and Accelerated Marketing Solutions) (Count I); a claim against Eclipse seeking a declaration that the MLA is unenforceable on account of promissory estoppel (Count II); a claim against Eclipse seeking a declaration that the MLA is unenforceable for lack of consideration (Count III); a claim against Eclipse seeking a declaration that the MLA is unenforceable for failure of a condition precedent (Count IV); a claim against Eclipse seeking a declaration that the MLA is unenforceable as unconscionable (Count V); a claim against Eclipse for breach of Antonucci's employment agreement and wrongful discharge (Count VI); a claim seeking injunctive relief against Eclipse in the form of an order that Eclipse produce business information to Antonucci and Digital, among other things (Count VII); and a claim against Drew and Lawrence for breach of the duty of loyalty and violation of the Texas minority oppression doctrine (Count VIII).  (Dkt. 51).  Counter-Defendants move to dismiss the MLA-related counts (Counts II, III, IV, and V) and the minority-oppression count (Count VIII).  (Dkt. 53).  Notably, discovery in this matter closed on April 26, 2018.  (Dkt. 48).

## LEGAL STANDARD

As noted, when reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in the counterclaim and draws all reasonable inferences in the non-

movant's favor.  *Killingsworth*, 507 F.3d at 618.  This Court dismisses claims only if the plaintiffs would not be entitled to relief under any set of facts that could be proven consistent with the allegations.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546 (2007).  However, a "pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  The Court may take judicial notice of matters in public record, including court documents, in deciding a motion to dismiss without converting it to a motion for summary judgment.  *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).  The Court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it."  *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013).

## DISCUSSION

### A.      Claims Regarding the MLA (Counts II, III, IV, and V)

The MLA dictates, and the parties agree, that Illinois law applies to their contract disputes.  *See* (51-1) at § 15.2 ("[T]he validity, interpretation, construction, and performance of this Agreement shall be governed by the laws of the State of Illinois.").  The first question that must be answered in connection with the parties' MLA dispute is simple:  what effect, if any, does the alleged side oral agreement about when the MLA goes into effect have on the overall enforceability of the MLA?  Counter-Defendants argue that the oral agreement that underscores Counts II and IV of the amended countercomplaint is inadmissible parol evidence because the MLA is fully integrated, the alleged oral agreement directly contradicts the MLA, and no exception to the parol evidence rule applies.  (Dkt. 54) at 4–9.

"[W]here parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence."  *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491

F.3d 625, 636 (7th Cir. 2007) (quoting *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 464 (1999)).   Accordingly, if a contract is facially unambiguous and contains an integration clause, as is the case here, courts are barred from considering extrinsic evidence and the "four corners rule" applies.   *Id.*; *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 673 (7th Cir. 2015) (under Illinois law, "[w]hen a contract is fully integrated, the parol-evidence rule bars evidence of prior or contemporaneous agreements within the scope of the written contract.").   Under that rule, the Court may not consider evidence related to understandings "not reflected in the terms of the [MLA], reached either before or at the time of [the MLA's] execution, where those terms would vary or modify the terms of the [MLA] itself." *See TAS Distrib. Co.*, 491 F.3d at 637; *Air Safety, Inc.*, 185 Ill. 2d at 462 (if the language of a contract is unambiguous, both the meaning of a written agreement and the intent of the parties is to be gathered from the face of the document without assistance from extrinsic evidence).

Here, the MLA contains provisions regarding its effective date, termination procedures, and assignment in the case of an acquisition.   *See* (Dkt. 51-1) at 1 & §§ 9.7, 12.1–12.3.   Had Digital and Eclipse intended to limit the effectiveness of the MLA in the manner alleged by the parties' contemporaneous oral agreement, then they were obligated, under Illinois law, to include this understanding within the four corners of the MLA.   *See Air Safety, Inc.*, 185 Ill. 2d at 462; *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447, (1991) ("The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law.").   Essentially, what Counter-Plaintiffs argue for is application of the "provisional admission approach" to contract interpretation. Under this approach, "although the language of a contract is facially unambiguous, a party may still proffer parol evidence to the trial judge for the purpose of showing that an ambiguity exists

which can be found only by looking beyond the clear language of the contract." *Air Safety, Inc.*, 185 Ill. 2d at 463. The only problem with this strategy is that, when faced with a contract that contained an explicit integration clause—similar to the one in this case—the Illinois Supreme Court declined to follow this approach. *Air Safety, Inc.*, 185 Ill. 2d at 464–65 ("considering extrinsic evidence of prior negotiations to create an 'extrinsic ambiguity' where both parties explicitly agree that such evidence will not be considered ignores the express intentions of the parties and renders integration clauses null").

