# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ECLIPSE GAMING SYSTEMS, LLC, | ) |
| *Plaintiff,* | ) No. 17 C 196 |
| v. | ) Judge Virginia M. Kendall |
| ANTHONY ANTONUCCI, | ) |
| *Defendant.* | ) |

## MEMORANDUM OPINION AND ORDER

In 2016, Chief Technical Officer Anthony Antonucci approached his employer, Eclipse Gaming Systems (EGS), a gambling machine developer, to request a buy-out of his membership interest in EGS. After the parties failed to reach an agreement, Antonucci allegedly retaliated by installing a "time bomb" into a software application his company, Digital Dynamics Software, Inc. (DDS), licensed to EGS for use in its machines. The time bomb required EGS to purchase a new security key from DDS or otherwise risk its machines shutting down.

For their part, Antonucci and DDS say it is not a time bomb but a "license check" made necessary because EGS failed to pay them royalties for permitting the use of their software in EGS's machines. In DDS's view, the software EGS was running was unlicensed, so they installed an update that would confirm the current license or lock the program on the machines. To avoid putting its entire business in jeopardy, EGS elected to use a previously-licensed and older version of the software.

After much back-and-forth that involved state-court litigation, EGS sued Antonucci in federal court alleging that he violated the Computer Fraud and Abuse Act and the Illinois Computer Crime Prevention Law, along with several other state-law claims, all arising out of his secret installation of a "time bomb" in the slot machines' software. Antonucci counterclaimed, basing his first set of contentions on the common law, in addition to averring that EGS and others (collectively, "the Eclipse parties") infringed his company's copyright in the software and breached the Digital Millennium Copyright Act (DMCA).

# I

The Eclipse parties moved to dismiss (Dkt. 77) the copyright infringement and DMCA claims (Counts IV–X in the second amended countercomplaint) under Federal Rule of Civil Procedure 12(b)(6) asserting that there is no copyright claim for breach of a licensing agreement and they neither circumvented the software nor did the license check effectively control access to it. DDS responded opposing the motion (Dkt. 80), arguing that Eclipse breached a contract condition when it acted outside the scope of its license and Eclipse circumvented the license verification mechanism when it removed it while it was effectively controlling access to the software.

The Eclipse parties then replied (Dkt. 81) explaining that DDS tried to shoehorn its contractual claims into statutory claims to avail itself of the significant damages available under the Acts. Whatever the impropriety of the Eclipse parties' neglect to pony up on the licensing fees, DDS's potential remedies for it lie in state law, not under federal copyright statutes. The same, however, cannot be said of the DMCA

claims. The Court therefore grants the Eclipse parties' motion (Dkt. 77) in part and denies it in part, dismissing only Counts IV–VII of the second amended countercomplaint with prejudice.

The Court assumes the parties' familiarity with the relevant facts. *See, e.g.*, *Eclipse Gaming Sys., LLC v. Antonucci*, No. 17 C 196, 2018 WL 2463379, at *1–*3 (N.D. Ill. June 1, 2018); *Digital Dynamics Software, Inc. v. Eclipse Gaming Sys., LLC*, No. 18 C 892, 2018 WL 2463378, at *1–*5 (N.D. Ill. June 1, 2018); *Eclipse Gaming Sys., LLC v. Antonucci*, No. 17 C 196, 2017 WL 3071258, at *1–*2 (N.D. Ill. July 18, 2017).

In reviewing a motion to dismiss, a court must consider whether the complaint "'state[s] a claim to relief that is plausible on its face.'" *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

II

DDS's copyright infringement claims generally boil down to the Eclipse parties' failure to pay DDS the licensing fees they owed for running DDS's software on their slot machines. "Typically, a copyright owner who licenses his work to another 'waives his right to sue the licensee for copyright infringement.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 202 (2d Cir. 2018) (quoting *Graham v. James*, 144 F.3d 229,

236 (2d Cir. 1998)). Instead, an unpaid copyright owner normally sues for breach of contract. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010), *as amended on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). "Whether the failure of a nonexclusive licensee to pay royalties constitutes copyright infringement turns on the distinction between a promise subject to a condition and a covenant or contractual promise." *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d 121, 130 (D.P.R. 2014).