Counter-Plaintiffs recognize that "*Air Safety* stands for the proposition that parol evidence is inadmissible to vary or contradict the clear written provisions of an integrated contract." (Dkt. 57) at 4. But they proceed to argue that *Air Safety* does not apply here because they are not asking the Court "to use parol evidence to vary or contradict any provision the MLA. Rather, [Counter-Plaintiffs] claim that despite the existence of the MLA, the extrinsic facts establish that no contract was ever formed." *Id.* But because the MLA contains explicit terms regarding its effectiveness and also its terms apply both with and without a sale of Eclipse, the alleged oral agreement goes to contradict those terms and therefore evidence about the oral agreement is prohibited under *Air Safety*.

In support of their argument, Counter-Plaintiffs cite to *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281 (1990), for the proposition that "parol evidence could be used to determine the parties' intent to be bound." (Dkt. 57) at 5. But Counter-Plaintiffs misapply this case, which states that if the "language of a purported contract is clear as to the parties' intent . . . the parties' intent must be derived by the [trial court], as a matter of law, solely from the writing itself." *Quake Constr. Inc.*, 141 Ill. 2d at 288. There, the issue was whether a letter of intent exchanged by the parties constituted an enforceable contract. As relevant, the

letter of intent expressly contemplated the later execution of a written subcontract agreement and, although the parties began negotiating the written agreement, it was never entered into by the parties. Reviewing the terms of the letter of intent, the Illinois Supreme Court held that it was ambiguous as to whether the parties intended to be bound by it and whether the letter of intent contained conditions precedent to a contract—including the execution of a formal contract; therefore, parol evidence should have been considered by the lower court in order to determine whether the letter of intent constituted a binding contract. *Id*. at 293–94. And so, even though it involved a potentially unique situation involving a purported contract that was intended to be superseded by a formal written contract, *Quake Construction* simply represents a straightforward application of the parol evidence rule in the presence of ambiguous language in an alleged contract. Thus, *Quake Construction* does not, as Counter-Plaintiffs suggest, universally allow for parol evidence to determine the intent of contracting parties to be bound, and because Counter-Plaintiffs do not dispute that the MLA is clear as to the parties' intent to be bound, the Court cannot consider parol evidence as their intent. *See Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (holding that, under Illinois law, "[w]here a written agreement is clear and explicit, a court must enforce the agreement as written. Both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids.") (quoting *Rakowski v. Lucente*, 104 Ill. 2d 317, 323 (1984)).

Accordingly, the Court "is unable, by virtue of the integration clause, to recognize the asserted oral agreement" and must conclude that Digital has "failed to state a claim" on any counterclaims that are based solely on the oral agreement. *See, e.g.*, *Brodsky v. Blake*, 2018 WL 1138539, at *5 (N.D. Ill. Mar. 2, 2018); *Murphy v. Curran Contracting Co.*, 648 F. Supp. 986,

987–88 (N.D. Ill. 1986). In other words, Illinois law precludes the Court from considering any pre-contractual or contemporaneous negotiations between Digital and Eclipse in determining whether Digital has succeeded in pleading its claims for a declaration that the MLA is unenforceable. This holding directly affects Digital's promissory estoppel and failure of condition precedent claims.