A

Broadly speaking, "the promise to pay royalties in a license agreement is generally considered a covenant, not a condition." *Id.* (citing *MDY Indus., LLC*, 629 F.3d at 939; *Graham, 144 F.3d at 236*; *Peer Intern. Corp. v. Latin American Music Corp.*, 161 F. Supp. 2d 38, 51 (D.P.R. 2001)). District courts follow that rule in this Circuit, too. *See, e.g.*, *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 338 F. Supp. 3d 841, 849–50 (N.D. Ill. 2018); *Edgenet, Inc. v. Home Depot U.S.A., Inc.*, No. 09-CV-747, 2010 WL 148389, at *6 (E.D. Wis. Jan. 12, 2010), *aff'd*, 658 F.3d 662 (7th Cir. 2011) (citing *Chapman v. Airleaf Publ. & Book Selling*, 292 F. App'x 500, 501 (7th Cir. 2008); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1198 (7th Cir. 1987), *abrogation on other grounds recognized by Glickenhaus & Co. v. Household Intern., Inc.*, 787 F.3d 408 (7th Cir. 2015)).

The issue, then, is whether the Eclipse parties' failure to pay licensing fees amounts to a breach of a covenant or a condition. On the one hand, "[a] covenant is a contractual promise, i.e., a manifestation of intention to act or refrain from acting

in a particular way, such that the promisee is justified in understanding that the promisor has made a commitment." *MDY Indus., LLC*, 629 F.3d at 939 (citations omitted). On the other hand, "[a] condition precedent is an act or event that must occur before a duty to perform a promise arises." *Id.* (citations omitted). Courts usually disfavor conditions and thus interpret any ambiguous provisions as covenants. *See id.*

B

Here, the master license agreement (MLA) makes clear that the Eclipse parties' obligation to pay licensing fees to DDS is a covenant, as opposed to a condition, of the contract. (Dkt. 70-2 ¶ 2.1 ("Upon Licensee's payment of the one-time SAS Engine Base Cost, and subject in each instance to Licensee's *subsequent timely payment* of the applicable Run-time licensing fee, DIGDYN hereby grants to Licensee a limited, nonexclusive license . . .) (emphasis added); ¶ 6.1.2 ("The Run-time license fee is *due within 30 days of Licensee's receipt of DIGDYN's invoice after the end of the calendar quarter in which such copy is first used*, sold, imported, exported, transferred or otherwise implemented by Licensee.") (emphasis added).)

The text therefore establishes that DDS would install its software program onto the Eclipse parties' slot machines *and then* Eclipse would pay DDS for those copies. So, the duty to pay licensing fees does not accrue until after DDS makes copies of its software, meaning it cannot be a condition because then it would need to occur beforehand. If anything, DDS's installation of its software onto additional machines is a condition to the Eclipse parties' obligation to pay for those new copies. DDS's

remedies for the Eclipse parties' failure to cover the licensing fees lie in contract,[1] not copyright, and the Court accordingly grants the Eclipse parties' motion to dismiss (Dkt. 77) Counts IV, V, VI, and VII of the second amended countercomplaint with prejudice.[2]

## III

DDS alleges that the Eclipse parties circumvented the license verification mechanism it installed to protect its software when the Eclipse parties removed the current software and installed an old version onto their machines. The DMCA provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A); *see MDY Indus., LLC*, 629 F.3d at 952–53; *Davidson & Assocs. v. Jung*, 422 F.3d 630, 640–41 (8th Cir. 2005); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 548–49 (6th Cir. 2004).

The Act states that "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the

---

[1] "Such breach of contract may nevertheless give rise to a claim for copyright infringement, but before a plaintiff can institute such a claim, he must affirmatively rescind the license. Only then can he seek to hold the licensee liable for infringement for the uses of the work thereafter." *Montalvo*, 56 F. Supp. 3d at 130 (citing *Graham*, 144 F.3d at 237; *Peer Intern. Corp.*, 161 F. Supp. 2d at 51–52). There being no allegations that DDS ever rescinded its license, the Court need not consider the issue any further.

[2] Considering this ruling, the Court does not reach the Eclipse parties' arguments regarding the work-for-hire doctrine and Antonucci's employment agreement. That said, the Court notes that the record seems to indicate that GAP Protocol is not distinct from SAS Engine (and SAS Gateway) in the sense that it appears to be an integral part of that software (the interface and message set used for communications) essential to its proper function.

copyright owner." 17 U.S.C. § 1201(a)(3)(A). It also explains that "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." § 1201(a)(3)(B).