### 1. Promissory Estoppel (Count II)

To plausibly plead a promissory estoppel claim, Digital must allege that (1) Eclipse made an unambiguous promise to it, (2) it relied on that promise, (3) its reliance was expected and foreseeable by Eclipse, and (4) it relied on the promise to its detriment. *Ho v. Abbott Labs.*, 2013 WL 1348426, at *7 (N.D. Ill. Mar. 31, 2013) (citing *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009)). Digital's promissory-estoppel claim is based solely on the theory that, outside of the written terms of the MLA, Eclipse orally promised that the MLA would only be "used" for the purpose of consummating a sale of Eclipse to Ainsworth and that the MLA would otherwise be void. *Id.* at ¶¶ 70, 74. Eclipse argues that application of the parol evidence rule prevents Digital from proceeding on its promissory estoppel claim. (Dkt. 54) at 5–6. Counter-Plaintiffs did not respond to this argument in their response brief and have thus conceded this point. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (noting that a "[f]ailure to respond to an argument . . . results in waiver" and a party's "silence" in response to an argument leads to the conclusion that a point is conceded).

In any event, Counter-Plaintiffs misuse the theory of promissory estoppel. In Illinois, promissory estoppel is typically a method for enforcing promises that do not meet the requirements necessary for a valid and enforceable contract. *See Prentice v. UDC Advisory Servs., Inc.*, 271 Ill. App. 3d 505, 512 (1st Dist. 1995) (referring to promissory estoppel as "a

doctrine which is intended to permit recovery for promises which lack consideration"). But Counter-Plaintiffs do not advance this type of theory, that is, they do not allege that the oral agreement made alongside the MLA is a separate agreement that does not meet all of the requirements of a valid contract. Instead, they allege that the parties entered into the written MLA and also orally agreed that the MLA would only exist if one specific eventuality occurred. They invoke the doctrine of promissory estoppel in order to vary the terms of the MLA—when it was to go into effect, if at all. *See* (Dkt. 57) at 7 (although Counter-Plaintiffs have brought declaratory judgment actions regarding the MLA, stating that they "should be able to make equitable claims for rescission based upon promissory estoppel"). This is not permissible. *Prentice*, 271 Ill. App. 3d at 514 ("[A] dispute as to the terms of a contract rather than its existence cannot be grounds for invoking the doctrine of promissory estoppel where to do so would violate the parol evidence rule."). Instead, "[w]here the contract is either supplemented or interpreted vis-a-vis parol evidence," either because of ambiguity or partial integration, 'it is the law of contracts and not the doctrine of promissory estoppel which provides the remedy." *Id.* at 515. Because Counter-Plaintiffs seek to use parol evidence to alter the contract, their allegations do not state a claim for promissory estoppel. *Cf. W. Bend Mut. Ins. Co.*, 794 F.3d at 680 ("Using equitable estoppel to admit evidence of a separate contemporaneous oral agreement would circumvent the basic purpose of the parol-evidence rule."). Count II is dismissed.

## 2. Condition Precedent (Count IV)

Although Counter-Plaintiffs recognize the effect of the parol evidence rule (*see* (Dkt. 57) at 4)), they argue that the oral agreement may be considered here under an exception that allows parol evidence to establish that there is a condition precedent to the formation of a contract. *See id.* at 5. "Under Illinois law, a condition precedent is some act that must be performed or event

that must occur before a contract becomes effective or before one party to an existing contract is obligated to perform." *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992). Both parties acknowledge that "[w]hen the language of the contract is unambiguous, the parol evidence rule prevents the consideration of extrinsic evidence to show the existence of a condition precedent to *performance*." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (citing *Althoff Indus., Inc. v. Elgin Med. Ctr.*, 95 Ill. App. 3d 517, 521 (2d Dist. 1981)) (emphasis added).

So Digital alleges that the oral agreement between the parties "created a condition precedent to the formation of" the MLA—"the successful consummation of the sale of Eclipse to Ainsworth on terms acceptable to [Digital] and Antonucci." (Dkt. 51) at ¶ 86. Digital further alleges that that the MLA "was never delivered to Eclipse for its own use. Rather, the MLA was tendered to Eclipse to be held solely for use if the sale to Ainsworth was successfully closed and Ainsworth paid significant sums of money to or for the benefit of [Digital] and Antonucci." *Id.* at ¶ 89. That is, both the creation and "delivery" of the MLA were contingent on the Ainsworth sale, despite the fact that the MLA had been executed and "tendered" to Eclipse.