A

In this case, DDS's DMCA claims are facially plausible because it pleaded that the Eclipse parties "remove[d] . . . a technological measure[ ] without the authority of the copyright owner." § 1201(a)(3)(A). DDS's license verification mechanism is like a password protection system in that it verifies user identity and blocks unauthorized users from accessing the software. (Dkt. 70 ¶ 228). In removing DDS's new software that contained the license check and replacing it with an older version that did not, the Eclipse parties employed a work-around to bypass the security measure.

That the Eclipse parties removed the entire new version of the software and not just the technological measure is a distinction without a difference that disregards the factual allegations that add up to an end-run around the system. Moreover, such an assertion fails to account for a familiar maxim in legal reasoning: the greater includes the lesser. *Cf. Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018); *United States v. Gries*, 877 F.3d 255, 259 (7th Cir. 2017). Applied here, that translates to a conclusion that removing the software necessarily includes removing the license verification mechanism installed on that software to secure it.

Sure, the Eclipse parties did not do anything to change or manipulate the software; however, the fact remains that they removed the software and reinstalled a

prior version. For that reason, *I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Info. Systems, Inc.* 307 F. Supp. 2d 521, 532 (S.D.N.Y. 2004) and *Navistar, Inc. v. New Baltimore Garage, Inc.*, No. 11-CV-6269, 2012 WL 4338816, at *4–*5 (N.D. Ill. Sept. 20, 2012), relied on by the Eclipse parties, are not to the contrary. First, those cases acknowledge that removing a technological measure suffices to state a claim under the DMCA. *See, e.g.*, *I.M.S. Inquiry Management Systems, Ltd.*, 307 F. Supp. 2d at 531–32; *Navistar, Inc.*, 2012 WL 4338816 at *3–*5.

Second, the Eclipse parties lean heavily on the fact that DDS analogized its license check to a password protection system, and that the district courts there reasoned that "using a password to access a copyrighted work, even without authorization, does not constitute circumvention under the DMCA . . ." *Navistar, Inc.*, 2012 WL 4338816 at *5. But implicit in those courts' reasoning is a recognition that the licensee already knew the password and thus had the key to the castle. Here, the Eclipse parties had no way to go through the license check and access the current software save removing it entirely. So understood, a more apt analogy is that the Eclipse parties circumvented "the deployed technological measure in the measure's gatekeeping capacity" by uprooting the locked gate. *I.M.S. Inquiry Management Systems, Ltd.*, 307 F. Supp. 2d at 532.

B

Finally, the license verification mechanism effectively controlled access to DDS's software. The Eclipse parties depend on *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546–49 (6th Cir. 2004), which held that blocking only

one form of access while leaving intact another form of access does not control access, let alone effectively, to the work in that case (laser printers). What the Eclipse parties missed in that opinion is the court granting that "a precondition for DMCA liability is not the creation of an impervious shield to the copyrighted work. Otherwise, the DMCA would apply only when it is not needed." *Id.* at 549 (citations omitted). The court made clear that its "reasoning [did] not turn on the *degree* to which a measure controls access to a work. It turns on the textual requirement that the challenged circumvention device must indeed circumvent something," which did not happen there. *Id.* (emphasis in original).

Here, the Eclipse parties flout the Sixth Circuit's analysis and base theirs on the degree to which the license verification mechanism controlled access to the software because they were able to uninstall the new software with the check and reinstall old software without it. As it so happens, DDS directed significant security efforts through the mechanism to ensure that its software could not be accessed by those without a valid license. *Cf. id.* (deciding that the copyright owner failed to verify that its work could not be read and copied). To get around those safeguards, DDS alleges that the Eclipse parties installed unlicensed software that would not lock them out, and it follows that DDS states claims under the DMCA.[3] The Court accordingly denies the Eclipse plaintiffs' motion to dismiss (Dkt. 77) with respect to Counts VIII–X.

---

[3] As stated previously, although there are no claims before the Court for breach of the master licensing agreement, it bears mentioning that a party could ostensibly, indeed concurrently, violate both a contract and federal statute (here, the DMCA).

## IV

Even though DDS needed to bring breach-of-contract claims for much of the Eclipse plaintiffs' alleged misconduct, it did not need to do so for all of it. On the record as it stands now, DDS plausibly alleged that the Eclipse plaintiffs violated the DMCA, so the Court grants the Eclipse plaintiffs' motion (Dkt. 77) in part and denies it in part, dismissing only Counts IV, V, VI, and VII with prejudice. The Court reminds the parties that they remain free to explore their options in resolving this case.

_____
Virginia M. Kendall
United States District Judge

Date: January 31, 2019