The language of the MLA, however, addresses these issues and indicates otherwise, as it contains an effective date and termination procedures and fails to include any language about its being contingent on a sale of Eclipse to Ainsworth. Although parol evidence may be admissible to show conditions precedent that relate to the delivery or the taking effect of a written document, *see* 18 Ill. Law and Prac. Evidence § 270, if the alleged condition precedent is inconsistent with, or contradictory to, the written instrument, parol evidence of the condition is inadmissible. *See Pirelli Tire Corp. v. Action Auto. Distributors, Inc.*, 1988 WL 82252, at *3 (N.D. Ill. Aug. 4, 1988) (where the "written agreement expressly contradicts the terms of such an

alleged oral condition precedent, it cannot escape the parol evidence rule"); *Luria Bros. & Co. v. Pielet Bros. Scrap Iron & Metal*, 600 F.2d 103, 111 (7th Cir. 1979) (where integrated writing called for an unconditional sale of goods, parol evidence that the seller's obligations were conditioned upon receiving the goods from a particular supplier is inconsistent and must be excluded); *see also W. Bend Mut. Ins. Co.*, 794 F.3d at 673 ("parol evidence may not be used to explain the writing or to introduce terms that contradict the written agreement"); 11 Williston on Contracts § 33:20 (4th ed.) ("[P]roof that the parties agreed by parol that the writing would not become effective until some future day or the happening of some contingency is admissible if it is not inconsistent with the express terms of the writing. For example, when the contract states that it is not to be effective until a certain contingency, a contemporaneous oral agreement that it shall take effect immediately is inadmissible."). Here, because the MLA contains terms regarding its Effective Date and duration, the proffered allegations that the effective date was something other than March 14, 2015 directly contradict those terms and cannot be admitted to prove a different condition precedent to the formation of the contract.[2] *See Air Safety, Inc.*, 185 Ill. 2d at 464–65 (parol evidence cannot be used to create an ambiguity that does not exist into an otherwise unambiguous contract). Further, because Digital's concept of "delivery" is intertwined with the acquisition by Ainsworth, that argument fails for the same reasons—it contracts the written terms of the MLA. Count IV is dismissed.

---

[2] Counter-Defendants further argue that evidence submitted along with Counter-Plaintiffs' motion-to-dismiss response brief proves that any alleged "condition precedent" was actually a condition subsequent, that is a condition precedent to performance, not contract formation. *See* (Dkt. 58) at 3–4. The evidence in question, an affidavit from Saltiel, is not permissible evidence for the Court's consideration on a motion to dismiss, and therefore the Court has not relied on it in this Memorandum Opinion & Order. *Cf. Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 719 (7th Cir. 1993) (holding that an affidavit considered by a trial court during a motion to dismiss converts a motion to dismiss to a motion for summary judgment). That being said, Counter-Defendants correctly highlight that the affidavit only concerns one of the contract terms—the delivery of Digital's source code—as being contingent on the Ainsworth acquisition, meaning that the condition as set forth in the affidavit only triggers one of Digital's performance obligations, not the formation of the entire MLA. *See* (Dkt. 57-1) at ¶ 10.

### 3. Mutual Mistake

Counter-Plaintiffs also argue in their response brief that the MLA should be rescinded or reformed on account of mutual mistake. (Dkt. 57) at 7–8. This is not a theory advanced in the amended countercomplaint. *See* (Dkt. 51). A plaintiff cannot amend a complaint with the brief opposing the defendant's motion to dismiss, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), but a party may "elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings," *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). However, the new allegations that a mistake was made are not consistent with the amended countercomplaint, and will not be considered here. In particular, nothing in the amended countercomplaint suggests that parties misunderstood certain contract terms and the MLA-related counterclaims all allege defects and request declarations that the MLA is void and unenforceable; they do not request rescission or reformation. *See Penn Mut. Life Ins. Co. v. Greatbanc Tr. Co.*, 887 F. Supp. 2d 822, 828 (N.D. Ill. 2012) ("Under Illinois law, 'the remedy of rescission presumes that a valid contract exists; it does not negate that a contract ever existed.'") (quoting *Allianz Ins. Co. v. Guidant Corp.*, 373 Ill. App. 3d 652, 675 (2d Dist. 2007)). And even if the Court were to consider this argument, it is woefully underdeveloped. Although Counter-Plaintiffs discuss at length the *concept* of a mistake, they fail to elaborate on any alleged mistake involved in the MLA. Instead, the response alleges that both parties understood the same thing. *See* (Dkt. 57) at 9 ("Saltiel and Antonucci understood that the MLA would or could be held by Eclipse for use only with the Ainsworth sale . . . .").

### 4. Consideration (Count III)

Digital next alleges that the MLA is void and unenforceable "[b]ecause the purported MLA lacks any consideration"; "Eclipse provided no consideration for the purported MLA."

(Dkt. 51) at ¶¶ 80–81.  In elaborating on these allegations through their response, Counter-Plaintiffs argue that, because Eclipse already had the duty to pay Digital license fees under the 2008 oral agreement, the promise to pay the same licensing fees in the MLA essentially was "past consideration" or something Eclipse was already legally obligated to do, and therefore was insufficient to support the formation of a new contract.  (Dkt. 57) at 10–11.

These arguments ignore the other promises set forth in the MLA, such as Eclipse's promises to pay the "Engine Base Cost payment" and the quarterly software maintenance fees. (51-1) at §§ 1.4, 6.1.  In addition to these actions, Eclipse agreed to only use the Digital software as an integrated part of its machines and to refrain from selling or copying the software.  *E.g.*, *id.* at §§ 2.2, 7.1, 7.2, 7.3.  In Illinois, "[v]aluable consideration consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other."  *Palmetto Leasing Co. v. Chiles*, 235 Ill. App. 3d 986, 989 (2d Dist. 1992); *see also F.H. Prince & Co. v. Towers Fin. Corp.*, 275 Ill. App. 3d 792, 798 (1st Dist. 1995).  Courts will inquire to determine whether a contract is supported by consideration, but they will not scrutinize the adequacy of that consideration.  *See GLS Dev., Inc. v. Wal-Mart Stores, Inc.*, 944 F. Supp. 1384, 1394–95 (N.D. Ill. 1996) (citing *Goodwine State Bank v. Mullins*, 253 Ill. App. 3d 980, 1011, (4th Dist. 1993)).

Because Counter-Plaintiffs do not argue that all of these additional promises were part and parcel of the earlier oral license agreement, they fail to sufficiently allege that the MLA lacked consideration.  Mutual and concurrent promises provide sufficient legal consideration to support each other.  *Leisure v. Smith*, 13 Ill. App. 3d 1070, 1073 (5th Dist. 1973).  Accordingly, the conclusory allegations contained in Count III, as clarified by Counter-Plaintiffs' response

brief, are insufficient to allege that the MLA lacked consideration from Eclipse, and Count III is dismissed.

### 5. Unconscionability (Count V)

Digital's last MLA-related claim is for a declaration that the MLA is both procedurally and substantively unconscionable. (Dkt. 51) at ¶¶ 94–106. First, "[p]rocedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 22 (2006) (citation and quotation omitted). In other words, "[p]rocedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Id.* (citations omitted). This analysis takes into account all of the circumstances surrounding the transaction, including any disparity of bargaining power between the drafter of the contract and the party claiming unconscionability. *Id.* Unconscionability may be shown by "acts of bad faith such as concealments, misrepresentations, [or] undue influence." *Singer v. Sunbeam Prods., Inc.*, 2016 WL 1697777, at *4 (N.D. Ill. Apr. 28, 2016) (alteration in original). Here, Counter-Plaintiffs allege that the MLA is procedurally unconscionable because Digital was "misled into believing that the written MLA would be held in trust by Eclipse for use in the eventuality of the sale of Eclipse to Ainsworth." (Dkt. 51) at ¶ 97. According to Counter-Plaintiffs, Eclipse's assertion of rights under the MLA alters and distorts its prior offer to Digital. *Id.* at ¶ 99.

These allegations are focused on the alleged side oral agreement between the parties, not on any specific terms of the MLA. Accordingly, are not sufficient allegations to plead that the MLA is procedurally unconscionable, particularly where the amended counterclaim does not contain other allegations concerning unequal bargaining power (*cf.* (Dkt. 51) at ¶ 53 ("Eclipse

and [Digital] prepared a written [MLA] . . . .")), and where Counter-Plaintiffs do not allege that the MLA itself contains any difficult, confusing, or obscured terms. Although Digital may have believed that the MLA would not come to pass, it has not alleged any impropriety during the MLA drafting process that served to deprive it of a meaningful choice or its ability to fully participate in the matter. *Kinkel*, 223 Ill. 2d at 23. This is particularly true where the allegations indicate that Digital is not a novice license-agreement negotiator. (Dkt. 51) at ¶ 39 (alleging that Digital has approximately "30 other licensees"); *see Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 943-44 (N.D. Ill. 2013) (applying elements of procedural unconscionability to a corporation and stating that "contractual provisions . . . between two sophisticated business parties will be enforced unless there is a compelling reason not to do so").

Looking next at substantive unconscionability, this "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Kinkel*, 223 Ill. 2d at 28 (citations and quotation omitted). Here, Counter-Plaintiffs allege that the MLA is imbalanced to Eclipse's great favor, because the software source code is worth more than $1 million and the risk of dissemination of the source code if provided to Eclipse is great. (Dkt. 51) at ¶¶ 100–02. In connection with this risk, Counter-Plaintiffs argue that Eclipse cannot be trusted based on past behavior and will not abide by the MLA's contractual protections of the source code. (Dkt. 57) at 12. But these arguments are based on speculation that Eclipse will breach the MLA. Such speculation cannot support a claim of substantive unconscionability.

But Counter-Plaintiffs' argument that the agreement is one-sided has more heft, particularly in light of the alleged value of the source code as compared with Eclipse's obligations under the MLA. However, the MLA catalogues the promises and forbearances on Eclipse's side of the bargain, and the amended countercomplaint alleges that Digital entered into the MLA because it believed it would receive some $6 million from the Ainsworth acquisition. *See* (Dkt. 51) at ¶ 54. Now that the sale fell through, Counter-Plaintiffs may feel like the MLA is a bad deal, but that does not mean that the MLA is substantively unconscionable. "[A] court will not set aside the contract merely because that agreement later turns out to be a bad bargain for one of the parties." *Lake Forest Acad. v. Am. Language Acad.*, 777 F. Supp. 610, 618 (N.D. Ill. 1991) (citation omitted); *see also Matter of Rick Michaels Ford, Inc.*, 7 B.R. 763, 768 (Bankr. N.D. Ill. 1980) (the unconscionability doctrine is intended to prevent oppression and unfair surprise and not to relieve a party of the effect of a bad bargain). Because Count V fails to set forth sufficient allegations that the MLA is either procedurally or substantively unconscionable, it is dismissed.[3]

## B. Minority Suppression/Breach of Fiduciary Duty Claim (Count VIII)

Finally, Count VIII brings a claim for (1) breach of the duty of loyalty by Drew and Lawrence, and (2) violation of the minority oppression doctrine. (Dkt. 51) at ¶¶ 165–170. Starting with the minority oppression doctrine, the parties appear to agree that, under *Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014), there is no Texas common law cause of action for minority shareholder oppression in closely-held corporations. *See* (Dkt. 54) at 15; (Dkt. 57) at 14. That is, *Ritchie* held that the only available remedy for this type of claim is receivership pursuant to § 11.404 of the Texas Business Corporations Act. Accordingly, Counter-Plaintiffs confirm that

---

[3] Having dismissed Counts II, III, IV, and V, the Court declines to address Counter-Defendants' laches argument. *See* (Dkt. 54) at 13–14.

they seek appointment of a rehabilitative receiver under § 11.404, but they lean on Count VIII's fiduciary-duty aspect to support the other relief requested.

Under § 11.404, a court may appoint a receiver if: "(1) circumstances exist that are considered by the court to necessitate the appointment of a receiver to conserve the property and business of the domestic entity and avoid damage to interested parties; (2) all other requirements of law are complied with; and (3) the court determines that all other available legal and equitable remedies, including the appointment of a receiver for specific property of the domestic entity under Section 11.402(a), are inadequate." These requirements demonstrate the Texas Legislature's intent that receivership—which replaces the managers the shareholders chose with the courts' chosen managers—is a "harsh" remedy that is not readily available. *Ritchie*, 443 S.W.3d at 867 (Tex. 2014). Required for this type of relief are allegations that the entity is in imminent danger of insolvency, the actions of the governing persons are "illegal, oppressive or fraudulent," of the property of the entity is being misapplied or wasted, among other things. Tex. Bus. Orgs. Code § 11.404(a). Although the allegations of Count VIII are arguably sufficient to allege that property of Eclipse is being misapplied or going to waste and that Drew's and Lawrence's actions of taking cash payments belonging to Eclipse and diverting corporate opportunities sound in illegal and or fraudulent conduct, the receivership request in Count VIII must be dismissed because, under the Texas Business Organizations Code, this Court does not possess jurisdiction over Eclipse, which maintains its principal place of business in Duluth, Georgia. *See* (Dkt. 51) at ¶ 3; Tex. Bus. Orgs. Code § 11.402(b) (stating that the district court "in the county in which the registered office or principle place of business of a domestic entity is located has jurisdiction to" appoint a receiver under § 11.404).

As to the breach of fiduciary allegations, which support all other relief sought in Count VIII, they are dismissed. Notably, Count VIII does not specify how or by which Counter-Plaintiff it is brought. To the extent it is brought by Antonucci individually, Count VIII fails to state a claim. The elements for breach of fiduciary duty are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach of the duty by the defendant; and (3) injury to the plaintiff or benefit to the defendant. *Herring Bancorp, Inc. v. Mikkelsen*, 529 S.W.3d 216, 227 (Tex. App. 2017). But the Texas Supreme Court has never recognized a formal fiduciary duty between a majority and minority shareholder in a closely-held corporation. *Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 791 n.1 (Tex. 2014). That is, one's status as a co-shareholder in a closely-held corporation alone does not automatically create a fiduciary relationship between co-shareholders. *Opperman v. Opperman*, 2013 WL 6529228, at *4 (Tex. App. Dec. 9, 2013). "A co-shareholder in a closely held corporation does not as a matter of law owe a fiduciary duty to his co-shareholder." *Id*. (citations and quotations omitted). This is true even in the context of disproportionate ownership interests. *See id*. (noting that an *informal* fiduciary relationship can arise in certain circumstances, such as where a contract or confidential relationship exists between the shareholders). Count VIII therefore fails to allege that Drew and/or Lawrence owed a duty of loyalty to Antonucci individually.

To the extent that Count VIII is brought by Antonucci as a derivative action, it is duplicative of Count I, and duplicative claims should be dismissed. *See Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 744 (7th Cir. 2004) (citations omitted) (finding that a legal malpractice claim could not be re-characterized as a breach of fiduciary duty claim or a breach of contract claim to avoid dismissal because such claims would be duplicative). Claims are duplicative if they are based upon the same operative

facts and allege the same injury.  *Id.*  Count I and Count VIII are unquestionably based on the same operative facts—the same actions taken by Drew and Lawrence as manager and the same actions they have condoned as majority members.  That is, refusing to honor Antonucci's request to inspect Eclipse's books and records, firing Antonucci, using company money to pay their expenses, using Eclipse money for personal expenses, taking corporate opportunities and diverting them to Elite and AMS, using Elite assets and resources without compensating, and wrongful failure to issue dividends.  Count VIII therefore is dismissed without prejudice.

## CONCLUSION

For the reasons stated above, Counter-Defendants' partial motion to dismiss (Dkt. 53) is granted.  Counts II, III, IV, V of the amended countercomplaint (Dkt. 51) are dismissed with prejudice; Count VIII is dismissed without prejudice.

_____
Hon. Virginia M. Kendall
United States District Judge

Date:  June 1, 2018