**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ECLIPSE GAMING SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:17-cv-00196 |
| | ) | |
| v. | ) | Hon. Virginia M. Kendall, Presiding |
| | ) | |
| ANTHONY ANTONUCCI, | ) | Mag. Judge Sidney I. Schenkier |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| DIGITAL DYNAMICS SOFTWARE, INC. et al., | ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ECLIPSE GAMING SYSTEMS, LLC, et al., | ) | |
| | ) | |
| Counter-Defendants. | ) | |

<u>**COUNTER DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO DIGITAL DYNAMICS SOFTWARE, INC.'S AND ANTHONY ANTONUCCI'S SECOND AMENDED COUNTERCOMPLAINT**</u>

Counter Defendants Eclipse Gaming Systems, LLC ("<u>Eclipse Gaming</u>"), Greg Drew, David Lawrence, Elite Games, LLC ("Elite"), and Accelerated Marketing Solutions ("AMS") (collectively, the "<u>Counter Defendants</u>"), in answer to Counter Plaintiffs Digital Dynamics Software, Inc.'s ("<u>DigDyn</u>") and Anthony Antonucci's (together the "<u>Counter Plaintiffs</u>") Second Amended Countercomplaint [Dkt. 70], state as follows:

<u>**ANSWERS TO COUNTER-PLAINTIFFS' SECOND AMENDED COUNTERCOMPLAINT ALLEGATIONS**</u>

Counter Defendants, by undersigned attorneys and in accordance with Federal Rule of Civil Procedure 8(b), provide the following answers to the allegations in the Counter Plaintiffs'

Second Amended Countercomplaint.  Counter Defendants respond in this Answer to the best of their current knowledge and information and consistent with the applicable rules.  The Counter Defendants' investigation in this matter continues, and they reserve the right to supplement or modify any portion of this Answer, including the affirmative and other defenses.

Counter Defendants deny all allegations, if any, contained in headings.  For the avoidance of doubt, Counter Defendants generally deny all allegations except for those specifically admitted herein.

On January 31, 2019, the Court granted Counter Defendants' Motion to Dismiss Counts IV through VII.  *See* Dkt. 94.  Accordingly, any admissions to allegations herein should not be construed as suggesting that such allegations are relevant to the remaining Counts.

## PARTIES

1.      Counter Plaintiff, Digital Dynamics Software, Inc., is an Illinois corporation ("DDS") with its principal place of business located at 444 Rand Road, in Lake Zurich, Illinois. DDS is owned by Antonucci who owns 2% of DDS personally and 98% beneficially through his interest in the Orion Trust. Antonucci is the President of DDS.

> **ANSWER:**  On information and belief, Counter Defendants admit that DDS is an Illinois corporation with its principal place of business in Lake Zurich, Lake County, Illinois. Counter Defendants lack knowledge or information sufficient to form a belief about the veracity of Counter Plaintiffs' allegations about DDS's ownership structure.  Except as expressly admitted herein, the allegations of this paragraph are denied.

2.      Counter Plaintiff, Antonucci, is an individual who resides in Lake County, Illinois. At all times relevant herein, Antonucci was a founding member and owner of ECLIPSE. Antonucci is the beneficial owner of 17.18% of ECLIPSE.

> **ANSWER:**  On information and belief, Counter Defendants admit that Antonucci resides in Lake County, Illinois. Counter Defendants admit that Antonucci is a member of Eclipse.  Counter Defendants further admit that Antonucci currently

2

owns a 17.18% interest in Eclipse—11.10% as an individual and 6.08% through DDS. Except as expressly admitted herein, the allegations of this paragraph are denied.

3. Counter Defendant, ECLIPSE, is a Texas limited liability company. ECLIPSE maintains its principal place of business at 3237 Satellite Blvd, #120, in Duluth, Georgia 30096. ECLIPSE was founded on, or about, March 11, 2008, by Antonucci and several other founding members including Jack Saltiel. ECLIPSE develops and assembles electronic gaming machines for the gambling industry. Its registered agent is Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, GA 30092. Its current Chief Executive Officer is Boris Amegadjie ("Amegadjie"). Greg Drew ("Drew") was the manager of ECLIPSE from September 2015 until July 2017. David Lawrence ("Lawrence") became the manager of Eclipse in July 2017. Drew and Lawrence, individually and beneficially, own a majority of the membership interests in ECLIPSE. ECLIPSE generates revenue by placing electronic gaming machines in Casinos and other gambling locations. ECLIPSE earns revenue by entering into revenue sharing arrangements with the casinos and gambling or gaming facilities where it provides electronic gaming machines.

> **ANSWER:** Counter Defendants admit that, at all times relevant hereto, Eclipse Gaming has been a limited liability company organized under the laws of the State of Texas and that Eclipse Gaming maintained its principal place of business in Lawrenceville, Georgia prior to March 2016. Counter Defendants further admit that Eclipse Gaming was formed in March 2008 and that Eclipse Gaming is in the business of supplying slot-style games, systems, and middleware to the worldwide gaming industry and also provides gaming services and support. Counter Defendants admit that (a) Tim Minard is the Chief Executive Officer of Eclipse Gaming; (b) Greg Drew was the manager of Eclipse Gaming between approximately June 2015 and July 2017; and (c) David Lawrence has been the manager of Eclipse Gaming since July 2017. The Eclipse Defendants further admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC, and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

4.      Counter Defendant, ELITE, is an Alabama limited liability company with offices located at 3049 Massey Road, Suite 6, Vestavia Hills, Alabama 35216.  Lawrence and Drew, individually and beneficially, wholly own the membership interests of ELITE. David Lawrence resides at 561 Mountain Trail, in Warrior, Alabama 35180. Greg Drew resides at 1300 Paprika Drive, Flower Mount, Texas 75028. Its registered agent is Greg Drew with a registered office street address of 561 Mountain Trail, Warrior, AL 35180 (which is actually the home address of David Lawrence).

> **ANSWER:**  Counter Defendants admit that Elite is an Alabama limited liability company with offices located at 3049 Massey Road, Suite 6, Vestavia Hills, Alabama 35216.  Counter Defendants further admit that David Lawrence resides at 561 Mountain Trail, in Warrior, Alabama 35180 and Greg Drew resides at 1300 Paprika Drive, Flower Mound, Texas 75028. Counter Defendants further admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC, and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC.  Counter Defendants further admit that Elite's registered agent is Greg Drew and that its registered office street address is 561 Mountain Trail, Warrior, Alabama 35180.  Except as expressly admitted herein, the allegations of this paragraph are denied.

5.      Counter Defendant, AMS, is an Alabama limited liability company. Upon information and belief and based upon an online search, AMS has its principal office at Greg Drew's residential address of 1300 Paprika Drive, Flower Mound, TX 75028. Just as with ELITE, the membership interests of AMS are wholly owned, individually and beneficially, by Lawrence and Drew.

> **ANSWER:**  Counter Defendants admit that AMS is a Nevada limited liability company with its registered principal office at 10777 W. Twain Avenue, #300, Las Vegas, NV 89135.  Counter Defendants further admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in AMS, and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in AMS. Except as expressly admitted herein, the allegations of this paragraph are denied.

6.      Counter Defendant, Greg Drew ("Drew"), is an individual residing 1300 Paprika

4

Drive, Flower Mount, Texas 75028.

> **ANSWER:** Counter Defendants admit that Drew resides at 1300 Paprika Drive, Flower Mound, Texas 75028.

7.       Counter Defendant, David Lawrence ("Lawrence"), resides at 561 Mountain Trail, in Warrior, Alabama 35180.

> **ANSWER:** Admitted.

## JURISDICTION

8.       This Court has jurisdiction over these Counter Claims pursuant to 28 U.S.C. §1367 in that they are ancillary to the Claims asserted in Plaintiff's Complaint.

> **ANSWER:** Counter Defendants admit that this Court may exercise supplemental jurisdiction over Counter Plaintiffs' counterclaims. Except as expressly admitted herein, the allegations of this paragraph are denied.

9.       Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to these Counterclaims occurred in this district – contracts were entered into in the County of Cook and the County of Lake, monies were due and owing in the County of Cook and/or the County of Lake, DDS developed the GAP Protocol software in this District, it enters into contracts regarding the licensing of the software in this District, it is where the copyright infringement damages have occurred and where monies are due and owing to DDS for the unauthorized use of its software.

> **ANSWER:** Counter Defendants admit that, to the extent that this Court exercises supplemental jurisdiction over Counter plaintiffs' counterclaims, venue is proper in the U.S. District Court for the Northern District of Illinois under 28 U.S.C. § 1391. Except as expressly admitted herein, the allegations of this paragraph are denied.

## FACTS COMMON TO ALL COUNTS

10.      At all times relevant hereto, DDS has been in the business of providing a variety

of software solutions for casino gaming communications, including the Slot Accounting System

("SAS") and Gaming Application ("GAP") protocols. DDS specializes in providing custom

software development and implementation of electronic gaming industry communications

protocols.

> **ANSWER:** Counter Defendants admit that DDS portrays itself as being in the
> business of providing "software solutions" in the casino and gambling or gaming
> industry. Counter Defendants also admit that DDS contends that it "specializes in
> providing custom communications protocols and software that is compliant with
> electronic gambling or gaming industry standards, requirements, and protocols."
> Counter Defendants admit that DDS asserts that its purported "solutions" include
> Slot Accounting System ("SAS") and Gaming Application Protocols ("GAP").
> Counter Defendants dispute those and the characterizations in this paragraph and
> accordingly deny those allegations. Except as expressly admitted herein, the
> allegations of this paragraph are denied.

11.    Starting in 2003, DDS conceived, created, and began developing a software

product known as the SAS Engine including its source code and related documentation. It uses a

universal interface and message that is commonly known as the GAP Protocol which was also

conceived, created, and developed by DDS. Starting in 2006 DDS also conceived, created, and

began developing a software/hardware device commonly known as the SAS Gateway including

its source code and related documentation. The SAS Gateway also communicates using GAP

Protocol messages. SAS stands for Slot Accounting Systems. The GAP Protocol is the interface

to the SAS Engine and the message set that the SAS Gateway uses to communicate to a host

system. The GAP Protocol has always been a key component of both these products. The GAP

protocol is defined in the engine.h and the engine.cs files, which are contained in both products.

DDS is and always has been the sole and exclusive owner the GAP Protocol and the Intellectual

Property rights including the Source Code for these software systems and products.

> **ANSWER:** Counter Defendants admit that DDS owns the intellectual property
> rights to SAS Engine and SAS Gateway software. Except as expressly admitted
> herein, the allegations of this paragraph are denied.

12.     DDS created, conceived, designed, and developed the GAP Protocol, the SAS

Engine, and the SAS Gateway, including all manuals, user documentation, and other related

materials pertaining to the GAP Protocol, the SAS Engine, and the SAS Gateway.

> **ANSWER:**  Counter Defendants admit that DDS owns the intellectual property
> rights to SAS Engine and SAS Gateway software.  Counter Defendants have
> insufficient information or belief to admit or deny that DDS designed and wrote
> SAS Engine and SAS Gateway, including the manuals, user documentation, and
> other related materials.  Accordingly, those allegations are denied.  Except as
> expressly admitted herein, the allegations of this paragraph are denied.

13.     It is DDS's business model, and custom and practice, to charge users of the SAS

Engine a license fee which includes an upfront fee of $35,000 and a one-time fee of $150.00 per

machine ("Standard Licensing Fees").

> **ANSWER:**  Counter Defendants lack knowledge or information sufficient to form
> a belief about the veracity of Counter Plaintiffs' custom and practice for licensing
> fees for his software.  Accordingly, those allegations are denied.  Except as
> expressly admitted herein, the allegations of this paragraph are denied.

14.     In 2008, Antonucci became one of the founding members of ECLIPSE. At that

time, he also became the Vice President of Systems – a title that was later revised to Chief

Technical Officer of ECLIPSE.

> **ANSWER:**  Counter Defendants admit that in 2008, Antonucci became one of the
> founding members of Eclipse Gaming Systems, LLC and that at that time, he also
> became the Vice President of Systems – a title that was later revised to Chief
> Technical Officer of Eclipse.  Except as expressly admitted herein, the allegations
> of this paragraph are denied.

15.     On January 15, 2015, Anthony Antonucci signed an Employment Agreement

with Eclipse. A true and accurate copy of the Employment Agreement is attached hereto as

Exhibit A and incorporated herein by reference.

> **ANSWER:**  Counter Defendants admit that Antonucci and Eclipse entered into a
> written Employment Agreement ("Employment Agreement") dated January 15,
> 2015.  Counter Defendants further admit that a true and accurate copy of the

Employment Agreement appears to be attached as Exhibit A to Antonucci's Counterclaim. Except as expressly admitted herein, the allegations of this paragraph are denied.

16. The Employment Agreement defines "Inventions" to mean "any and all information or data in any form or medium, tangible or intangible, relating to the properties, business activities, or operations of the Employer, including, without limitation, (a) inventions, trade secrets, ideas, processes, formulas, source and object codes, all technical information relating to the Employer's software, data, computer programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques." Reference should be made to page one of the Employment Agreement. The Employment Agreement defines "Employee Invention" to means "any and all Inventions created, conceived, or developed by the Executive, either solely or in conjunction with others, during the Employment Period, or a period that includes a portion of the Employment Period, that relates in any way to, or is useful in any manner in, the business then being conducted or proposed to be conducted by the Employer, and any such item created by the Executive, either solely or in conjunction with others, following termination of the Executive's employment with the Employer, that is based upon or uses Confidential Information. Inventions created and documented before the employment period are excluded, even if said inventions are licensed by the Employer." Reference should be made to page two of the Employment Agreement. The Employment Period for the Employment Agreement was from the effective date of the agreement, January 15, 2015, until the Antonucci termination date of August 25, 2016 ("Employment Period").

> **ANSWER:** Counter Defendants admit that the Employment Agreement defines "Employee Invention" as "any and all Inventions created, conceived, or developed by the Executive, either solely or in conjunction with others, during the Employment Period, or a period that includes a portion of the Employment Period, that relates in any way to, or is useful in any manner in, the business then being conducted or proposed to be conducted by the Employer, and any such item created by the

Executive, either solely or in conjunction with others, following termination of the Executive's employment with the Employer, that is based upon or uses Confidential Information. Inventions created and documented before the employment period are excluded, even if said inventions are licensed by the Employer." Except as expressly admitted herein, the allegations of this paragraph are denied.

17. At no time did Antonucci ever perform work on the GAP Protocol, the SAS Engine, or the SAS Gateway, as an employee of Eclipse. Antonucci did not use any Eclipse time; did not use any Eclipse computer; did not use any Eclipse employee; and did not use any other Eclipse' resource to create, conceive, or develop the GAP Protocol, the SAS Engine, or the SAS Gateway. The GAP Protocol, the SAS Engine, and the SAS Gateway, were created, conceived, and developed exclusively by DDS.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations in this paragraph are denied.

18. In 2008, DDS verbally granted to ECLIPSE a license to use the SAS Engine and SAS Gateway software applications in ECLIPSE operated electronic gaming machines. ECLIPSE has been using the SAS Engine since 2008.

> **ANSWER:** Counter Defendants admit that, after the formation of Eclipse in 2008, Antonucci's company, DDS, granted a license to Eclipse, initially through an oral agreement, for use of the SAS Engine and SAS Gateway software. Counter Defendants further admit that Eclipse has utilized SAS Engine in certain gaming machines in accordance with its licensing agreements. Except as expressly admitted herein, the allegations of this paragraph are denied.

19. Because Antonucci owned a 17.18% Membership Interest in ECLIPSE, DDS agreed that the base upfront fee for the use of the SAS engine would be waived, and that the "per machine fee" was reduced to $100.00 plus the cost of the license dongle.

> **ANSWER:** Counter Defendants admit that, pursuant to the parties' license agreement, DDS waived the upfront fee and Eclipse paid licensing fees on a per-machine basis ($100) for gaming machines that actually utilized the SAS Engine (that is, they were not configured to run the SAS Engine) in exchange for a

perpetual license. Eclipse was not required to pay DDS licensing fees for machines operating in environments that did not utilize a SAS protocol and which were accordingly configured to bypass. Counter Defendants further admit that Antonucci currently owns a 17.18% interest in Eclipse – 11.10% as an individual and 6.08% through DDS. Except as expressly admitted herein, the allegations of this paragraph are denied.

20. The verbal licensing agreement between DDS and ECLIPSE provided ECLIPSE with a non-exclusive right to copy the SAS Engine and/or SAS Gateway software upon the payment of the applicable license fees. Eclipse was not given further rights and was not given any other right, title, or interest in or to the SAS Engine or the SAS Gateway. Eclipse was not granted any right to sublicense any DDS property, including the SAS Engine or the SAS Gateway. At no time did DDS grant Eclipse or any other party a license or any other right, title or interest in or to the GAP Protocol, including the right to make copies or other use of the GAP Protocol. At no time has DDS provided ECLIPSE or any of Counter Plaintiffs' approximately 30 other licensees with the right to copy the Source Code for the SAS Engine or the SAS Gateway software applications or a license to copy or use the GAP Protocol without a fully paid SAS Engine and SAS Gateway license.

**ANSWER:** Counter Defendants admit that the oral license agreement between Eclipse and DDS granted Eclipse certain rights with respect to the use of the SAS Engine. Except as expressly admitted herein, the allegations of this paragraph are denied.

21. On March 14, 2015, DDS and Eclipse executed an agreement which is commonly known as the Master License Agreement ("MLA"). A true and accurate copy of the MLA is attached hereto as Exhibit B and incorporated herein by reference. The discussions and agreements reached relating to the MLA were between Jack Saltiel as the manager of ECLIPSE and Tony Antonucci on behalf of DDS.

**ANSWER:** Counter Defendants admit that DDS and Eclipse executed a Master License Agreement ("MLA") on March 14, 2015, and that a true and accurate copy

10

of the MLA appears to be attached as Exhibit B to Antonucci's Counterclaim. On information and belief, the discussions and agreements relating to the MLA were between Jack Saltiel and Antonucci. Except as expressly admitted herein, the allegations of this paragraph are denied.

22.     The MLA provided, at page one of thirteen, that DDS "is the owner of two gaming communications products referred to as the SAS Engine and SAS Gateway, including the Software and Documentation."

**ANSWER:** Counter Defendants admit that the recitals of the MLA state, *inter alia*, that DDS "is the owner of two gaming communications products referred to as the SAS Engine and SAS Gateway, including the Software and Documentation." Except as expressly admitted herein, the allegations of this paragraph are denied.

23.     Under the MLA Eclipse was obligated to pay license fees of $100 per machine and quarterly fees of $5000 per quarter as set forth in paragraph 1.4 of the MLA.

**ANSWER:** Counter Defendants admit that paragraph 1.4 of the MLA states, *inter alia*: "'License Fees' shall mean the SAS Engine Base Cost, and the Run-Time license fees for each copy of the Designated Software or sold to a third party by a licensee. and the maintenance fees for licensed Designated Software (maintenance is optional, but strongly recommended), as set forth is Section 6 and outlined in the table below:" Counter Defendants further admit that the table in paragraph 1.4 of the MLA lists $100.00/unit cost for "SAS Engine and SAS Gateway Run-time license fees (once per unit)" and $5,000/qtr cost for "Maintenance fees." Except as expressly admitted herein, the allegations of this paragraph are denied.

24.     Paragraph 7.2 of the MLA provided, in pertinent part, that "Licensee (Eclipse) further agrees not to interfere, disable, or otherwise modify any licensing mechanism(s) implemented by DIGDYN for preventing any unauthorized use of the Software, including but not limited to, altering the MAC address of any computer devices implementing Designated Software in an attempt to circumvent payment of any Licensing Fees."

**ANSWER:** Counter Defendants admit that the second half of Paragraph 7.2 of the MLA states, *inter alia*: "Licensee further agrees not to interfere, disable, or otherwise modify any licensing mechanism(s) implemented by DIGDYN for preventing any unauthorized use of the Software, including but not limited to, altering the MAC address of any computer devices implementing Designated

Software in an attempt to circumvent payment of any Licensing Fees." Except as expressly admitted herein, the allegations of this paragraph are denied.

25. Paragraph 7.3 of the MLA provides, in pertinent part, that: "Ownership. Licensee further acknowledges that all copies of the Software in any form provided by DIGDYN or made by Licensee are the sole property of DIGDYN….Licensee shall not have any right, title, or interest to any such Software or copies thereof except as provided in this Agreement, and further shall secure and protect all Software and Documentation consistent with maintenance of DIGDYN's proprietary rights therein."

> **ANSWER:** Counter Defendants admit that Paragraph 7.3 of the MLA states in part: "Ownership. Licensee further acknowledges that all copies of the Software in any form provided by DIGDYN or made by Licensee are the sole property of DIGDYN….Licensee shall not have any right, title, or interest to any such Software or copies thereof except as provided in this Agreement, and further shall secure and protect all Software and Documentation consistent with maintenance of DIGDYN's proprietary rights therein." Except as expressly admitted herein, the allegations of this paragraph are denied.

26. Upon information and belief, ECLIPSE operates 1000 machines which contain copies of the SAS Engine. Upon information and belief, ECLIPSE has copied or otherwise provided the SAS Engine onto machines owned and/or operated by Elite Gaming, LLC ("Elite") and Accelerated Marketing Solutions, LLC ("AMS"). Upon information and belief, both Elite and AMS are wholly owned by Drew and Lawrence. Elite owns or operates 650 machines in El Paso, Texas and it owns or operates 230 or more gaming machines in Alabama all containing copies of the SAS Engine, the SAS Gateway, and/or the GAP Protocol. Upon information and belief, ECLIPSE has provided copies of the SAS Engine, the SAS Gateway, and/or the GAP Protocol to additional machines. ECLIPSE has failed or refused to account for the number of machines containing copies of the SAS Engine, the SAS Gateway, and/or the GAP Protocol and it has failed to pay licensing fees due and owing to DDS, including licensing fees owed per machine and per

quarter by Eclipse, ELITE and AMS.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations in this paragraph are denied.

27. On December 2, 2016, Mr. Tim Fox from Gemalto issued a report to DDS identifying that Eclipse had ordered 4400 RWIID dongles which are used in conjunction with the SAS Engine. As of the date of the Gemalto Report Eclipse had only paid for 332 individual licenses and had paid no quarterly fees. Eclipse has failed and refused to report whether the copies of DDS's software were put on Eclipse, ELITE or AMS machines.

> **ANSWER:** Denied.

28. As recently as January 15, 2015, and March 14, 2015, ECLIPSE acknowledged that it had no ownership interest in the SAS Engine or the SAS Gateway inventions as those were DDS's property from a time prior to the relationship between ECLIPSE and DDS.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit that Eclipse Gaming does not own the SAS Engine or SAS Gateway software. Counter Defendants lack knowledge or information sufficient to form a belief about the veracity of whether SAS Engine or the SAS Gateway were DIGDYN's property from a time prior to the relationship between Eclipse Gaming and DIGDYN, and accordingly, that allegation is denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

29. In the first quarter of 2015, ECLIPSE became involved in negotiations with Ainsworth Game Technology, Inc., commonly known as Ainsworth North America ("Ainsworth") concerning its acquisition of the ownership rights to ECLIPSE. Ainsworth offered to pay the sum of $30 million dollars to acquire 100% of ECLIPSE. For personal reasons and not in the best interest of ECLIPSE or its other members, Greg Drew, acting as the newly appointed manager of ECLIPSE, terminated the Ainsworth transaction.

**ANSWER:** Counter Defendants admit that Jack Saltie, Carlos Lozano and, on information and belief, Antonucci became involved in negotiations with Ainsworth in connection with a transaction concerning Eclipse Gaming. Counter Defendants lack knowledge or information sufficient to form a belief about the veracity of the remaining allegations in this paragraph, and accordingly, those allegations are denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

30.     If the transaction with Ainsworth had been allowed to continue, Antonucci would have received roughly $6 million based on his 17.18% membership interest in ECLIPSE from the eventual sale.

**ANSWER:** Denied.

31.     In July of 2015, acting without a meeting or notice to the other members of ECLIPSE, Drew and his father removed Jack Saltiel as the manager of ECLIPSE and installed Drew as the new manager ("New Manager"). Thereafter, in September of 2015, Drew, acting as the New Manager of ECLIPSE rejected the purchase terms offered by Ainsworth and the acquisition discussions were terminated.

**ANSWER:** Counter Defendants admit Eclipse Gaming removed Jack Saltiel as its manager sometime in 2015 and that the decision to hire Greg Drew as manager was made by vote by the majority ownership of Eclipse Gaming in accordance with its operating agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

32.     From the execution of the MLA on March 14, 2015 until a Court hearing in the Circuit Court of Cook County on December 5, 2016 – a span of nearly 19 months - ECLIPSE never made even one single payment that was set forth in the MLA.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations in this paragraph are denied.

33.     During the same meeting in which Drew announced the termination of the Ainsworth deal, Drew fired the ECLIPSE management team including the CEO, Jack Saltiel,

the COO, Carlos Lozano, and Anthony Antonucci. Within hours of firing Antonucci, ECLIPSE

rescinded the firing and requested that Antonucci remain employed. This event constituted a

Change of Ownership or Control as described in the Antonucci Employment Agreement.

> **ANSWER:** Counter Defendants admit that Saltiel and Lozano were terminated as Eclipse's CEO and COO, respectively. Except as expressly admitted herein, the allegations of this paragraph are denied.

34.     On June 16, 2016, DDS filed suit in the Circuit Court of Cook County seeking

declaratory judgment. An Amended Complaint was filed in the action. In the Amended Complaint

DDS and Antonucci sought declaratory and injunctive relief to, inter alia, compel the release of

business and financial information from ECLIPSE to Antonucci. The Amended Complaint sought

other and additional claims and damages against ECLIPSE. Shortly after the suit was filed and

served, ECLIPSE terminated Antonucci's employment on August 25, 2016.

> **ANSWER:** Counter Defendants admit that DDS filed a now-dismissed declaratory judgment action in the Circuit Court of Cook County, Chancery Division, Case No. 2016 CH 08122, seeking a declaration that the MLA was void and unenforceable. Counter Defendants affirmatively state that DDS subsequently amended its complaint to assert a broad range of other claims relating to and arising out of the business relations between Eclipse, on the one hand, and DDS or Antonucci, on the other had. Except as expressly admitted herein, the allegations of this paragraph are denied.

35.     Since May of 2016 or earlier, Antonucci has endeavored to obtain basic business

and financial information from ECLIPSE which information has been willfully and wrongfully

withheld from Antonucci.

> **ANSWER:** Counter Defendants admit that Antonucci has asked for access to the financial books and records of Eclipse. Except as expressly admitted herein, the allegations of this paragraph are denied.

36.     Since May of 2016, ECLIPSE ceased providing Antonucci with information

relating to Eclipse's operations and finances. Prior to this time, Antonucci received such

information on a regular weekly basis.

**ANSWER:** Denied.

37.     Antonucci has asked for access to the financial books and records of ECLIPSE - which is his right as an owner.  These requests have been denied.

> **ANSWER:**  Counter Defendants admit that Antonucci has asked for access to the financial books and records of Eclipse.  Except as expressly admitted herein, the allegations of this paragraph are denied.

38.     Antonucci has sought to review the contracts currently in place between ECLIPSE and its customers to determine the profitability associated with each of the Contracts as he is being told that the Company is making very little, if any, profit on many of its transactions. Again, this request has been denied.

> **ANSWER:**   Counter Defendants admit that Antonucci has asked to review contracts currently in place between Eclipse and its customers.  Except as expressly admitted herein, the allegations of this paragraph are denied.

39.     Antonucci has questioned the expenditure of ECLIPSE's funds on expenses designed to benefit the other owners/employees personally rather than the Company.

> **ANSWER:**   Counter Defendants admit that Antonucci has questioned the expenditure of Eclipse's funds and made allegations about their misuse.  Except as expressly admitted herein, the allegations of this paragraph are denied.

40.     ECLIPSE owes substantial licensing fees for its use of the SAS Engine software. It has failed and refused to pay fees owing to DDS for machines used by ECLIPSE or for machines used by Elite or AMS which ECLIPSE has provided with the SAS Engine software. ECLIPSE has further failed to identify or account for the total number of machines using the SAS Engine software.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations in this paragraph are denied.

41.     Since 2003, DDS has expended substantial time, energy, resources, and materials to conceive, create, develop, correct, update, distribute, and protect the SAS Engine, the SAS Gateway, and/or the GAP Protocol. DDS has not licensed GAP Protocol, by itself, to any of its customers and access to or use of the GAP Protocol has only been allowed in conjunction with a paid SAS Engine or SAS Gateway license.  DDS has not previously licensed the GAP Protocol, by itself, to any of its 30 other clients and it has not ever independently licensed the GAP Protocol to Eclipse, ELITE, or AMS.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations in this paragraph are denied.

42.     DDS denies that ECLIPSE has any lawful right, title or interest in or to the GAP Protocol beyond any paid license for the use or copying of the SAS Engine. Eclipse, ELITE, and AMS have failed to pay licensing fees, including quarterly licensing fees of $5,000/quarter, as licensing fees to copy the SAS Engine or SAS Gateway.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations in this paragraph are denied.

**COUNT ONE**
**DERIVATIVE ACTION AGAINST MANAGERS AND**
**MAJORITY OWNERS OF ECLIPSE GAMING SYSTEMS, LLC**
**(Antonucci vs Drew and Lawrence)**

43.     Counter Plaintiff, Antonucci, realleges the above allegations of this Second Amended Countercomplaint as if fully set forth herein.

> **ANSWER:**  Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

44.     This derivative action is brought on behalf of Eclipse Gaming Systems, LLC ("ECLIPSE") and Antonucci, individually, pursuant to the Texas Business Organizations   Code

§101.463(c)(1) and (2), to remedy and to recover damages sustained as a result of breaches of

fiduciary duty and corporate waste by members of ECLIPSE's Board of Directors, majority

owners, and senior executives.

> **ANSWER:** Counter Defendants admit that Counter Plaintiff purports to characterize his counterclaim in the manner described in this paragraph but deny that there exists any basis in law or fact for Counter Plaintiff to do so. Except as expressly admitted herein, the allegations of this paragraph are denied.

45.     At all times relevant herein, the Texas Business Organizations Code provided in

relevant part, at 3(c)(1) and (2) as follows:

> "CLOSELY HELD LIMITED LIABILITY COMPANY. (a) In this section, "closely held limited liability company" means a limited liability company that has:
> (1) fewer than 35 members; and (2) no membership interests listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association.
> (b)  Sections 101.452-101.459 do not apply to a closely held limited liability company.
> (c)  If justice requires:
> (1)   a derivative proceeding brought by a member of a closely held limited liability company may be treated by a court as a direct action brought by the member for the member's own benefit; and
> (2)   a recovery in a direct or derivative proceeding by a member may be paid directly to the plaintiff or to the limited liability company if necessary to protect the interests of creditors or other members of the limited liability company."

> **ANSWER:** Counter Defendants admit that Section 101.463 of the Texas Business Organizations Code, effective September 1, 2007, includes the language quoted in this paragraph. Except as expressly admitted herein, the allegations of this paragraph are denied.

46.     Nominal Counter Defendant, ECLIPSE, is a limited liability company organized

under the laws of the State of Texas with business offices located in Duluth, Georgia 30096. Its

current Chief Executive Officer is Boris Amegadjie ("Amegadjie"). Drew was the manager of

ECLIPSE from September 2015 until July 2017, and Drew is a one-half owner of Elite Gaming,

LLC ("Elite") and Accelerated Marketing Solutions, LLC ("AMS"). Lawrence became the

manager of Eclipse in July 2017 and he is also a one-half owner of Elite and AMS. Drew and

Lawrence are collectively referred to herein as the "Director Counter Defendants." ECLIPSE is in the electronic gaming machine business and generates revenue by placing electronic gaming machines in Casinos and other gaming locations. ECLIPSE earns revenue, in part, by entering into revenue sharing arrangements with the casinos and gaming facilities with which it places electronic gaming machines. ECLIPSE was formed on or about March 11, 2008, for the purpose of developing and manufacturing electronic games and systems for the electronic gaming industry.

> **ANSWER:** Counter Defendants admit that, at all times relevant hereto, Eclipse Gaming has been a limited liability company organized under the laws of the State of Texas and that Eclipse Gaming maintained its principal place of business in Lawrenceville, Georgia prior to March 2016. Counter Defendants further admit that Eclipse Gaming was formed in March 2008 and that Eclipse Gaming is in the business of supplying slot-style games, systems, and middleware to the worldwide gaming industry and also provides gaming services and support. Counter Defendants further admit that Eclipse Gaming has earned licensing fees pursuant to its software licensing agreements with Elite Games LLC or AMS. Counter Defendants further admit that (a) Tim Minard is the Chief Executive Officer of Eclipse Gaming; (b) Greg Drew was the manager of Eclipse Gaming between approximately June 2015 and July 2017; and (c) David Lawrence has been the manager of Eclipse Gaming since July 2017. The Eclipse Defendants further admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC, and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

47. In July of 2015, ECLIPSE removed Jack Saltiel as its Manager, fired its management team, and installed Drew as the new manager of ECLIPSE ("New Manager").

> **ANSWER:** Counter Defendants admit that Saltiel was Manager of Eclipse Gaming until June 2015. Counter Defendants further admit that the decision to hire Greg Drew as manager was made by vote by the majority ownership of Eclipse Gaming in accordance with its operating agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

48. The decision to install Drew as the New Manager was made by Drew and his father, Bob Drew, as the majority owners of ECLIPSE. Upon information and belief, Drew

became the New Manager in September of 2015.

> **ANSWER:** Counter Defendants admit that the decision to hire Greg Drew as manager was made by vote by the majority ownership of Eclipse Gaming in accordance with its operating agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

49. Upon information and belief, Drew retained and hired new officers for ECLIPSE including, but not limited to, Amegadjie who is acting as a CEO and as the agent of Drew and/or Lawrence.

> **ANSWER:** Counter Defendants admit that Tim Minard acts as Eclipse's CEO. Except as expressly admitted herein, the allegations of this paragraph are denied.

50. From and after the installation of Drew as the New Manager, he and other officers have owed a fiduciary duty to ECLIPSE and its owners. Officers and employees who exercise managerial authority vested in a manager owe a fiduciary duty to ECLIPSE and its members.

> **ANSWER:** Counter Defendants admit that Greg Drew owed certain fiduciary duties to Eclipse Gaming during the time when he was its Manager. Counter Defendants further admit that, as its Manager, David Lawrence owes certain fiduciary duties to Eclipse Gaming. Counter Defendants further admit that those fiduciary duties are circumscribed by contract and/or law. Except as expressly admitted herein, the allegations of this paragraph are denied.

51. At all times relevant herein, Drew and Lawrence, including their agent Amegadjie ("Management Representatives") owed a fiduciary duty to ECLIPSE and its members to act with loyalty and care. This duty includes the obligation to act in good faith and fair dealing in all matters related to ECLIPSE and its members and to avoid self-dealing transactions.

> **ANSWER:** Counter Defendants admit that Greg Drew owed certain fiduciary duties to Eclipse Gaming during the time when he was its Manager. Counter Defendants further admit that, as its Manager, David Lawrence owes certain fiduciary duties to Eclipse Gaming. Counter Defendants further admit that those fiduciary duties are circumscribed by contract and/or law. Except as expressly admitted herein, the allegations of this paragraph are denied.

52.     The duty of loyalty imposes upon the Management Representatives a duty to refrain from appropriating company opportunities; to avoid unfair or self-dealing transactions; and to avoid competing with ECLIPSE.

> **ANSWER:** Counter Defendants decline to respond to the allegations in this paragraph as they constitute a legal conclusion and no response is required thereto. To the extent that a response is required, the allegations of this paragraph are denied.

53.     Demand on the ECLIPSE Board of Directors or upon its manager to bring this suit against individual Counter Defendants herein would be a futile and useless act, in that Counter Defendants committed the wrongs complained of herein, profited from the wrongs, and would not sue themselves or cause ECLIPSE to file suit against themselves. The Director Counter Defendants own, either individually or beneficially, the controlling interests of ECLIPSE and the Director Counter Defendants participated in, were aware of, or approved the unlawful activities complained of and therefore are not independent and disinterested. The acts that are complained of in the Counter Claims constitute violations of fiduciary duties owed to ECLIPSE and its members, and these acts are incapable of ratification.

**ANSWER:** Denied.

54.     Each of the Director Counter Defendants has acted wrongfully and/or participated in, had knowledge of, intentionally disregarded, and/or benefited from such wrongful conduct in one or more of the following ways:

> **ANSWER:** Denied.

A.     The Director Counter Defendants caused or permitted revenue which was due and owing to ECLIPSE from the Speaking Rock Casino account to be diverted or paid to Elite Gaming, LLC ("Elite"). Elite is owned one-half by David Lawrence and one-half by Greg Drew. Counter

21

Plaintiff has requested financial information and reports concerning the financial obligations owed by Elite to ECLIPSE concerning the Speaking Rock Casino account and ECLIPSE has refused to produce any such information. Upon information and belief, the Speaking Rock Casino produced profits of $150,000 per week. This profit is generated from the operation of 625 to 650 gaming machines in the Speaking Rock Casino located in El Paso, Texas. ECLIPSE, by and through its CEO, Boris, has taken the position during calendar year 2017 that ECLIPSE will have to "live without" the Speaking Rock revenue, including any revenue due and owing from Elite. Upon information and belief, substantial funds have been diverted from ECLIPSE to Elite and for the direct benefit of its two owners, David Lawrence and Greg Drew.

> **ANSWER:** Counter Defendants admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC, and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC. Counter Defendants further admit that Antonucci has requested financial information concerning, *inter alia*, Eclipse Gaming and Elite Games LLC. Counter Defendants further admit that, pursuant to the software licensing agreement between Eclipse Gaming and Elite Games LLC, Eclipse Gaming earns licensing fees calculated based on a percentage of the Net Hold—*i.e.*, the gross revenue generated by play of any electronic gaming machines operated by the software less winners paid. Counter Defendants further admit that the Net Hold and number of gaming machines are not fixed, but vary from time to time. Except as expressly admitted herein, the allegations of this paragraph are denied.

B.     The Director Counter Defendants caused or permitted revenue which was due and owing to ECLIPSE from the Speaking Rock Casino account to be diverted or paid to Accelerated Marketing Solutions, LLC ("AMS"). Like Elite, AMS is owned one-half by Lawrence and one- half by Drew. Counter Plaintiff has requested financial information and reports concerning the financial obligations owed by AMS to ECLIPSE for the Speaking Rock Casino account and ECLIPSE has refused to produce any such information. Upon information and belief, the Speaking Rock Casino produced profits of $150,000 per week. This profit is generated from the operation of 625 to 650 gaming machines in the speaking rock casino located

in El Paso, Texas. ECLIPSE, by and through its CEO, Boris, has taken the position during calendar year 2017 that ECLIPSE will have to live without the Speaking Rock revenue, including any revenue due and owing from AMS. Upon information and belief, substantial funds have been diverted from ECLIPSE to AMS and for the direct benefit of its two owners, Lawrence and Drew.

> **ANSWER:** Counter Defendants admit that (a) Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Accelerated Marketing Solutions, LLC ("AMS"), and (b) David Lawrence has a beneficial interest in a trust that maintains a 50% interest in AMS. Counter Defendants further admit that Antonucci has requested financial information concerning, *inter alia*, AMS. Counter Defendants further admit that, pursuant to a software licensing agreement between Eclipse Gaming and AMS, for a period of time, Eclipse Gaming earned licensing fees that were calculated based on a percentage of the Net Hold—*i.e.*, the gross revenue generated by play of any electronic gaming machines operated by the software less winners paid. Counter Defendants further admit that the Net Hold and number of gaming machines was not fixed, but instead varied from time to time. Counter Defendants further admit that Eclipse Gaming and AMS ceased conducting business with Speaking Rock following the federal court decision in the *State of Texas v. Ysleta Del Sur Pueblo* case. Except as expressly admitted herein, the allegations of this paragraph are denied.

C.      ECLIPSE has paid excessive and unnecessary expenses to provide Boris, Drew, and Lawrence with personal gifts including season tickets to professional sporting events, expensive golf outings, and personal watches and/or jewelry costing thousands of dollars.

**ANSWER:** Denied.

D.      At all times prior to June of 2015, AMS and Elite were distributors of ECLIPSE gaming machines and paid 9.5% of the gross revenue received from various casino accounts, including a cash paying casino account in Alabama, for the use of ECLIPSE games. From and after the removal of Saltiel, Lozano, and Antonucci as employees, ECLIPSE has failed and refused to provide financial information to Antonucci, including information concerning cash payments received from various casino accounts. Upon information and belief, Lawrence

personally picks up cash payments from the Rivers Edge Casino or gaming facility in Alabama and in a weekly amount of approximately $25,000 - $30,000. Upon information and belief, ECLIPSE has not received its agreed upon fees for the use of ECLIPSE gaming machines in the Rivers Edge Casino in Alabama and ECLIPSE has refused to provide accounting or other financial information to allow Antonucci to verify that ECLIPSE is receiving proper revenue from AMS and Elite sites. On information and belief funds due and owing to ECLIPSE from these weekly cash payments are not being paid to ECLIPSE and have not been reported by Lawrence or the Director Counter Defendants to the members of ECLIPSE. Annually, these payments are equal to the sum of $1.2 to $1.44 million and ECLIPSE is entitled to between $114,000 and $136,8000 as and for its 9.5% fee on gross casino revenue earned on ECLIPSE's gaming machines.

> **ANSWER:** Counter Defendants admit that Eclipse Gaming has earned licensing fees pursuant to its software licensing agreements with Elite Games LLC or AMS which was calculated pursuant to a percentage of the Net Hold—*i.e.*, the gross revenue generated by play of any electronic gaming machines operated by the software less winners paid. Counter Defendants further admit that the Net Hold and number of gaming machines in any of the casinos was not fixed, but instead varied from time to time. Except as expressly admitted herein, the allegations of this paragraph are denied.

E.      The Director Counter Defendants use Eclipse to provide free assets and resources to ELITE, including the free use of Eclipse's employees to provide good and valuable services without payment to ECLIPSE.

**ANSWER:** Denied.

F.      The Director Counter Defendants use Eclipse to provide free assets and resources to AMS, including the free use of Eclipse's employees to provide good and valuable services without payment to ECLIPSE.

**ANSWER:** Denied.

G.     Both Drew and Lawrence received salaries in the amount of $100,000 per year from ECLIPSE without performing any employment duties or responsibilities and without having any day-to-day work responsibilities to ECLIPSE. The other members are not similarly compensated.

> **ANSWER:** The Eclipse Defendants admit that Greg Drew and David Lawrence have, at certain times, received salaries of $100,000 per year from Eclipse Gaming. Except as expressly admitted herein, the allegations of this paragraph are denied.

H.     ECLIPSE maintains excessively large and extravagant offices, including offices in the Chicago area which are nearly vacant, for the sole purpose of increasing expenses in order to avoid paying any profits to its minority members, including Antonucci

**ANSWER:** Denied.

I.     The Director Counter Defendants used ECLIPSE money to pay their personal expenses and to pay the personal expenses of their agent, Amegadjie;

**ANSWER:** Denied.

J.     Took cash payments from the Rivers Edge Casino or facility and failed to account for such monies to ECLIPSE and its members;

**ANSWER:** Denied.

K.     Otherwise, took corporate opportunities and diverted them to companies which the Director Counter Defendants wholly owned;

**ANSWER:** Denied.

L.     The Director Counter Defendants wrongfully failed to declare dividends;

**ANSWER:** Denied.

M. The Director Counter Defendants, and each of them, have otherwise breached their fiduciary duties to ECLIPSE by act or omission and have otherwise secured personal financial benefit at the expense of ECLIPSE and its minority members, including Antonucci. The Director Counter Defendants otherwise acted in violation of their duty of loyalty.

**ANSWER:** Denied.

55. ECLIPSE has suffered financial loss, including the loss of revenue, the loss of the use of its employees, and has incurred unnecessary and unreasonable expenses to pay the personal expenses of the Director Counter Defendants, as a direct result of the acts and omissions of Drew, Lawrence, and/or their agent, Amegadjie.

**ANSWER:** Denied.

56. The Director Counter Defendants are majority owners and/or executives of ECLIPSE and are fiduciaries of ECLIPSE and of all of its members and owe each of them the duty to conduct the business of ECLIPSE loyally, faithfully, carefully, diligently, and prudently.

> **ANSWER:** Counter Defendants admit that Greg Drew owed certain fiduciary duties to Eclipse Gaming during the time when he was its Manager. Counter Defendants further admit that, as its Manager, David Lawrence owes certain fiduciary duties to Eclipse Gaming. Counter Defendants further admit that those fiduciary duties are circumscribed by contract and/or law. Except as expressly admitted herein, the allegations of this paragraph are denied.

57. The Director Counter Defendants were aware, or should have become aware through reasonable inquiry and diligence, of the adverse facts alleged herein, but did nothing to correct them and thereby breached their duty of care, loyalty, accountability, and disclosure to the members of ECLIPSE by failing to act as an ordinary prudent person would have acted in a like position.

**ANSWER:** Denied.

58.     The Director Counter Defendants have been responsible for the gross and/or intentional mismanagement of ECLIPSE in connection with its management of customer accounts and its receipt and accounting of payments, including cash payments, and in other matters entrusted to their responsibility. Said Counter Defendants abdicated their corporate responsibilities by mismanaging ECLIPSE in at least the following ways:

A.     They diverted customers and revenue to Elite Gaming;

**ANSWER:**  Denied.

B.     They diverted customers and revenue to AMS;

**ANSWER:**  Denied.

C.     They failed to institute adequate cash control measures;

**ANSWER:**  Denied.

D.     They failed to protect customer payments or to institute strict accounting and reporting measures concerning cash payments by customers. Instead, cash payments were gathered into large plastic garbage bags and stored in closets or other rooms;

**ANSWER:**  Denied.

E.     They concealed from ECLIPSE and its minority members the truth regarding ECLIPSE's sales and revenue and failed to institute adequate internal controls to prevent the loss of revenue and to prevent the Director Counter Defendants from taking company funds   and company opportunities.

**ANSWER:**  Denied.

F.     They knowingly allowed ELITE and AMS to utilize the valuable assets and resources of Eclipse, including its employees, without charge or compensation. They intentionally caused ECLIPSE's revenue to fall and expenses to rise all to the financial detriment of Antonucci

and other minority members by leasing unnecessary office space, paying personal expenses of majority owners, and transferring corporate opportunities and revenue to other business entities.

**ANSWER:** Denied.

G.     Drew and Lawrence were otherwise responsible for the gross and/or intentional mismanagement of ECLIPSE.

**ANSWER:** Denied.

59.     By virtue of the above-described conduct, the Director Counter Defendants, Drew and Lawrence, and their agent, Amegadjie, have abused their authority over ECLIPSE for the purpose of obtaining personal benefit not in the best interest of the company or the interests of the other members and owners. As a result of the wrongful conduct and wrongful actions of the Director Counter Defendants, ECLIPSE has suffered and will continue to suffer considerable damage.

**ANSWER:** Denied.

60.     The Director Counter Defendants, singly and in concert, engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of their fiduciary duties to ECLIPSE and conspired to, and did, abuse the control vested in them by virtue of their high-level positions in ECLIPSE. The actions of the Director Counter Defendants violated their duty of loyalty and did not comport with the honest exercise of business judgment.

**ANSWER:** Denied.

61.     By reason of the foregoing, the Director Counter Defendants have breached their fiduciary obligations to ECLIPSE and its members.

**ANSWER:** Denied.

62.     ECLIPSE and its members have been injured by reason of the Director Counter

Defendants' intentional breach and/or reckless disregard of their fiduciary duties to ECLIPSE. Counter Plaintiff, Antonucci, as a member and representative of ECLIPSE, seeks damages and other relief for monetary damages and in such amounts as are demonstrated by the proofs offered at the time of trial.

> **ANSWER:** Counter Defendants admit that Antonucci purports to seek "damages and other relief for monetary damages and in such amounts as are demonstrated by the proofs offered at the time of trial," but deny that there is any basis in fact or law for any such relief. Except as expressly admitted herein, the allegations of this paragraph are denied.

**WHEREFORE,** Counter Plaintiff, Anthony Antonucci, individually and derivatively for the benefit of Eclipse Gaming Systems, LLC, prays that this Honorable Court enter judgment in their favor and against the Counter Defendants, Greg Drew, and David Lawrence jointly and severally, as follows:

A.   That the Court order Eclipse Gaming Systems, LLC be compelled to account for and document all customer accounts, all customer contracts, and all company revenue, including all cash receipts;

B.   That the Director Counter Defendants be ordered to pay restitution to Eclipse and/or Anthony Antonucci, as the facts and circumstances at the time of Judgment warrant, for all Eclipse revenue diverted to any other business and for all improper expenses paid or incurred by Eclipse and in such sums and amounts as this Court deems just and appropriate under the circumstances;

C.   For judgment in favor of Eclipse Gaming Systems, LLC for the benefit of its members and against the Counter Defendants, Greg Drew and David Lawrence, as established by the proofs offered at the time of trial or judgment and in an amount sufficient to compensate the members for the financial losses caused by such Counter Defendants;

D.      In favor of Counter Plaintiff, Anthony Antonucci, and against the Counter Defendants, Greg Drew and David Lawrence, for restitution and/or damages and awarding punitive and exemplary damages as appropriate, plus prejudgment interest.

E.      Extraordinary equitable and/or injunctive relief as permitted by law and equity, so as to assure that Counter Plaintiff and Eclipse Gaming Systems, LLC have an effective remedy.

F.      For judgment against Greg Drew and David Lawrence for the return or disgorgement of their salary or other compensation paid from Eclipse Gaming Systems, LLC during the times in which they breached their fiduciary duties to Eclipse Gaming Systems, LLC.

G.      Awarding Counter Plaintiff, Anthony Antonucci, the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

H.      Awarding such other relief as the Court may deem just and proper.

**ANSWER:**  Counter Defendants deny that Antonucci is entitled to any of the relief he seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

<u>**COUNT TWO**</u>
<u>**BREACH OF EMPLOYMENT**</u>
<u>**AGREEMENT AND WRONGFUL**</u>
<u>**DISCHARGE**</u>
**(Antonucci vs Eclipse)**

63.     Counter Plaintiff, Antonucci, reallege the above allegations of this Second Amended Countercomplaint as if fully set forth herein.

**ANSWER:**  Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

64.     At all times relevant herein, Counter Plaintiff, Antonucci, was an owner and member of ECLIPSE.  Antonucci is the beneficial owner of 17.18% of ECLIPSE.

**ANSWER:**  Counter Defendants admit that Antonucci currently owns a 17.18% interest in Eclipse Gaming—11.10% as an individual and 6.08% through Digital

Dynamics Software Inc. Except as expressly admitted herein, the allegations of this paragraph are denied.

65.     Antonucci, along with several other founding members, created ECLIPSE in 2008. Antonucci began working for ECLIPSE on, or about, the date of March 31, 2008. Antonucci was initially the Vice President of Systems and later became the Chief Technical Officer. Subsequently, on, or about, the date of January 15, 2015, Antonucci and ECLIPSE entered into a written Employment Agreement ("Employment Agreement"). A true and accurate copy of the Employment Agreement is attached hereto as Exhibit A and incorporated herein by reference.

> **ANSWER:** Counter Defendants admit that in 2008, Antonucci became one of the founding members of Eclipse Gaming and that at that time, he also became the Vice President of Systems – a title that was later revised to Chief Technical Officer of Eclipse. Counter Defendants also admit that Antonucci and Eclipse entered into a written Employment Agreement ("Employment Agreement") dated January 15, 2015. Counter Defendants further admit that a true and accurate copy of the Employment Agreement appears to be attached as Exhibit A to Antonucci's Counterclaim. Except as expressly admitted herein, the allegations of this paragraph are denied.

66.     When the Employment Agreement was executed and entered into, Jack Saltiel was the Manager of ECLIPSE.

> **ANSWER:** Admitted.

67.     Pursuant to the provisions of paragraph 2.2 of the Employment Agreement, the term of Antonucci's employment was for five years ("Initial Term"), beginning on the effective date of the Employment Agreement.

> **ANSWER:** Counter Defendants admit that paragraph 2.2 of the Employment Agreement provides:
>
> > 2.2 Term. Subject to the provisions of Section 6, the term of the Executive's employment under this Agreement will be five years (the "Initial Term"), beginning on the Effective Date and ending on the fifth anniversary of the Effective Date. At the end of the Initial Term, the

Employer, with the mutual agreement of the Executive, shall have the option to extend the term for an additional two-year term (the "Second Term"), beginning on the fifth anniversary of the Effective Date and ending on the seventh anniversary of the Effective Date. At the end of the Second Term, the Employer, with the mutual agreement of the Executive, shall have the option to extend the term for an additional two-year term (the "Third Term"), beginning on the seventh anniversary of the Effective Date and ending on the ninth anniversary of the Effective Date. Except as expressly admitted herein, the allegations of this paragraph are denied.

68.     As set forth at page two of the Employment Agreement, Antonucci was eligible for retirement benefits from ECLIPSE. The Employment Agreement provided, in relevant part, that: "Retirement Eligibility" has the following meaning. An Executive is eligible for retirement and any benefits that may accrue from such retirement if the sum of full years of service and the Executive's age in full years meet or exceed 66, with at least 6 years of service."

**ANSWER:** Counter Defendants admit that "Retirement Eligibility" is defined on page 2 of the Employment Agreement as having the following meaning: "An Executive is eligible for retirement and any benefits that may accrue from such retirement if the sum of full years of service and the Executive's age in full years meet or exceed 66, with at least 6 years of service." Except as expressly admitted herein, the allegations of this paragraph are denied.

69.     Section 3 of the Employment Agreement provided that Antonucci was entitled to salary and other compensation from ECLIPSE. The Employment Agreement provided, in pertinent part, as follows:

"3.1 Salary. The Executive will be paid an annual salary of $160,000, subject to adjustment as provided below (the "Salary"), which will be payable in equal periodic installments according to the Employer's customary payroll practices, but no less frequently than monthly. The Salary will be reviewed by the Manager not less frequently than annually, and may be adjusted upward or downward in the sale discretion of the Manager, but in no event will the Salary be less than the initial rate shown above. In the absence of any other adjustment the Executive's Salary will increase at a rate of 6%, every year, starting on January 1, 2016.

3.1.1 Higher Salary Adjustment. If the Company meets the objectives set forth in section 3.1.2 then the Executive's Salary will be adjusted as of January 15 as follows:
        (a)     10% if 85-120% of the goal is accomplished;
    (b) 15% if more than 120% of the goal is accomplished.

32

3.1.2 Performance Goal. The Performance Goal will be to increase EBITDA and Net Earnings by 20% over the previous year.

3.2 Benefits. The Executive will, during the Employment Period, be permitted to participate in such pension, profit sharing, bonus, life insurance, hospitalization, major medical, disability, and other employee benefit plans of the Employer that may be in effect from time to time to the extent the Executive is eligible under the terms of those plans (collectively, the "Benefits"). In addition, at the discretion of The Manager, an allowance for a company paid vehicle may be paid to the employee. The vehicle allowance, once started, may only be ended through termination, not including Change of Ownership or Control as defined in 6.6.

3.3 Bonus. The Executive will be entitled to participate in the Company's Bonus Pool, to be determined by the Manager based on performance goals set for the company on an annual basis. Nominal performance (100%) against the predetermined goals (which have been jointly agreed by the Manager and the Executive) will enable the Executive to earn a bonus equal to 35% of his Salary as of year-end. The Bonus schedule will allow the Bonus to be scaled up or down depending upon performance achieved against the predetermined goals. THESE GOALS WILL BE DEFINED BY THE MANAGER NO LATER THAN APRIL 1, of each calendar year."

> **ANSWER:** Counter Defendants admit the language block quoted in this paragraph appears in the Employment Agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

70.     The Employment Agreement also contained provisions governing the obligations

of ECLIPSE to Antonucci in the event of a Change in Control, as that term is defined in the

Employment Agreement. The Change of Control provisions provide, in relevant part, as

follows:

6.6 Definition of Change of Ownership or Control. Change of ownership is defined as (i) any aggregate transaction in which the owners/stockholders of ECLIPSE as of the Effective Date would own, in the aggregate, less than 75% of the total combined voting power of all classes of capital stock of the surviving entity normally entitled to vote for the election of directors/officers/managers of the surviving entity; or
     (ii) the sales by ECLIPSE of all or substantially all of ECLIPSE's assets in one or a series of related transactions.
     Change of control is defined as any change whereby either the current (as of the Effective Date) Manager, CEO, COO and/or VP Systems Development are no longer with the Company or are in positions lower than their current position or any of their individual responsibilities and/or authority are in any way diminished.

> **ANSWER:** Counter Defendants admit the language block quoted in this paragraph appears in the Employment Agreement. Except as expressly admitted herein, the

allegations of this paragraph are denied.

71.     The Employment Agreement provides that Antonucci is entitled to compensation upon the occurrence of a Change of Control event.  The Employment Agreement provides:

6.7 Termination Pay. (f) Change of ownership or control. The Executive will have the option to either (i) receive up to three years compensation as defined by this agreement or compensation for the remainder of this agreement, including all benefits; or (ii) execute a new employment agreement with the Company.

**ANSWER:** Counter Defendants admit the language block quoted in this paragraph appears in the Employment Agreement.  Except as expressly admitted herein, the allegations of this paragraph are denied.

72.     Prior to June 12, 2015, Mr. Saltiel was the CEO and Manager of ECLIPSE and Mr. Lozano was the COO. On or about June 12, 2015, Drew (the owner of Elite, which holds 40% of the member interests in ECLIPSE) and his father, Bob Drew (owner of 12.18% of the member interests in ECLIPSE), removed Mr. Saltiel as Manager of ECLIPSE and replaced him with Drew.

**ANSWER:** Counter Defendants admit that Saltiel was Manager of Eclipse Gaming and Lozano was its COO until June 2015.  Counter Defendants further admit that the decision to hire Greg Drew as manager was made by vote by the majority ownership of Eclipse Gaming in accordance with its operating agreement.  Except as expressly admitted herein, the allegations of this paragraph are denied.

73.     Thereafter, on, or about, September 15, 2015, Drew terminated the employment of Mr. Saltiel and Mr. Lozano. The termination of the Manager, the CEO, and the COO constitutes a Change of Control event as provided in the Employment Agreement. Despite the occurrence of a Change of Control event, ECLIPSE failed to pay Change of Control monies or benefits to Antonucci. Coincidentally, Antonucci was also fired on September 15, 2015, as a part of the sweep of existing management, but the firing was rescinded within hours that same day.

**ANSWER:** Counter Defendants admit that Saltiel's employment as CEO and manager and Lozano's employment as COO was terminated in September 2015. Except as expressly admitted herein, the allegations of this paragraph are denied.

74.     Under the Employment Agreement, Antonucci was entitled to receive

Retirement Benefits.  The Employment Agreement provided at paragraph 6.7 that:

(g) Retirement. In the event that the Executive chooses to retire and is eligible as defined in Section 1, the Executive will receive the following benefits:

(i) 65% of his then current salary for the remainder of his contract or for three full years, whichever is greater.

(ii) all of his benefits for same period as in (i) including, but not limited to: health insurance, 401(k), car allowance and any other benefits that might have regularly accrued to said Executive.

**ANSWER:**  Counter Defendants admit that paragraph 6.7(g) of the Employment Agreement contains the language block quoted in this paragraph.  Except as expressly admitted herein, the allegations of this paragraph are denied.

75.     For years, Eclipse provided Antonucci with regular financial information and

records, including but not limited to Weekly Cash Summary Reports.

**ANSWER:**  Counter Defendants admit that Eclipse Gaming LLC provided Antonucci with certain financial statements and records consistent with his status as a member of Eclipse Gaming LLC.  Except as expressly admitted herein, the allegations of this paragraph are denied.

76.     From and after July of 2016, ECLIPSE has failed and refused to provide Weekly

Cash Summary Reports and other business information to Antonucci.

**ANSWER:**  Denied.

77.     On July 15, 2016, Antonucci made lawful demand for production of Weekly

Cash Summary Reports and all information involving the business affairs and financial

condition of ECLIPSE. A true and accurate copy of said demand letter is attached hereto as

Exhibit C and incorporated herein by reference.

**ANSWER:**  Counter Defendants admit that Antonucci issued a demand letter and that a true and accurate copy appears to be attached to the Second Amended Counter Complaint as Exhibit C.  Except as expressly admitted herein, the allegations of this paragraph are denied.

78.     Antonucci fully performed his obligations under the Employment Agreement.

**ANSWER:** Denied.

79.     However, after Antonucci began questioning various business practices being engaged in by other Members, Managers and Officers of ECLIPSE, those very Members, Managers and Officers engaged in a subterfuge to eventually terminate Antonucci's Employment Agreement.

**ANSWER:** Denied.

80.     Despite fully performing his Employment Agreement, Antonucci's employment was terminated on August 25, 2016.     Eclipse wrongfully terminated Antonucci's employment agreement after Antonucci continued to demand access to financial information, including Cash Summary Reports. Antonucci was fired, in part, to deny him access to financial information relevant to his ownership interests in ECLIPSE. Said termination was also motivated by ECLIPSE's desire to prevent Antonucci from receiving Retirement Benefits.

**ANSWER:** Denied.

81.     The Employment Agreement defines "Retirement Eligibility" as being the sum of the full years in your age, plus the full years of service that Antonucci spent with ECLIPSE. Antonucci was born in July of 1959. Based on his March 31, 2008 start date with ECLIPSE, Antonucci was eligible for Retirement Benefits commencing on the date of March 31 of 2017.

> **ANSWER:**  Counter Defendants admit that "Retirement Eligibility" is defined on page 2 of the Employment Agreement as having the following meaning: "An Executive is eligible for retirement and any benefits that may accrue from such retirement if the sum of full years of service and the Executive's age in full years meet or exceed 69, with at least 7 years of service."  Except as expressly admitted herein, the allegations of this paragraph are denied.

82.     ECLIPSE terminated Antonucci's employment on August 25, 2016 and such

termination was wrongful and without justification or good cause. At the time of the termination, Antonucci was paid a salary of $160,000 per year. Under the terms of the Employment Agreement, Antonucci was entitled to salary increases at the minimum rate of 6% per annum from and after January 1, 2016.

> **ANSWER:** Counter Defendants admit that Antonucci's employment was terminated on or about August 25, 2016. Except as expressly admitted herein, the allegations of this paragraph are denied.

83. ECLIPSE violated the Employment Agreement by failing to pay to Antonucci all of the Compensation and Benefits to which he was entitled.

**ANSWER:** Denied.

84. Further, the Management Team at ECLIPSE knew that Antonucci was only a few months away from becoming eligible for Retirement Benefits pursuant to 6.6(g) of the Employment Agreement.

**ANSWER:** Denied.

85. Those Retirement Benefits would have included approximately Three Hundred Thousand Dollars ($300,000.00) in salary plus health insurance, 401(k), car allowance, etc for that same three (3) year period.

**ANSWER:** Denied.

86. On or about August of 2016, ECLIPSE notified Antonucci that he was being terminated "for cause" and therefore was not entitled to any of his compensation or other benefits under the Employment Agreement.

> **ANSWER:** Counter Defendants admit that Eclipse Gaming LLC issued a letter to Antonucci dated August 25, 2016, stating, *inter alia*, that Antonucci has "actively and intentionally undermined Eclipse's success on [numerous] occasions" and for those reasons Eclipse "hereby terminates your employment 'for cause' in accordance with Section 6.1(c) of the [Employment] Agreement." Except as expressly admitted herein, the allegations of this paragraph are denied.

37

87. Antonucci denied and continues to deny that any of his actions taken as Vice President of Systems Development amounted to anything that could be construed as "cause" under the Employment Agreement.

**ANSWER:** Counter Defendants admit that Antonucci purports to deny that Eclipse Gaming LLC terminated him for cause. Except as expressly admitted herein, the allegations of this paragraph are denied.

88. Rather, Antonucci was denied access to weekly financial reports, denied access to review the financial condition of the company, denied access to review the contracts between ECLIPSE and its customers: Antonucci also questioned whether corporate opportunities of ECLIPSE were being usurped by other ECLIPSE Members/Officers and whether ECLIPSE funds were being used to cover expenses not rightfully owed by ECLIPSE. These are the real reasons that Antonucci was terminated.

**ANSWER:** Counter Defendants admit that Antonucci has made numerous allegations without factual or legal basis. Except as expressly admitted herein, the allegations of this paragraph are denied.

89. Pursuant to the terms and conditions of the Employment Agreement, ECLIPSE was obligated to pay Antonucci salary, severance, a change of control bonus, and retirement benefits upon vesting. ECLIPSE has failed to pay Antonucci as required by the terms of the Employment Agreement and Antonucci has been harmed and damaged by ECLIPSE's breach of its Employment Agreement obligations.

**ANSWER:** Denied.

**WHEREFORE**, Counter Plaintiff, Anthony Antonucci, respectfully prays that this Honorable Court enter judgment in his favor and against the Counter Defendant, Eclipse Gaming Systems, LLC., as follows:

A.     Judgment in the sum of $602,490.00 as and for unpaid salary with annual

increases from the date of August 25, 2016 to the date of January 15, 2020;

B.     Judgment for the value of all benefits as defined in paragraph 3.2 of the

Employment Agreement for the period of June 15, 2015 to the date of January 15, 2020 and as

established by the proof offered at the time of trial;

C.     For judgment in the sum of $863,178.62 as and for payments Change of Control

payments due for the 4 years and 4 months for the period from September 15, 2015 to the date of

January 15, 2020 as stated in paragraphs 606 and 6.7(f) of the Employment Agreement;

D.     For an award of Retirement Benefits as defined in paragraph 6.7(g) of the

Employment Agreement and as established by the proofs offered at the time of trial; and

E.      For such other and further relief as this Honorable Court deems just and

appropriate under the circumstances.

**ANSWER:**  Counter Defendants deny that Antonucci is entitled to any of the relief
he seeks.  Except as expressly admitted herein, the allegations of this paragraph are
denied.


## COUNT THREE
## TEMPORARY RESTRAINING ORDER, PRELIMINARY INUNCTION,
## AND PERMANENT INJUNCTION - PRODUCTION OF BUSINESS
## INFORMATION
### (Antonucci and DDS vs ECLIPSE)

90.     Counter Plaintiffs reallege the above allegations of this Second Amended

Countercomplaint as if fully set forth herein.

**ANSWER:**  Counter Defendants incorporate their answers to the corresponding
paragraphs as if set forth herein.

91.     ECLIPSE and its Management Representatives, as a part of their duty of loyalty,

owe a duty to account to members including a duty to provide Antonucci and his agents and

attorneys with access to the records of ECLIPSE. At all times relevant herein, Antonucci had a

lawful right to inspect and copy the records of ECLIPSE in order to permit Antonucci to determine

the nature and extent of his financial and legal interests in ECLIPSE.

> **ANSWER:** Counter Defendants decline to respond to the allegations in this
> paragraph as they constitute a legal conclusion and no response is required thereto.
> To the extent that a response is required, the allegations of this paragraph are
> denied.

92.     At all times relevant herein, the Third Amended Operating Agreement of

ECLIPSE provided in relevant part as follows:

> "5.2  Records Required by TBOC; Right of Inspection... (b) *Right of lnspection.* On
> written request stating the purpose, a Member or an assignee of a Member's Interest (an "Eligible
> Person") may examine and copy in person or by the Eligible Person's representative, at any
> reasonable time, for any proper purpose, and at the Eligible Person's expense, records required
> to be maintained under the TBOC and such other information regarding the business, affairs and
> financial condition of the Company as is just and reasonable for the Eligible Person to examine
> and copy. Upon written request by any Eligible Person made to the Manager at the address of the
> Company's principal office, the Company shall provide to the Eligible Person without charge
> true copies of (i) this Agreement and the Certificate and all amendments or restatements, and
> (ii) any of the tax returns of the Company described above.

> **ANSWER:** Counter Defendants admit the language block quoted in this paragraph
> appears in the Third Amended Operating Agreement.  Except as expressly admitted
> herein, the allegations of this paragraph are denied.

93.     At all times relevant herein, the 2005 Texas Business Organizations Code

provided as follows:

> §101.502. RIGHT    TO    EXAMINE    RECORDS    AND    CERTAIN
> OTHER INFORMATION. (a) A member of a limited liability company or an
> assignee of a membership interest in a limited liability company, or a representative of the
> member or assignee, on written request and for a proper purpose, may examine and copy at any
> reasonable time and at the member's or assignee's expense: (1) records required under Sections
> 3.151 and 101.501; and (2) other information regarding the business, affairs, and financial
> condition of the company that is reasonable for the person to examine and copy. " V.T.C.A.
> ¶101.502(a)(2).

> **ANSWER:** Counter Defendants admit that Section 101.502 of the Texas Business
> Organizations Code, effective September 1, 2007, includes the language quoted in
> this paragraph.  Except as expressly admitted herein, the allegations of this

paragraph are denied.

94.    For years, Eclipse provided Antonucci with regular financial information and records, including but not limited to Weekly Cash Summary Reports.

**ANSWER:** Counter Defendants admit that Eclipse Gaming LLC provided Antonucci with certain financial statements and records consistent with his status as a member of Eclipse Gaming LLC.  Except as expressly admitted herein, the allegations of this paragraph are denied.

95.    From and after May of 2016, ECLIPSE wrongfully denied Antonucci access to business records and financial information relating to Eclipse, including business contracts, Weekly Cash Summary Reports, and other business information.

**ANSWER:** Denied.

96.    On July 15, 2016, Antonucci made lawful demand for production of Cash Summary Reports and all information involving the business affairs and financial condition of ECLIPSE.  A true and accurate copy of said demand letter is attached hereto as Exhibit C and incorporated herein by reference.

**ANSWER:** Counter Defendants admit that Antonucci issued a demand letter and that a true and accurate copy appears to be attached to the Second Amended Counter Complaint as Exhibit C.  Except as expressly admitted herein, the allegations of this paragraph are denied.

97.    Management Representatives, as a part of their duty of loyalty, owe a duty to account to members including a duty to provide Counter Plaintiff and his agents and attorneys with access to the records of ECLIPSE.

**ANSWER:** Denied.

98.    At all times relevant herein, Counter Plaintiff, Antonucci, had and has a lawful right to inspect and copy the records of ECLIPSE in order to permit him to determine the nature and extent of his financial and legal interests in ECLIPSE.

**ANSWER:** Denied.

99.     Without legal justification, Drew and Lawrence, including their agent, Amegadjie, have failed and refused to produce information involving the business affairs and financial condition of ECLIPSE as demanded by Antonucci.

**ANSWER:** Denied.

100.     Antonucci is a member of ECLIPSE and owns 17.18% of said company and is entitled to the reports and information requested in his demand letter dated July 15, 2016. The requested information is needed by Antonucci so that he can determine the nature and extent of his financial and legal interests in ECLIPSE; to determine the nature, extent, and existence of harm being caused to the Company by the majority owners and/or officers; and to discuss or negotiate the purchase of his ownership interest in ECLIPSE.

**ANSWER:** Counter Defendants admit that Antonucci currently owns a 17.18% interest in Eclipse – 11.10% as an individual and 6.08% through DDS. Except as expressly admitted herein, the allegations of this paragraph are denied.

101.     ECLIPSE wrongfully terminated Antonucci's employment with the company. As such, Antonucci does not have access to the requested information and is otherwise being deprived of information involving the business affairs and financial condition of ECLIPSE. Counter Plaintiff has no adequate legal remedy to compel the production of the requested information and reports.

**ANSWER:** Denied.

102.     Absent the entry of injunctive relief, Counter Plaintiff will suffer immediate and irreparable harm and injury in the event that Eclipse continues to refuse to provide Antonucci with business and financial information pertinent to allowing Antonucci to correctly evaluate the worth of his membership interest in Eclipse. This information was routinely and regularly

provided to Antonucci for years and no harm or substantial inconvenience will inure to Eclipse

if it is compelled to provide business information, including weekly cash summary reports, to

Antonucci. Counter Plaintiff is entitled to equitable relief accordingly.

**ANSWER:** Denied.

103.    Antonucci does not have an adequate remedy at law.

**ANSWER:** Denied.

104.    Antonucci is likely to prevail on the merits of his claim because he is entitled to

the requested information as provided by the governing Texas statutes and because the requested

information is essential to allow Antonucci to determine the value of his membership interest.

**ANSWER:** Denied.

105.    When balancing the harm to Antonucci, the harm will be significant and

substantial if he is not permitted access to business and financial information, whereas ECLIPSE

will not be harmed in any perceptible way should it be required to produce information which it

routinely produced to Antonucci in the past.

**ANSWER:** Denied.

106.    Due to the foregoing, a preliminary injunction is necessary and required to enable

Antonucci to obtain the business and financial information identified in his demand letter dated

July 15, 2016 and such other or further information as the facts and circumstances may dictate.

Accordingly, a preliminary injunction should be issued compelling Counter Defendant, Eclipse,

to produce the requested information until the trial of this cause and the entry of a decision on

the merits and final judgment thereon.

**ANSWER:** Denied.

107.    Antonucci is entitled to permanent and preliminary injunctive relief because he

has a clearly ascertainable right in need of protection, a likelihood that he will succeed on the

merits of his claims, will suffer irreparable harm if preliminary and a permanent injunctive relief

are not granted, and he has no adequate remedy at law otherwise.

**ANSWER:** Denied.

108.    A temporary restraining order, entered on an emergency basis, is necessary and

required to prevent the aforesaid immediate irreparable harm and injury to Antonucci.

**ANSWER:** Denied.

109.    Antonucci brings this count pursuant to 28 U.S.C. 2201 and 2202, Rule 65, and

Rule 57 of the Federal Rules of Civil Procedure.

**ANSWER:**   Counter Defendants decline to respond to the allegations in this
paragraph as they constitute a legal conclusion and no response is required thereto.
To the extent that a response is required, the allegations of this paragraph are
denied.

**WHEREFORE**, Counter Plaintiff, Anthony Antonucci, pray for entry of orders

and final judgment in his favor and against Counter Defendant, Eclipse Gaming Systems, LLC,

as follows:

A.      Entry of an order requiring and compelling Eclipse Gaming Systems, LLC to

produce to Anthony Antonucci copies of all records produced or maintained in the ordinary

course of ECLIPSE's business including all financial reports, profit reports, or cash flow

statements along with a record of any financial information or report produced or provided to

any other member, manager, or officer which has not been simultaneously provided to

Antonucci, *nunc pro tunc* from the date of May 1, 2016;

B.      Entry of an award of attorneys' fees and costs in favor Counter Plaintiff and

against Counter Defendant; and

C.      Awarding such other relief necessary to support the entry of an injunction and

deemed further just and appropriate.

> **ANSWER:** Counter Defendants deny that Antonucci is entitled to any of the relief he seeks. Except as expressly admitted herein, the allegations of this paragraph are denied.

## FACTS COMMON TO COPYRIGHT CAUSES OF ACTION

The actions identified in the Copyright and DMCA causes of action arise from the unauthorized use and/or copying of computer software commonly known as the "GAP Protocol." The GAP Protocol was developed and written by DDS. On December 21, 2016, DDS received its Certificate of Registration from the United States Copyright Office known as Registration Number TXu 2-018-105 for the GAP Protocol. In these actions, Counter Plaintiff, DDS, claims that the Counter Defendants, ELITE, AMS, and ECLIPSE have engaged in the unauthorized copying and/or use of DDS's GAP Protocol in violation of the Copyright Act. On numerous occasions the Counter Plaintiff, DDS, has requested that the Counter Defendant, ECLIPSE, account for its copying and/or use of DDS's software. Despite these lawful demands, ECLIPSE has failed and refused to provide an accounting. Counter Plaintiff brings these actions to recover its damages and the profits derived by Counter Defendants from their unlawful copying of Counter Plaintiffs' protected property rights and as provided by the Copyright Act and the Digital Millennium Copyright Act.

> **ANSWER:** Counter Defendants admit that Counter Plaintiffs purport to characterize their counterclaim in the manner described in this paragraph but deny that there exists any basis in law or fact for Counter Plaintiffs to do so. Except as expressly admitted herein, the allegations of this paragraph are denied.

110. DDS filed its copyright application for the GAP Protocol with the United States Copyright Office and was subsequently issued Registration Certificate No. TXu 2-018-105 on December 21, 2016. A true and accurate copy of the Copyright Registration Certificate is

attached hereto as Exhibit D and incorporated herein by reference.  The Certificate of Registration identifies the title of work known as "GAP – Game API Protocol" ("GAP Protocol"). GAP is an acronym for Game API Protocol while API is an acronym for Application Programming Interface. In   the context of this litigation, GAP Protocol is the definition of a set of messages that an electronic gaming machine, such as a slot machine, uses to communicate with a casino backend system.  The GAP Protocol was developed by DDS as a universal mechanism for an electronic gaming machine to communicate with a Casino Host System. In the gaming world, backend host systems use a variety of protocols, including SAS (worldwide), BACTA (UK), QCOM (Australia), G2S (Canada) etc., which can cause gaming manufacturers great difficulty when creating or building devices for multiple markets. The GAP Protocol solves that problem. The GAP Protocol allows gaming manufacturers to use a single interface and license "protocol engines" from DDS to facilitate communications in any market. The GAP Protocol can also be used directly to communicate with a Casino Host System. The SAS Engine and the SAS Gateway use and rely upon GAP Protocol in order to communicate and perform their intended functions. Viewed from a simple perspective, the SAS Engine acts as a GAP Protocol translator.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit that DDS has attached as Exhibit D to its Second Amended Counter Complaint a document purporting to be a Certificate of Registration from the Copyright Office, bearing registration number TXu 2-018-015. Counter Defendants admit that DDS has characterized what it has defined as "GAP Protocol" as described in this paragraph but deny that such characterization is accurate or complete. Counter Defendants deny that any application for the copyright registration submitted by DDS was valid or authorized. Counter Defendants further state that, except for "SAS Engine and SAS Gateway (SMIB)", all copyrights and other intellectual property for GAP Protocol is Eclipse's property.  Except as expressly admitted herein, the allegations of this paragraph are denied.

111.    At all times relevant hereto, DDS has been in the business of providing software

solutions for electronic gaming machines used in the casino and gambling or gaming industry, including the Slot Accounting System ("SAS") and Gaming Application Protocols ("GAP"). At the heart or core of each electronic gaming machine is a computer which uses hardware and software to perform the intended functions of the machine. These computers communicate with networks which govern and monitor their function. The communications between electronic gaming machines and the casino or facility server or servers are regulated and these communications must comply with gambling/gaming industry standards, requirements, and protocols. DDS specializes in providing custom communications protocols and software that is compliant with electronic gambling or gaming industry standards, requirements, and protocols.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit that DDS portrays itself as being in the business of providing "software solutions" in the casino and gambling or gaming industry. Counter Defendants admit that DDS asserts that its purported "solutions" include Slot Accounting System ("SAS") and Gaming Application Protocols ("GAP"). Counter Defendants dispute those and the characterizations in this paragraph and accordingly deny those allegations. Except as expressly admitted herein, the allegations of this paragraph are denied.

112. Starting in 2003, DDS conceived, created, and began developing a software product known as the SAS Engine including its source code and related documentation. It uses a universal interface and message that is commonly known as the GAP Protocol which was also conceived, created, and developed by DDS. Starting in 2006 DDS also conceived, created, and began developing a software/hardware device commonly known as the SAS Gateway including its source code and related documentation. The SAS Gateway also communicates using GAP Protocol messages. SAS stands for Slot Accounting Systems. The GAP Protocol is the interface to the SAS Engine and the message set that the SAS Gateway uses to communicate to a host system. The GAP Protocol has always been a key component of both these products. The GAP

protocol is defined in the engine.h and the engine.cs files, which are contained in both products. DDS is and always has been the sole and exclusive owner the GAP Protocol and the Intellectual Property rights including the Source Code for these software systems and products.

> **ANSWER:** Counter Defendants admit that DDS owns the intellectual property rights to SAS Engine and SAS Gateway software. Except as expressly admitted herein, the allegations of this paragraph are denied.

113. DDS created, conceived, designed, and developed the GAP Protocol, the SAS Engine, and the SAS Gateway, including all manuals, user documentation, and other related materials pertaining to the GAP Protocol, the SAS Engine, and the SAS Gateway.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent that a response is required, the allegations of this paragraph are denied.

114. The SAS Engine and the SAS Gateway are based upon the GAP Protocol rules and protocols. The GAP Protocol was independently created and written by DDS as an original software solution for electronic gaming machines.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

115. DDS conceived, created, and developed the GAP Protocol and the SAS Engine. Counter Plaintiffs' copyright is valid and subsisting.

> **ANSWER:** Counter Defendants admit that DDS owns the intellectual property rights to SAS Engine and SAS Gateway software. Except as expressly admitted herein, the allegations of this paragraph are denied.

116. DDS licenses the SAS Engine software to end users or customers and controls such licensing by way of individually negotiated license agreements. The GAP Protocol is only available to customers for use in conjunction with a fully paid and valid SAS Engine or SAS

Gateway license.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit, on information and belief, that DDS has claimed to license the use of SAS Engine software pursuant to license agreements. Counter Defendants have insufficient information to admit or deny that said license agreements are individually negotiated. Counter Defendants have insufficient information to admit or deny that DDS controls such licensing. Accordingly, those allegations are denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

117. In 2008, ECLIPSE undertook to build and assemble electronic gaming machines to deploy into casinos and other gambling or gaming facilities for the purpose of earning revenue and entering into revenue sharing arrangements with casinos and gambling or gaming facilities. Because ECLIPSE lacked the necessary experience or expertise to create or write the software programming code which was needed to make the electronic gaming machines operational, they sought to license the SAS Engine from DDS.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit that Eclipse was formed in 2008 to supply slot-style games to customers in the casino gaming industry. Except as expressly admitted herein, the allegations of this paragraph are denied.

118. In 2008, DDS verbally granted a license to ECLIPSE to copy the SAS Engine and SAS Gateway software onto electronic gaming machines owned and operated by ECLIPSE. ECLIPSE continued to copy the SAS Engine onto its electronic gaming machines from and after 2008 and continues to do so to the current time.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit that, after the formation of Eclipse in 2008, Antonucci's company, DDS, granted a license to Eclipse, initially through an oral agreement, for use of the SAS Engine and SAS Gateway software. Counter Defendants further admit that Eclipse has utilized SAS Engine in certain gaming machines in accordance with its licensing

agreements. Except as expressly admitted herein, the allegations of this paragraph are denied.

119.    The verbal license agreement between DDS and ECLIPSE permitted Eclipse to use the SAS Engine software upon payment of the required license fees. The agreement did not provide ECLIPSE with any further or other rights and it did not grant any independent right to copy or use the GAP Protocol. Under the verbal license agreement, ECLIPSE was obligated to report any copying or use, of any nature whatsoever, of the SAS Engine to DDS so that DDS could invoice ECLIPSE.

> **ANSWER:** Counter Defendants admit that, after the formation of Eclipse in 2008, Antonucci's company, DDS, granted a license to Eclipse, initially through an oral agreement, for use of the SAS Engine and SAS Gateway software. Counter Defendants further admit that Eclipse has utilized SAS Engine in certain gaming machines in accordance with its licensing agreements. Except as expressly admitted herein, the allegations of this paragraph are denied.

120.    It is DDS's business model, custom and practice to charge those who are authorized to copy the SAS Engine an upfront fee of $35,000 plus a one-time fee of $150 for each machine ("Standard Licensing Fees").

> **ANSWER:** Counter Defendants lack knowledge or information sufficient to form a belief about the veracity of Counter Plaintiffs' custom and practice for licensing fees for his software. Accordingly, those allegations are denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

121.    From 2008 to the date of the filing of this complaint, ECLIPSE paid DDS for 832 SAS Engine and/or SAS Gateway licenses. 500 of those 832 licenses were paid for pursuant to court proceedings in the matter of Digital Dynamics Software, Inc. v. Eclipse Gaming Systems, LLC which is known as case number 16 CH 08122 and which was filed in the Circuit Court of Cook County.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit

that Eclipse has paid DDS for over 300 licenses over the years in accordance with its obligations under the parties' licensing agreement. Counter Defendants further admit that DDS and Eclipse were parties to a now-dismissed court proceeding captioned *Digital Dynamics Software, Inc., v. Eclipse Gaming Systems, LLC*, case number 16 CH 08122 and which was filed in the Circuit Court of Cook County, Illinois. Defendants further state that they paid $50,000 as part of that proceeding in lieu of bond. Except as expressly admitted herein, the allegations of this paragraph are denied.

122.    Upon information and belief, ECLIPSE copied the GAP Protocol and the SAS

Engine onto 1000 of its electronic gaming machines.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

123.    Because Antonucci owned a 17.18% Membership Interest in ECLIPSE, DDS

agreed that the base upfront fee for the use of the SAS Engine would be waived, and that the

"per machine fee" was reduced to $100.00 plus the cost of the license dongle.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Counter Defendants admit that, pursuant to the parties' license agreement, DDS waived the upfront fee and Eclipse paid licensing fees on a per-machine basis ($100) for gaming machines that actually utilized the SAS Engine (that is, they were not configured to run the SAS Engine) in exchange for a perpetual license. Eclipse was not required to pay DDS licensing fees for machines operating in environments that did not utilize a SAS protocol and which were accordingly configured to bypass. Counter Defendants further admit that Antonucci currently owns a 17.18% interest in Eclipse – 11.10% as an individual and 6.08% through DDS. Except as expressly admitted herein, the allegations of this paragraph are denied.

124.    Upon information and belief, ECLIPSE has copied the GAP Protocol and the

SAS Engine onto electronic gaming machines owned or operated by ELITE and AMS.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

125.     ELITE is wholly owned, individually and/or beneficially, by Greg Drew and David Lawrence. Because Greg Drew and David Lawrence hold a controlling interest in ECLIPSE, they had control over the actions of ECLIPSE and they had access to DDS's copyrighted GAP Protocol and SAS Engine software.

> **ANSWER:**  Counter Defendants admit that Greg Drew has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC, and David Lawrence has a beneficial interest in a trust that maintains a 50% interest in Elite Games LLC. Except as expressly admitted herein, the allegations of this paragraph are denied.

126.     ELITE owns or operates 650 machines in El Paso, Texas ("Speaking Rock") and it owns or operates 230 or more gambling or gaming machines in Alabama ("Rivers Edge"). AMS owns or owned electronic gaming machines which were used at the Rivers Edge Casino in Alabama. Upon information and belief, ECLIPSE, ELITE, and AMS own and/or operate thousands of electronic gaming machines throughout the United States. ELITE and AMS procure their electronic gaming machine software from ECLIPSE. Upon information and belief, ECLIPSE copied the GAP Protocol, including the SAS Engine software, onto electronic gaming machines owned or operated by ECLIPSE, ELITE and/or AMS, without permission or authority from DDS.  DDS has made several demands upon ECLIPSE to account for the number of copies of the SAS Engine which it has copied or installed on any electronic gaming machine, but ECLIPSE has refused to account for such copying. ECLIPSE, ELITE, and AMS have failed to pay license fees for the unauthorized copies of the SAS Engine that were copied or installed onto their electronic gaming machines.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

127.     Prior to July of 2015, Elite Games, LLC and Robert Drew became majority

owners of ECLIPSE. In July of 2015, Elite Games, LLC and Robert Drew took action as the
majority owners to remove Jack Saltiel as the manager of ECLIPSE and installed Greg Drew as
the manager. Thereafter, in September of 2015, Greg Drew fired the ECLIPSE management
team including the CEO - Jack Saltiel, the COO - Carlos Lozano, and Anthony Antonucci. Within
hours of firing Antonucci, ECLIPSE rescinded the firing and requested that Antonucci remain
employed.

> **ANSWER:** Counter Defendants admit that Saltiel and Lozano were terminated as
> Eclipse's CEO and COO, respectively. Counter Defendants further admit that the
> decision to hire Greg Drew as manager was made by vote by the majority
> ownership of Eclipse Gaming in accordance with its operating agreement. Except
> as expressly admitted herein, the allegations of this paragraph are denied.

128. After Greg Drew became the manager of ECLIPSE, Anthony Antonucci became
suspicious that ECLIPSE was wrongfully copying DDS's software, including the GAP Protocol
and SAS Engine. DDS and Anthony Antonucci made demand for an accounting of the number
of electronic gaming machines containing copies of the DDS software, but ECLIPSE failed and
refused to provide such information. On or about July 15, 2016, Anthony Antonucci issued
written demand, through his attorney, Robert Riffner, that ECLIPSE provide Anthony
Antonucci with financial information, including Weekly Cash Summary Reports. Said lawful
demand was refused and Anthony Antonucci persisted in his demand for information. Shortly
thereafter, on August 25, 2016, Anthony Antonucci's employment with ECLIPSE was
terminated.

> **ANSWER:** Counter Defendants admit that DDS and/or Antonucci have made
> various "demands" for information regarding machines on which, DDS and/or
> Antonucci contend, SAS Engine runs. Counter Defendants have insufficient
> knowledge to affirm or deny DDS's allegations concerning Antonucci's state of
> mind. Accordingly, those allegations are denied. Counter Defendants admit that
> Robert Riffner issued a written communication dated in July 2016 demanding
> information from Eclipse, but deny DDS's characterization of that letter insofar as
> it differs from the contents of the written document. Counter Defendants admit that

Eclipse has used the SAS Engine in accordance with its rights and pursuant to the parties' licensing agreement thereto. Except as expressly admitted herein, the allegations of this paragraph are denied.

129. It is the GAP Protocol that enables electronic gaming machines to be deployed into casinos and other gambling facilities and which permits the operators of those electronic gaming machines to communicate with their various systems, including their host systems, and to earn revenue and profits.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

130. Since 2003, DDS has expended substantial time, energy, resources, and materials to conceive, create, develop, correct, update, distribute, and protect the GAP Protocol and the SAS Engine.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

131. Upon information and belief and following the termination of the Antonucci Employment Agreement by Eclipse, Eclipse has undertaken to copy and use DDS's GAP Protocol in conjunction with its own communications software and in violation of DDS's rights and the laws pertaining to copyright protections.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

## COUNT FOUR
## DIRECT INFRINGEMENT AGAINST ELITE GAMES, LLC

132. Counter Plaintiff, DDS, repeats and realleges all paragraphs of this Second

Amended Countercomplaint as though more fully set forth herein.

**ANSWER:** Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

133. This Count is brought against Elite Games, LLC ("ELITE") based upon its copying of DDS's copyrighted GAP Protocol and the SAS Engine software and Counter Plaintiff seeks damages from ELITE for its violations of the Copyright Act. Counter Plaintiff claims that Counter Defendant, ELITE, has infringed Counter Plaintiffs' copyright in that ELITE has copied DDS's GAP Protocol, including its SAS Engine, onto electronic gaming machines which ELITE owns and/or operates at casinos or other gambling or gaming facilities.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

134. The GAP Protocol and the SAS Engine were created and written by DDS and the GAP Protocol is the subject of a valid copyright. Counter Plaintiffs' copyrighted content is the way in which Counter Plaintiffs' programming code instructs and directs the processing of information used by electronic gaming machines and the networks with which they communicate and in a fashion which complies with the gambling or gaming industry requirements, standards and protocols.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

135. DDS is the author and owner of the GAP Protocol, including the SAS Engine, and it is the owner of the Copyright granted by the U.S. Copyright Office. The right to copy the GAP Protocol is contingent upon DDS granting a license arrangement for the use of the SAS Engine or SAS Gateway and upon the payment of any agreed upon licensing fee.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

136. Counter Defendant, ELITE, did not create their own copyrighted computer software to operate electronic gaming machines in compliance with the gambling or gaming industry requirements, standards, and protocols. Instead, ELITE copied the DDS GAP Protocol, including the SAS Engine, onto electronic gaming machines which they placed into casinos or other gambling or gaming facilities and from which they earned revenue and derived substantial profits ("Infringing Machines"). ELITE's copying of the GAP Protocol, including the SAS Engine, was done without permission from DDS or payment to DDS. As set forth more specifically herein, ELITE copied the protected expression in DDS's copyrighted work, including the GAP Protocol, onto numerous Infringing Machines which are located throughout the United States.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

137. The Infringing Machines are operational at Casinos and gambling or gaming facilities throughout the United States and the Counter Defendant, ELITE, earns substantial revenue and profits from these operations. All of this is done by Counter Defendant, ELITE, without accounting or compensation to DDS and in violation of DDS's lawful rights under the Copyright Act. Upon information and belief, ELITE, earned and continues to earn substantial profits from the unauthorized use of DDS's copyrighted property.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

138.     Counter Plaintiff has made demand upon ECLIPSE to account for the number of electronic gaming machines which it built for ELITE and which contain copies of its GAP Protocol, including the SAS Engine. ECLIPSE has refused to comply with Counter Plaintiffs' lawful demands.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

139.     Upon information and belief, Infringing Machines are located at the Speaking Rock Casino located in El Paso, Texas, and at the Rivers Edge Casino located in Alabama. Upon information and belief, ELITE has electronic gaming machines located at other gambling or gaming facilities in the United States. The electronic gaming machines operated at Rivers Edge Casino in Alabama were originally owned or operated by AMS. At the current time the electronic gaming machines operated at Rivers Edge are operated by ELITE, AMS, and/or some other entity created by David Lawrence and Greg Drew.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

140.     Upon information and belief, the Speaking Rock Casino produced profits of $150,000 per week from the operation of 625 to 650 electronic gaming machines.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

141.     Upon information and belief, David Lawrence personally picked up cash payments from the Rivers Edge Casino or gaming facility in Alabama and in a weekly amount

of approximately $25,000 to $30,000 representing ELITE's portion of the revenue sharing arrangement with Rivers Edge Casino or gaming facility which amounts to annual revenue of $1.2 to $1.44 million.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

142. Counter Plaintiff has complied in all respects with 17 U.S.C. §§ 101 et seq. and secured the exclusive rights and privileges in and to the copyrights of the above-referenced works. Counter Plaintiff has been and still is the sole proprietor of all rights, title, and interest in and to copyrights in their respective works as identified hereinabove.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

143. ELITE did not and does not have a license agreement with Counter Plaintiff to copy or use Counter Plaintiffs' GAP Protocol, including the SAS Engine software. Counter Defendant's conduct of copying the GAP Protocol, including the SAS Engine, violates the exclusive rights belonging to Counter Plaintiff as owner of the copyrights identified in this Complaint including, without limitation, Counter Plaintiffs' rights under 17 U.S.C. § 106.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

144. Upon information and belief, Counter Plaintiff alleges that, as a direct and proximate result of ELITE's conduct, Counter Defendant has realized and continues to realize profits and other benefits which belong, in whole or in part, to Counter Plaintiff. Accordingly, Counter Plaintiff seeks an award of damages pursuant to 17 U.S.C. §§ 504 and 505.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

145. Upon information and belief, ELITE has willfully engaged in, and is willfully engaging in, the acts complained of in conscious disregard of the rights of Counter Plaintiff. The owners of ELITE, Greg Drew and David Lawrence, are controlling owners of ECLIPSE and are on actual notice that DDS has demanded that ECLIPSE account for Infringing Machines and terminate their unlawful copying behavior. ELITE is actually aware that Counter Plaintiff has not been compensated for its copyrighted software – the GAP Protocol, including the SAS Engine - and that Counter Plaintiffs' property is being copied without Counter Plaintiffs' consent.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

146. The Copyright Act of 1976 grants copyright owners certain exclusive rights including the rights to copy the work and prepare derivative works based on the copyrighted work. 17 U.S.C. § 106.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Additionally, Counter Defendants decline to respond to the allegations in this paragraph as they constitute a legal conclusion and no response is required thereto. To the extent that a response is required, the allegations of this paragraph are denied.

147. Counter Plaintiff is the owner and holder of the exclusive right to license the copyrighted GAP Protocol, including the SAS Engine software programs.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is

required, the allegations of this paragraph are denied.

148.    Counter Defendant, ELITE, has infringed on Counter Plaintiffs' copyrights by making unauthorized copies of the GAP Protocol, including the SAS Engine as described herein.

**ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

149.    By copying, storing, and/or loading the GAP Protocol onto Infringing Machines, the Counter Defendant, ELITE, has infringed on Counter Plaintiffs' exclusive right to make copies of the copyrighted software programs.

**ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

150.    ELITE's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Counter Plaintiffs' rights.

**ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

151.    Counter Plaintiffs are entitled to recover the damages they have and will sustain, together with any gains, profits, and advantages obtained by ELITE as a result of its infringement.

**ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

152.    Counter Plaintiffs are also entitled to preliminary and permanent injunctive relief to restrain and enjoin ELITE's continuing infringement and to require ELITE to destroy all infringing materials in its custody or control.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

153. Counter Plaintiffs are further entitled to their attorney's fees and costs pursuant to 17 U.S.C. § 505.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

**WHEREFORE,** Counter Plaintiff, Digital Dynamics Software, Inc., prays for entry of judgment in its favor and against Elite Games, LLC, as follows:

A. Declaring that Counter Defendant's unauthorized conduct violates Counter Plaintiff's rights under common law and the Federal Copyright Act;

B. Immediately and permanently enjoin the Counter Defendant, ELITE GAMES, LLC, including its officers, directors, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them from using any of Counter Plaintiff's copyrighted computer programs without Counter Plaintiff's express consent or otherwise infringing Counter Plaintiff's copyrights or other rights in any manner;

C. Ordering the Counter Defendant, ELITE GAMES, LLC, to account to Counter Plaintiff for all the revenues, gains, profits, and advantages derived by Counter Defendant by their infringement of Counter Plaintiff's copyrights or such damages as this Court deems proper and to enter judgment in favor of Counter Plaintiff and against Counter Defendant for all profits derived by Counter Defendant from the Infringing Machines and as established by the proofs offered at the time of trial or judgment;

D.    Awarding Counter Plaintiff its costs, reasonable attorney's fees, and disbursements in this action, pursuant to 17 U.S.C. § 505; and

E.    For such other and further relief this Honorable Court deems just and appropriate under the circumstances.

> **ANSWER:**  Counter Defendants deny that Digital Dynamics Software, Inc., is entitled to any of the relief it seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

## COUNT FIVE
## DIRECT INFRINGEMENT AGAINST
## ACCELERATED MARKETING SOLUTIONS,
## LLC

154.    Counter Plaintiff repeats and realleges all paragraphs of this Second Amended Countercomplaint as though more fully set forth herein.

> **ANSWER:**  Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

155.    This Count is brought against Accelerated Marketing Solutions, LLC ("AMS") based upon its copying of DDS's copyrighted GAP Protocol and SAS Engine software and Counter Plaintiff seeks damages from AMS for its violations of the Copyright Act. Counter Plaintiff claims that Counter Defendant, AMS, has infringed Counter Plaintiffs' copyright in that AMS has copied DDS's GAP Protocol, including its SAS Engine, onto electronic gaming machines which it owns and/or operates at casinos or other gambling or gaming facilities in the United States.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense.  *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

156.    Counter Plaintiffs' copyrighted computer programming protocol and software is identified in its copyright filing which Counter Plaintiff made with the Copyright Office.  The

title of this copyright work is known as GAP Protocol. The Copyright Registration for the GAP

Protocol was previously attached hereto as Exhibit D and is incorporated herein by reference.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part
> Counter Defendants' motion to dismiss, the allegations of this paragraph are not
> relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is
> required, the allegations of this paragraph are denied.

157. The GAP Protocol and the SAS Engine were created and written by DDS and the

GAP Protocol is the subject of a valid copyright. Counter Plaintiffs' copyrighted content is the

way in which Counter Plaintiffs' programming code instructs and directs the processing of

information used by electronic gaming machines and the networks with which they

communicate and in a fashion which complies with the gambling or gaming industry

requirements, standards and protocols.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part
> Counter Defendants' motion to dismiss, the allegations of this paragraph are not
> relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is
> required, the allegations of this paragraph are denied.

158. DDS is the author and owner of the GAP Protocol, including the SAS Engine,

and it is the owner of the Copyright granted by the U.S. Copyright Office. The right to copy the

GAP Protocol is contingent upon DDS granting a license arrangement for the use of the SAS

Engine or SAS Gateway and upon the payment of any agreed upon licensing fee.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part
> Counter Defendants' motion to dismiss, the allegations of this paragraph are not
> relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is
> required, the allegations of this paragraph are denied.

159. Counter Defendant, AMS, did not create their own copyrighted computer

software to operate electronic gaming machines in compliance with the gambling or gaming

industry requirements, standards, and protocols. Instead, AMS copied the DDS GAP Protocol,

including the SAS Engine, onto electronic gaming machines which they placed into casinos or

other gambling or gaming facilities and from which they earned revenue and derived substantial profits ("Infringing Machines"). AMS's copying of the GAP Protocol, including the SAS Engine, was done without permission from DDS or payment to DDS. As set forth more specifically herein, AMS copied the protected expression in DDS's copyrighted work, including the GAP Protocol, onto numerous Infringing Machines which are located throughout the United States.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

160.    The Infringing Machines are or were operational at Casinos and gambling or gaming facilities throughout the United States and the Counter Defendant, AMS, earned and continues to earn substantial revenue and profits from these operations. All of this is done by Counter Defendant, AMS, without accounting or compensation to DDS and in violation of DDS's lawful rights under the Copyright Act. Upon information and belief, AMS, earns substantial profits from the unauthorized use of DDS's copyrighted property.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

161.    Counter Plaintiff has made demand upon ECLIPSE to account for the number of electronic gaming machines which it built for AMS and which contain copies of its GAP Protocol, including the SAS Engine. ECLIPSE has refused to comply with Counter Plaintiffs' lawful demands.

> **ANSWER:**  Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94.  To the extent an answer is required, the allegations of this paragraph are denied.

162.     Upon information and belief, Infringing Machines are located at the Rivers Edge Casino or gaming facility located in Alabama and at other Casinos or gambling/gaming facilities in the United States. Upon information and belief, the Infringing Machines located at Rivers Edge are now owned or operated, in whole or in part, by ELITE or by some other entity created or designated by David Lawrence and Greg Drew.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

163.     Upon information and belief, David Lawrence personally picked up cash payments from the Rivers Edge Casino or gambling/gaming facility in Alabama and in a weekly amount of approximately $25,000 to $30,000 representing AMS's portion of the revenue sharing arrangement with Rivers Edge Casino or gambling or gaming facility which amounts to annual revenue of $1.2 to $1.44 million.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

164.     Counter Plaintiff has complied in all respects with 17 U.S.C. §§ 101 et seq. and secured the exclusive rights and privileges in and to the copyrights of the above-referenced works. Counter Plaintiff has been and still is the sole proprietor of all rights, title, and interest in and to copyrights in their respective works as identified hereinabove.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

165.     AMS did not and does not have a license agreement with Counter Plaintiff to

copy or use Counter Plaintiffs' GAP Protocol, including the SAS Engine software. Counter Defendant's conduct of copying the GAP Protocol, including the SAS Engine, violates the exclusive rights belonging to Counter Plaintiff as owner of the copyrights identified in this Complaint including, without limitation, Counter Plaintiffs' rights under 17 U.S.C. § 106.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

166. Upon information and belief, Counter Plaintiff alleges that, as a direct and proximate result of AMS's conduct, Counter Defendant has realized and continues to realize profits and other benefits which belong, in whole or in part, to Counter Plaintiff. Accordingly, Counter Plaintiff seeks an award of damages pursuant to 17 U.S.C. §§ 504 and 505.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

167. Upon information and belief, AMS has willfully engaged in, and is willfully engaging in, the acts complained of in conscious disregard of the rights of Counter Plaintiff. The owners of AMS, Greg Drew and David Lawrence, are controlling owners of ECLIPSE and are actually aware that DDS has demanded that ECLIPSE account for Infringing Machines and terminate their unlawful copying behavior. AMS is actually aware that Counter Plaintiff has not been compensated for its copyrighted software – the GAP Protocol, including the SAS Engine - and that Counter Plaintiffs' property is being copied without Counter Plaintiffs' consent.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

168. The Copyright Act of 1976 grants copyright owners certain exclusive rights

including the rights to copy the work and prepare derivative works based on the copyrighted

work. 17 U.S.C. § 106.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Additionally, Counter Defendants decline to respond to the allegations in this paragraph as they constitute a legal conclusion and no response is required thereto. To the extent that a response is required, the allegations of this paragraph are denied.

169. Counter Plaintiff is the owner and holder of the exclusive right to license the

copyrighted GAP Protocol, including the SAS Engine software programs.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

170. Counter Defendant, AMS, has infringed on Counter Plaintiffs' copyrights by

making unauthorized copies of the GAP Protocol, including the SAS Engine as described herein.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

171. By copying, storing, and/or loading the GAP Protocol onto Infringing Machines,

the Counter Defendant, AMS, has infringed on Counter Plaintiffs' exclusive right to make copies

of the copyrighted software programs.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

172. AMS's acts of infringement are willful, intentional, and purposeful, in disregard

of and with indifference to Counter Plaintiffs' rights.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not

relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

173. Counter Plaintiffs are entitled to recover the damages they have and will sustain,

together with any gains, profits, and advantages obtained by AMS as a result of its infringement.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

174. Counter Plaintiffs are also entitled to preliminary and permanent injunctive relief

to restrain and enjoin AMS's continuing infringement and to require AMS to destroy all

infringing materials in its custody or control.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

175. Counter Plaintiffs are further entitled to their attorney's fees and costs pursuant

to 17 U.S.C. § 505.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

**WHEREFORE,** Counter Plaintiff, Digital Dynamics Software, Inc. respectfully

prays that is Honorable Court enter judgment in its favor and against the Counter Defendant,

Accelerated Marketing Solutions, as follows:

A. Declaring that Counter Defendant's unauthorized conduct violates Counter

Plaintiff's rights under common law and the Federal Copyright Act;

B. Immediately and permanently enjoin the Counter Defendant, ACCELERATED

MARKETING SOLUTIONS, LLC, including its officers, directors, agents, servants, employees,

representatives, attorneys, related companies, successors, assigns, and all others in active concert

or participation with them, from using any of Counter Plaintiff's copyrighted computer programs

without Counter Plaintiff's express consent or otherwise infringing Counter Plaintiff's copyrights

or other rights in any manner;

C.      Ordering the Counter Defendant, ACCELERATED MARKETING SOLUTIONS,

LLC, to account to Counter Plaintiff for all the revenues, gains, profits, and advantages derived by

Counter Defendant by their infringement of Counter Plaintiff's copyrights or such damages as this

Court deems proper and to enter judgment in favor of Counter Plaintiff and against Counter

Defendant for all profits derived by Counter Defendant from the Infringing Machines and as

established by the proofs offered at the time of trial or judgment;

D.      Awarding Counter Plaintiff its costs, reasonable attorney's fees, and disbursements

in this action, pursuant to 17 U.S.C. § 505; and

E.      For such other relief as this Honorable Court deems just and appropriate under the

circumstances.

> **ANSWER:**  Counter Defendants deny that DDS is entitled to any of the relief it
> seeks.  Except as expressly admitted herein, the allegations of this paragraph are
> denied.

**COUNT SIX**
**DIRECT INFRINGEMENT AGAINST**
**ECLIPSE GAMING SYSTEMS, LLC**

176.    Counter Plaintiff repeats and realleges all paragraphs of this Second

Amended Countercomplaint as if more fully set forth herein.

> **ANSWER:**  Counter Defendants incorporate their answers to the corresponding
> paragraphs as if set forth herein.

177.    ECLIPSE has paid for 832 licenses and copied the DDS GAP Protocol, including

the SAS Engine, onto more than 1,000 electronic gaming machines.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

178. This Count is brought against ECLIPSE GAMING SYSTEMS, LLC ("ECLIPSE") based upon Counter Plaintiffs' claim that Counter Defendant, ECLIPSE, has infringed Counter Plaintiffs' copyright in that ECLIPSE has copied DDS's GAP Protocol, including its SAS Engine, onto electronic gaming machines which it owns and/or operates at casinos or other gambling/gaming facilities. This Count seeks damages from ECLIPSE for its violations of the Copyright Act.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

179. Counter Plaintiffs' copyrighted computer programming protocol and software is identified in its copyright filing which Counter Plaintiff made with the Copyright Office. The title of this copyright work is known as GAP- Game API Protocol. The Copyright Registration for the GAP Protocol was previously attached hereto as Exhibit D and is incorporated herein by reference.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

180. The GAP Protocol and the SAS Engine were created and written by DDS and it is the subject of a valid copyright. Counter Plaintiffs' copyrighted content is the way in which Counter Plaintiffs' software instructs and directs the processing of information used by electronic gaming machines and the networks with which they communicate and in a fashion which complies with the gambling or gaming industry requirements, standards and protocols.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

181. DDS is the author and owner of the GAP Protocol which is included in the SAS Engine and DDS is the owner of the Copyright granted by the U.S. Copyright Office. The right to copy the GAP Protocol is contingent upon DDS granting a license arrangement for the use of the SAS Engine or SAS Gateway and upon the payment of any agreed upon licensing fee. By virtue of its Copyright, DDS owns the exclusive rights and protections to the GAP Protocol, including the right to reproduce, distribute, or create adaptations or derivative works based upon the GAP Protocol.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

182. Counter Defendant, ECLIPSE, did not create their own copyrighted computer software to operate electronic gaming machines in compliance with the gambling or gaming industry requirements, standards, and protocols. Instead, ECLIPSE copied the DDS GAP Protocol, including the SAS Engine, onto electronic gaming machines which they placed into casinos or other gambling or gaming facilities and from which they earned revenue and derived substantial profits ("Infringing Machines"). ECLIPSE's copying of the GAP Protocol, including the SAS Engine, was done without permission from DDS or payment to DDS. As set forth more specifically herein, ECLIPSE copied the protected expression in DDS's copyrighted work, including the GAP Protocol, onto numerous Infringing Machines which are located throughout the United States.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not

relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

183.    The Infringing Machines are or were operational at Casinos and gambling or gaming facilities throughout the United States and the Counter Defendant, ECLIPSE, earned or earns substantial revenue and profits from these operations. All of this is done by Counter Defendant, ECLIPSE, without accounting or compensation to DDS and in violation of DDS's lawful rights under the Copyright Act. Upon information and belief, ECLIPSE, earns substantial profits from the unauthorized use of DDS's copyrighted property.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

184.    Counter Plaintiff has made demand upon ECLIPSE to account for the number of electronic gaming machines which it owns and operates and which contain copies of Counter Plaintiffs' GAP Protocol, including the SAS Engine. ECLIPSE has refused to comply with Counter Plaintiffs' lawful demands.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

185.    Upon information and belief, ECLIPSE earns revenue from a revenue sharing arrangement in place with the Rod N Reel Casino in Maryland and ECLIPSE owns and/or operates 113 electronic gaming machines at said location. ECLIPSE earns revenue from a revenue sharing arrangement in place with the Miccosukee Casino in Florida and ECLIPSE owns or operates 50 electronic gaming machines at the Miccosukee Tribal Casino in Florida.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is

required, the allegations of this paragraph are denied.

186.    Upon information and belief, ECLIPSE has revenue sharing arrangements in place with ELITE and AMS and ECLIPSE earns revenue and profit from the copying and/or use of DDS's GAP Protocol, including the SAS Engine, in those revenue sharing arrangements and in an amount not known by Counter Plaintiff despite demand by Antonucci for ECLIPSE to account for its revenue, including its Weekly Cash Summary Reports.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

187.    Counter Plaintiff has complied in all respects with 17 U.S.C. §§101 et seq. and secured the exclusive rights and privileges in and to the copyrights of the above-referenced works. Counter Plaintiff has been and still is the sole proprietor of all rights, title, and interest in and to copyrights in their respective works as identified hereinabove.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

188.    ECLIPSE and DDS entered into a verbal licensing agreement in 2008, but ECLIPSE copied Counter Plaintiffs' software onto electronic gaming machines for which ECLIPSE failed to pay any licensing fee and which ECLIPSE refused to disclose to Counter Plaintiff despite Counter Plaintiffs' demands to the contrary. Counter Defendant's conduct of copying the GAP Protocol, including the SAS Engine, without paying required licensing fees violates the exclusive rights belonging to Counter Plaintiff as owner of the copyrights identified in this Complaint including, without limitation, Counter Plaintiffs' rights under 17 U.S.C. § 106.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

189. Upon information and belief, Counter Plaintiff alleges that, as a direct and proximate result of ECLIPSE's conduct, Counter Defendant has realized and continues to realize profits and other benefits which belong, in whole or in part, to Counter Plaintiff. Accordingly, Counter Plaintiff seeks an award of damages pursuant to 17 U.S.C. §§ 504 and 505.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

190. Upon information and belief, ECLIPSE has willfully engaged in, and is willfully engaging in, the acts complained of in conscious disregard of the rights of Counter Plaintiff. DDS has demanded that ECLIPSE account for Infringing Machines and terminate their unlawful copying behavior. ECLIPSE is actually aware that Counter Plaintiff has not been compensated for its copyrighted software – the GAP Protocol, including the SAS Engine - and that Plaintifs's property is being copied without Counter Plaintiffs' consent.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

191. The Copyright Act of 1976 grants copyright owners certain exclusive rights including the rights to copy the work and prepare derivative works based on the copyrighted work. 17 U.S.C. § 106.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. Additionally, Counter Defendants decline to respond to the allegations in this paragraph as they constitute a legal conclusion and no response is required thereto. To the extent that a response

is required, the allegations of this paragraph are denied.

192.    Counter Plaintiff is the owner and holder of the exclusive right to license the
copyrighted GAP Protocol, including the SAS Engine software programs.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part
Counter Defendants' motion to dismiss, the allegations of this paragraph are not
relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is
required, the allegations of this paragraph are denied.

193.    Counter Defendant, ECLIPSE, has infringed on Counter Plaintiffs' copyrights by
making unauthorized copies of the GAP Protocol, including the SAS Engine as described herein.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part
Counter Defendants' motion to dismiss, the allegations of this paragraph are not
relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is
required, the allegations of this paragraph are denied.

194.    By copying, storing, and/or loading the GAP Protocol onto Infringing Machines,
the Counter Defendant, ECLIPSE, has infringed on Counter Plaintiffs' exclusive right to make
copies of the copyrighted software programs.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part
Counter Defendants' motion to dismiss, the allegations of this paragraph are not
relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is
required, the allegations of this paragraph are denied.

195.    Upon information and belief, Eclipse has copied the GAP Protocol in conjunction
with its own communications software and has thereby violated DDS's copyright protections,
including the rights to reproduce, distribute, or create adaptations or derivative works based
upon the GAP Protocol.

**ANSWER:** Following this Court's January 31, 2019, Opinion granting in part
Counter Defendants' motion to dismiss, the allegations of this paragraph are not
relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is
required, the allegations of this paragraph are denied.

196.    ECLIPSE's acts of infringement are willful, intentional, and purposeful, in

disregard of and with indifference to Counter Plaintiffs' rights.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

197. Counter Plaintiffs are entitled to recover the damages they have and will sustain, together with any gains, profits, and advantages obtained by ECLIPSE as a result of its infringement.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

198. Counter Plaintiffs are also entitled to preliminary and permanent injunctive relief to restrain and enjoin ECLIPSE's continuing infringement and to require ECLIPSE to destroy all infringing materials in its custody or control.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

199. Counter Plaintiffs are further entitled to their attorney's fees and costs pursuant to 17 U.S.C. § 505.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

**WHEREFORE,** Counter Plaintiff, Digital Dynamics Software, Inc. respectfully prays that is Honorable Court enter judgment in its favor and against the Counter Defendant, ECLIPSE GAMING SYSTEMS, LLC, as follows:

A.    Declaring that Counter Defendant's unauthorized conduct violates Counter Plaintiff's rights under common law and the Federal Copyright Act;

B.    Immediately and permanently enjoin the Counter Defendant, ECLIPSE GAMING SYSTEMS, LLC, including its officers, directors, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them, from using any of Counter Plaintiff's copyrighted computer programs without Counter Plaintiff's express consent or otherwise infringing Counter Plaintiff's copyrights or other rights in any manner;

C.    Ordering the Counter Defendant, ECLIPSE GAMING SYSTEMS, LLC, to account to Counter Plaintiff for all the revenues, gains, profits, and advantages derived by Counter Defendant by their infringement of Counter Plaintiff's copyrights or such damages as this Court deems proper and to enter judgment in favor of Counter Plaintiff and against Counter Defendant for all profits derived by Counter Defendant from the Infringing Machines and as established by the proofs offered at the time of trial or judgment;

D.    Awarding Counter Plaintiff its costs, reasonable attorney's fees, and disbursements in this action, pursuant to 17 U.S.C. § 505; and

E.    For such other relief as this Honorable Court deems just and appropriate under the circumstances.

**ANSWER:**  Counter Defendants deny that DDS is entitled to any of the relief it seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

<u>**COUNT SEVEN**</u>
<u>**VICARIOUS INFRINGEMENT AGAINST ECLIPSE GAMING SYSTEMS, LLC**</u>

200.    Counter Plaintiff repeats and realleges all prior paragraphs of this

Second Amended Countercomplaint herein.

> **ANSWER:** Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

201. At all times relevant herein, ECLIPSE assembled and built electronic gaming machines for ELITE and AMS including the Infringing Machines as set forth herein. In violation of Counter Plaintiffs' copyright, ECLIPSE copied the GAP Protocol and SAS Engine software onto electronic gaming machines used or operated by ELITE and AMS.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

202. ECLIPSE knowingly encouraged, facilitated, and induced ELITE's and AMS's unauthorized use of Counter Plaintiffs' copyrighted GAP Protocol software and has derived substantial benefit therefrom. ECLIPSE profited from the infringement by ELITE and AMS because ECLIPSE had revenue sharing arrangements with ELITE and AMS and because the controlling members of ECLIPSE owned 100% of ELITE and AMS.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

203. ECLIPSE had the right and the ability to supervise and to stop the infringement by ELITE and AMS but failed to do so. Greg Drew and David Lawrence individually and/or beneficially own 100% of ELITE and AMS. At the same time, Greg Drew and David Lawrence, individually and beneficially own a controlling interest over ECLIPSE. At all times relevant herein, it was in the financial best interest of Greg Drew and David Lawrence and in the interest of ECLIPSE to allow the infringing activities to occur and to fail and to refuse to account to Counter Plaintiff for the unauthorized copying of its copyright materials and software.

ECLIPSE had a direct financial interest in the infringing activities of ELITE and AMS. At no time herein, has ECLIPSE paid any dividend or other financial benefit to Antonucci as the minority member of ECLIPSE.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

204.  Counter Plaintiffs are entitled to recover the damages they have and will sustain, together with any gains, profits, and advantages obtained by ECLIPSE, ELITE, and/or AMS as a result of the infringements alleged herein.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

205.  Counter Plaintiffs are further entitled to their attorney's fees and costs pursuant to 17 U.S.C. § 505.

> **ANSWER:** Following this Court's January 31, 2019, Opinion granting in part Counter Defendants' motion to dismiss, the allegations of this paragraph are not relevant to any pending claim or defense. *See* Dkt. 94. To the extent an answer is required, the allegations of this paragraph are denied.

**WHEREFORE,** Counter Plaintiff, Digital Dynamics Software, Inc. prays for entry of judgment in its favor and against ECLIPSE GAMING SYSTEMS, LLC, as follows:

A.  Declaring that Counter Defendant's unauthorized conduct violates Counter Plaintiff's rights under common law and the Federal Copyright Act;

B.  Immediately and permanently enjoin the Counter Defendant, ECLIPSE GAMING SYSTEMS, LLC, including its officers, directors, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them, from using any of Counter Plaintiff's copyrighted computer programs without Counter

Plaintiff's express consent or otherwise infringing Counter Plaintiff's copyrights or other rights in any manner;

      C.     Ordering the Counter Defendant, ECLIPSE GAMING SYSTEMS, LLC, to account to Counter Plaintiff for all the revenues, gains, profits, and advantages derived by Counter Defendant or by Elite Games, LLC, or by Accelerated Marketing Solutions, LLC, virtue of Eclipse Gaming Systems, LLC's infringement of Counter Plaintiff's copyrights or such damages as this Court deems proper and to enter judgment in favor of Counter Plaintiff and against Counter Defendant for all profits derived by Counter Defendant from the Infringing Machines and as established by the proofs offered at the time of trial or judgment;

      D.     Awarding Counter Plaintiff its costs, reasonable attorney's fees, and disbursements in this action, pursuant to 17 U.S.C. § 505; and

      E.     For such other relief as this Honorable Court deems just and appropriate under the circumstances.

> **ANSWER:** Counter Defendants deny that DDS is entitled to any of the relief it seeks. Except as expressly admitted herein, the allegations of this paragraph are denied.

## FACTS COMMON TO DIGITAL MILLENIUM COPYRIGHT ACT

206.    In 2002 DDS developed the GAP Protocol, including the SAS Engine software.

> **ANSWER:** Counter Defendants admit that DDS owns the intellectual property rights to SAS Engine. Except as expressly admitted herein, the allegations of this paragraph are denied.

207.    On, or about, March 11, 2008, Antonucci and other founding members, including Jack Saltiel, formed Eclipse Gaming Systems, LLC.

> **ANSWER:** Counter Defendants admit that in 2008 Antonucci became one of the founding members of Eclipse. Except as expressly admitted herein, the allegations of this paragraph are denied.

208.    In 2008, DDS entered into an oral licensing agreement with ECLIPSE permitting ECLIPSE to copy DDS's SAS Engine software, including the Engine.h or Engine.cs files containing the GAP Protocol, onto electronic gaming machines owned and operated by ECLIPSE at casinos or other gambling/gaming facilities. This agreement was reached by and between Jack Saltiel as the manager of ECLIPSE and Anthony Antonucci as the President of DDS.

> **ANSWER:** Counter Defendants admit that, after the formation of Eclipse in 2008, Antonucci's company, DDS, granted a license to Eclipse, initially through an oral agreement, for use of the SAS Engine and SAS Gateway software. Under the parties' licensing agreement, Eclipse paid licensing fees on a per-machine basis for gaming machines that actually utilized the SAS Engine (that is, they were configured to run the SAS Engine) in exchange for a perpetual license. Eclipse was not required to pay DDS licensing fees for machines operating in environments that did not utilize a SAS protocol and which were accordingly configured to bypass DDS's SAS Engine. Counter Defendants further admit that Eclipse has utilized SAS Engine in certain gaming machines in accordance with its licensing agreements. Except as expressly admitted herein, the allegations of this paragraph are denied.

209.    In June or July 2015, Jack Saltiel was removed as the manager of ECLIPSE by the new majority owners and Greg Drew was installed as ECLIPSE's new manager.

> **ANSWER:** Counter Defendants admit that Saltiel was the Manager of Eclipse until June 2015. Counter Defendants further admit that Greg Drew became manager of Eclipse in September 2015 by vote by the majority ownership of Eclipse in accordance with its operating agreement. Except as expressly admitted herein, the allegations of this paragraph are denied.

210.    In September of 2015, Jack Saltiel and Carlos Lozano, the CEO and COO of ECLIPSE respectively, were terminated as officers of ECLIPSE.

> **ANSWER:** Counter Defendants admit that Saltiel and Lozano were terminated as Eclipse's CEO and COO, respectively. Except as expressly admitted herein, the allegations of this paragraph are denied.

211.    After Jack Saltiel was terminated, Antonucci became suspicious that DDS was not receiving licensing fees owed by ECLIPSE and that ECLIPSE was copying unlicensed

versions of DDS's copyrighted software.

> **ANSWER:** Counter Defendants have insufficient knowledge to affirm or deny DDS's allegations concerning Antonucci's state of mind. Accordingly, those allegations are denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

212. On several occasions following the termination of Jack Saltiel, Antonucci demanded that ECLIPSE provide an accounting of the total number of electronic gaming machines operated by ECLIPSE or any other entity that contained copies of DDS's software. Antonucci also requested that ECLIPSE provide financial information relating to ECLIPSE's contracts and revenues, including Weekly Cash Summary Reports, earned by ECLIPSE from its electronic gaming machine operations. Antonucci's requests were lawful and ECLIPSE refused to provide information to Antonucci.

> **ANSWER:** Counter Defendants admit that Antonucci has requested financial and other information concerning, *inter alia*, Eclipse and Elite, including through discovery requests. Except as expressly admitted herein, the allegations of this paragraph are denied.

213. Because DDS was concerned about the unauthorized copying of its software, DDS updated its software in January 2016 to restrict access only to users who had a valid license. The software update was designed to begin checking for licenses effective upon the date of December 7, 2016 ("DDS License Verification").

> **ANSWER:** Counter Defendants admit that DDS stated that its license verification "time bomb" would detonate on December 7, 2016. Except as expressly admitted herein, the allegations of this paragraph are denied.

214. Each electronic gaming machine used by ECLIPSE requires a device known as a license dongle to enable software operations ("dongle"). Dongle's used by DDS and ECLIPSE are produced by a third-party supplier, Gemalto, and dongle orders are fulfilled or issued as authorized by the registered owner of the particular vendor code.

**ANSWER:** Counter Defendants admit that Eclipse's gaming machines have utilized so-called dongles supplied by Gemalto in connection with the software on those gaming machines. Except as expressly admitted herein, the allegations of this paragraph are denied.

215. The DDS software licensed to Eclipse used a dongle known under the vendor code of "RWIID" and DDS owns the RWIID vendor code.

**ANSWER:** Counter Defendants admit that DDS characterizes its software as using "a dongle known under the vendor code of 'RWID'" and that DDS contends that it owns the RWIID vendor code. Counter Defendants deny DDS's characterization as accurate or complete. Except as expressly admitted herein, the allegations of this paragraph are denied.

216. During the spring of 2015, DDS authorized Gemalto to issue RWIID dongles to ECLIPSE.

**ANSWER:** Counter Defendants lack knowledge or information sufficient to form a belief about the veracity of the allegations in this paragraph, and accordingly those allegations are denied. Except as expressly admitted herein, the allegations of this paragraph are denied.

217. On June 16, 2016, DDS filed suit in the Circuit Court of Cook County seeking various declarations of court relating to legal controversies between Eclipse and DDS. This declaratory judgment suit was commonly known as case number 2016 CH 08122. DDS's Amended Complaint asserted claims related to the failure of ECLIPSE to provide business information previously requested by Antonucci and for other matters relating to and arising out of the business relations between ECLIPSE, on the one hand, and DDS or Antonucci, on the other hand.

**ANSWER:** Counter Defendants admit that DDS did file a now-dismissed declaratory judgment action in the Circuit Court of Cook County, Chancery Division, Case No. 2016 CH 08122, seeking a declaration that the MLA was void and unenforceable. Counter Defendants affirmatively state the DDS subsequently amended its complaint to assert a broad range of other claims relating to and arising out of the business relations between Eclipse, on the one hand, and DDS or Antonucci, on the other hand. Except as expressly admitted herein, the allegations of this paragraph are denied.

218.    By November 10, 2016, and in advance of the effective date of the DDS License

Verification, DDS issued notice to ECLIPSE that unlicensed copies of its software would no

longer operate.

> **ANSWER:**  Counter Defendants admit that on November 18, 2016, Eclipse's
> counsel received a letter from DDS/Antonucci's counsel, Robert G. Riffner,
> demanding Eclipse pay DDS/Antonucci $300,000 or else Eclipse's gaming
> machines would become inoperable the first week of December 2016.  The letter
> did not specify how the machines would become inoperable but did allude to some
> dongles that were purportedly necessary for the functioning of the gaming
> machines.  At the time, Eclipse had no knowledge of the time bomb, and was
> unaware that any software update or dongles were necessary for the continuing
> operation of the gaming machines. Except as expressly admitted herein, the
> allegations of this paragraph are denied.

219.    In response to DDS's notification of the existence of the DDS license

verification, ECLIPSE filed a declaratory judgment action in the Circuit Court of Cook County

asserting that it would be harmed by the DDS License Verification. This case was commonly

known as case number 2016 CH 155559.

> **ANSWER:**  Counter Defendants admit that on November 30, 2016, Eclipse filed a
> complaint for declaratory judgment, anticipatory breach, and specific performance
> in anticipation of its motion for restraining order in Illinois state court, Case No. 2-
> 16 CH 15559, for Antonucci's malicious installation of a time bomb in Eclipse's
> gaming machines.  Except as expressly admitted herein, the allegations of this
> paragraph are denied.

220.    On December 2, 2016, Gemalto issued a report identifying that ECLIPSE had

previously ordered 4,400 of the RWIID dongles. Up to this point in time, ECLIPSE had only

paid for 332 licenses.

> **ANSWER:**  Denied.

221.    The declaratory judgment cases filed by DDS and ECLIPSE were consolidated

and heard by the Honorable Judge Rodolfo Garcia on December 5, 2016. During that hearing,

ECLIPSE acknowledged and agreed that it had not paid for any DDS license since at least

calendar year 2014 and ECLIPSE reached an agreement in open court to purchase an additional

500 RWIID dongles for use with their electronic gaming machines. DDS provided the 500

dongles to counsel for ECLIPSE within the hour and in accord with the representations and

agreement made before the Court. ECLIPSE paid $100 per dongle as a licensing fee and an

additional $30 per dongle for the cost of the dongle. ECLIPSE paid DDS the sum of $65,000.

> **ANSWER:** Counter Defendants admit that the declaratory judgment cases filed
> by DDS and Eclipse were consolidated and heard by the Honorable Judge Rodolfo
> Garcia on December 5, 2016. Counter Defendants admit that on December 5, 2016,
> the Court heard Eclipse's motion for a temporary restraining order. Counter
> Defendants further admit that the Count entered a restraining order against DDS for
> which, in lieu of bond, the Court directed Eclipse to pay DDS $50,000 for ostensible
> licensing fees and $15,000 for 500 dongles. Except as expressly admitted herein,
> the allegations of this paragraph are denied.

222. When Antonucci suspected that ECLIPSE was copying DDS's software without

reporting to DDS or paying required license fees, DDS terminated the authority of ECLIPSE to

order DDS's RWIID dongles from Gemalto.

> **ANSWER:** Counter Defendants admit that DDS improperly interfered with
> Eclipse's business relationship with Gemalto by preventing Eclipse from obtaining
> dongles. Except as expressly admitted herein, the allegations of this paragraph are
> denied.

223. On February 17, 2017, ECLIPSE ordered another 200 RWIID dongles from DDS.

> **ANSWER:** Counter Defendants admit that 200 RWIID dongles were ordered on
> or about February 17, 2017. Counter Defendants further state that DDS improperly
> interfered with Eclipse's business relationship with Gemalto by preventing Eclipse
> from obtaining said dongles. Except as expressly admitted herein, the allegations
> of this paragraph are denied.

224. In the summer of 2017, DDS learned from Rachel Arias-Barrington that

ECLIPSE had commenced a company-wide effort to revert to using an older version of DDS's

software on its electronic gaming machines in order to avoid the DDS License Verification.

Rachel Arias- Barrington was the head of the Quality Control Department for ECLIPSE and had

personal knowledge of the software copied or deployed by ECLIPSE in various electronic gaming machines which it built. DDS learned from Ms. Arias-Barrington that ECLIPSE was installing unlicensed DDS GAP-Game API Protocol software, including the SAS Engine software, onto ECLIPSE electronic gaming machines and that it was also installing unlicensed software onto electronic gaming machines owned and operated by ELITE GAMES, LLC ("ELITE") and/or ACCELERATED MARKETING SOLUTIONS, LLC ("AMS"). Reference should be made to the affidavit of Rachel Arias-Barrington dated July 20, 2017, which is attached hereto as Exhibit E and incorporated herein by reference.

> **ANSWER:**  Counter Defendants admit that DDS has produced an affidavit from Rachel Arias-Barrington that is attached as Exhibit E to the Second Amended Counter Complaint.  Counter Defendants further admit that Arias-Barrington was an employee of Eclipse.  Counter Defendants deny that Arias-Barrington was the head of the Quality Control Department.  Counter Defendants affirmatively state that Arias-Barrington was a Quality Control Analyst.  Except as expressly admitted herein, the allegations of this paragraph are denied.

225.    On October 24, 2017, Rachel Arias-Barrington provided DDS with an additional affidavit identifying that ECLIPSE was continuing to install unlicensed DDS software onto electronic gaming machines owned and operated by ECLIPSE, ELITE, and AMS. Reference should be made to the affidavit of Rachel Arias-Barrington attached hereto as Exhibit F and incorporated herein by reference.

> **ANSWER:**  Counter Defendants admit that DDS has produced an affidavit from Rachel Arias-Barrington that is attached as Exhibit F to the Second Amended Counter Complaint.  Counter Defendants further admit that Arias-Barrington was an employee of Eclipse.  Except as expressly admitted herein, the allegations of this paragraph are denied.

226.    Paragraph 7.2 of the MLA provided, in pertinent part, that "Licensee (Eclipse) further agrees not to interfere, disable, or otherwise modify any licensing mechanism(s) implemented by DIGDYN for preventing any unauthorized use of the Software, including but not

limited to, altering the MAC address of any computer devices implementing Designated Software in an attempt to circumvent payment of any Licensing Fees."

> **ANSWER:** Counter Defendants admit that the second half of Paragraph 7.2 of the MLA states: "Licensee further agrees not to interfere, disable, or otherwise modify any licensing mechanism(s) implemented by DIGDYN for preventing any unauthorized use of the Software, including but not limited to, altering the MAC address of any computer devices implementing Designated Software in an attempt to circumvent payment of any Licensing Fees." Except as expressly admitted herein, the allegations of this paragraph are denied.

227. The DDS License Verification is a technological measure designed to control access to DDS's software as set forth at 17 U.S.C. 1201 (a)(3)(B).

**ANSWER:** Denied.

228. The DDS License Verification actively prevents unauthorized users from accessing copyrighted software created, developed, and owned by DDS. The DDS License Verification is analogous to password protection systems and to secret handshake systems that verify user identity and block unauthorized users from accessing software. As such, the DDS License Verification is a technological measure as defined by the Digital Millennium Copyright Act ("DMCA").

**ANSWER:** Denied.

229. Since ECLIPSE would have no cause to install older versions of the GAP Protocol or SAS Engine software onto any properly licensed electronic gaming machine, ECLIPSE must have copied unlicensed software onto an unknown and undisclosed number of electronic gaming machines. Upon information and belief, after ECLIPSE learned of the DDS License Verification, ECLIPSE began systematically installing progressively older versions of DDS's SAS Engine software onto a test computer or computers until it identified a prior version of the software that did not contain the DDS License Verification. Thereafter, ECLIPSE

commenced and undertook to install an older version of the SAS Engine software, known as version number 4.22.607.0, onto electronic gaming machines owned and operated by ECLIPSE, ELITE, and AMS and as further identified in the affidavits of Rachel Arias-Barrington ("Eclipse Circumvention"). This activity and conduct violated the terms and conditions of the MLA.

> **ANSWER:** Counter Defendants Admit that Eclipse rolled back some copies of SAS Engine from version 4.22.609.10 to version 4.22.607.0 on certain gaming machines to avoid the time bomb. Except as expressly admitted herein, the allegations of this paragraph are denied.

230. At all times relevant herein, the DMCA provided, in relevant part at 17 U.S.C. 1201(a)(1) that no person shall circumvent a technological measure that effectively controls access to a work protected under this title. The DMCA provides at 17 U.S.C. 1201 (a)(3)(A) and (B) that: (A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and (B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

> **ANSWER:** Counter Defendants decline to respond to the allegations in this paragraph as they constitute a legal conclusion and no response is required thereto. To the extent that a response is required, the allegations of this paragraph are denied.

## COUNT EIGHT
## BREACH OF DIGITAL MILLENNIUM COPYRIGHT ACT
## AGAINST ECLIPSE GAMING SYSTEMS, LLC

231. Counter Plaintiff repeats all the above allegations of this Second Amended Countercomplaint as if more fully set forth herein.

> **ANSWER:** Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

88

232.    The Eclipse Circumvention thwarted or circumvented the DDS License Verification measure.

**ANSWER:** Denied.

233.    The Eclipse Circumvention was an act to avoid, bypass, remove, deactivate, or impair a technological measure designed to protect DDS's software. Such act was taken without the authority of DDS as described at 17 U.S.C. 1201 (a)(3)(A).

**ANSWER:** Denied.

234.    The Eclipse Circumvention was an act which infringes upon the exclusive rights owned by DDS in its copyrighted software and constitutes an act of infringement in violation of the Copyright Act.

**ANSWER:** Denied.

235.    Copying, installing, or using a software program without a license constitutes copyright infringement.

**ANSWER:**    Counter Defendants decline to respond to the allegations in this paragraph as they constitute a legal conclusion and no response is required thereto. To the extent that a response is required, the allegations of this paragraph are denied.

236.    Counter Defendant, ECLIPSE, is liable for copyright infringement for any unlicensed use, duplication, or distribution of DDS's software and such violations, under the circumstances described herein, also constitute circumvention under the DMCA.

**ANSWER:** Denied.

237.    The wrongful actions of Eclipse circumvented the technological measure protecting DDS's software from unauthorized use. The Eclipse Circumvention was unauthorized since   the Counter Defendant, ECLIPSE, did not have a license for such copying and because such conduct

violated the express agreement of ECLIPSE as set forth in the MLA – not to remove such a mechanism.

**ANSWER:** Denied.

238. Counter Defendant's unauthorized access resulted in the infringement of DDS's copyrighted software because the Counter Defendant, ECLIPSE, used or unlawfully copied DDS's software including the GAP-Game API Protocol and/or the SAS Engine software.

**ANSWER:** Denied.

239. That ECLIPE's actions, as alleged herein, caused substantial financial damage to DDS while at the same time ECLIPSE has earned substantial revenues and profits from its unlawful actions.

**ANSWER:** Denied.

**WHEREFORE,** Counter Plaintiff, Digital Dynamics Software, Inc. respectfully prays that is Honorable Court enter judgment in its favor and against the Counter Defendant, Eclipse Gaming Systems, LLC, as follows:

A. That this Honorable Court permanently enjoin and restrain Eclipse Gaming Systems, LLC, including its agents, employees, successors, assigns, and all other persons acting in concert with or affiliation with it, from copying, reproducing, manufacturing, duplicating, disseminating, distributing, or otherwise using any Digital Dynamics Software, Inc. software programs which are the subject of this Complaint, including any user instructions, reference manuals and other associated documents relative to such software, and to otherwise grant temporary and permanent injunctions on such terms are reasonable to prevent or restrain a violation of the Digital Millennium Copyright Act;

B.      That this Honorable Court enter an order impounding, on such terms as it deems reasonable, any **device** or product that is in the custody or control of Eclipse Gaming Systems, LLC and that the Court has reasonable cause to believe was involved in a violation of the DMCA;

C.      That the Counter Defendant, Eclipse Gaming Systems, LLC, be ordered to file, within 30 days of the injunction's issuance and/or order of impoundment, a sworn report setting forth in detail the manner in which Counter Defendant has complied with the injunction and order of impoundment;

D.      That Counter Defendant, Eclipse Gaming Systems, LLC, be ordered to conduct an accounting of all revenues and/or profits derived from making, using, marketing or selling unlicensed copies of the software which is the subject of this Complaint;

E.      For an award sufficient to compensate Counter Plaintiff for its actual damages plus the profits derived by Eclipse Gaming Systems, LLC from its violation of the DMCA and as established by the proofs offered at the time of trial or entry of judgment;

F.      For an award of reasonable attorney's fees as this Court deems just and appropriate under the circumstances;

G.      For an award of statutory damages for each violation of § 1201 of the Digital Millennium Copyright Act and in the sum of not less than $200 or more than $2,500 per act of circumvention, **device**, product, component, offer, or performance of service, as the Court deems just and appropriate;

H.      For such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

**ANSWER:**  Counter Defendants deny that DDS is entitled to any of the relief it seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

## COUNT NINE
## BREACH OF DIGITAL MILLENNIUM COPYRIGHT ACT
## AGAINST ELITE GAMES, LLC

240.    Counter Plaintiff repeats all the above allegations of this Second Amended Countercomplaint as if more fully set forth herein.

**ANSWER:** Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

241.    The Eclipse Circumvention was taken, in whole or in part, at the direction, request, authority, or instruction of ELITE and older versions of DDS's GAP Protocol, including SAS Engine software, was installed on electronic gaming machines owned and/or operated by ELITE. Such wrongful acts circumvented the DDS License Verification measure.

**ANSWER:** Counter Defendants Admit that Eclipse rolled back some copies of SAS Engine from version 4.22.609.10 to version 4.22.607.0 on certain gaming machines to avoid the time bomb. Counter Defendants admit that Eclipse has used the SAS Engine in accordance with its rights and pursuant to the parties' licensing agreement thereto. Except as expressly admitted herein, the allegations of this paragraph are denied.

242.    ELITE's act of directing, requesting, authorizing, or instructing the Eclipse Circumvention is an act to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of DDS as described at 17 U.S.C. 1201 (a)(3)(A).

**ANSWER:** Denied.

243.    ELITE's actions constitute an act which infringes upon the exclusive rights owned by DDS in its copyrighted software and constitutes an act of infringement in violation of the Copyright Act.

**ANSWER:** Denied.

244.    Copying, installing, or using a software program without a license constitutes copyright infringement.

**ANSWER:** Counter Defendants decline to respond to the allegations in this paragraph as they constitute a legal conclusion and no response is required thereto. To the extent that a response is required, the allegations of this paragraph are denied.

245. Counter Defendant, ELITE, is liable for copyright infringement for any unlicensed use, duplication, or distribution of DDS's software and such violations, under the circumstances described herein, also constitute circumvention under the DMCA.

**ANSWER:** Denied.

246. ELITE's actions circumvented the technological measure protecting DDS's software from unauthorized use. The Eclipse Circumvention was unauthorized since the Counter Defendant, ELITE, did not have a license for such copying and because such conduct violated the express agreement of ECLIPSE as set forth in the MLA – not to remove such a mechanism.

**ANSWER:** Denied.

247. Counter Defendant's unauthorized access resulted in the infringement of DDS's copyrighted software because the Counter Defendant, ELITE, used or unlawfully copied DDS's software including the GAP-Game API Protocol and/or the SAS Engine software.

**ANSWER:** Denied.

248. That ELITE's actions, as alleged herein, caused substantial financial damage to DDS while at the same time ELITE has earned substantial revenues and profits from its unlawful actions.

**ANSWER:** Denied.

**WHEREFORE,** Plaintiff, Digital Dynamics Software, Inc. respectfully prays that is Honorable Court enter judgment in its favor and against the Defendant, Elite Games, LLC, as follows:

A. That this Honorable Court permanently enjoin and restrain Elite Games, LLC,

including its agents, employees, successors, assigns, and all other persons acting in concert with or affiliation with it, from copying, reproducing, manufacturing, duplicating, disseminating, distributing, or otherwise using any Digital Dynamics Software, Inc. software programs which are the subject of this Complaint, including any user instructions, reference manuals and other associated documents relative to such software, and to otherwise grant temporary and permanent injunctions on such terms are reasonable to prevent or restrain a violation of the Digital Millennium Copyright Act;

B.      That this Honorable Court enter an order impounding, on such terms as it deems reasonable, any **device** or product that is in the custody or control of Elite Games, LLC and that the Court has reasonable cause to believe was involved in a violation of the DMCA;

C.      That the Defendant, Elite Games, LLC, be ordered to file, within 30 days of the injunction's issuance and/or order of impoundment, a sworn report setting forth in detail the manner in which Defendant has complied with the injunction and order of impoundment;

D.      That Defendant, Elite Games, LLC, be ordered to conduct an accounting of all revenues and/or profits derived from making, using, marketing or selling unlicensed copies of the software which is the subject of this Complaint;

E.      For an award sufficient to compensate Plaintiff for its actual damages plus the profits derived by Elite Games, LLC from its violation of the DMCA and as established by the proofs offered at the time of trial or entry of judgment;

F.      For an award of reasonable attorney's fees as this Court deems just and appropriate under the circumstances;

G.      For an award of statutory damages for each violation of § 1201 of the Digital Millennium Copyright Act and in the sum of not less than $200 or more than $2,500 per act of

circumvention, **device**, product, component, offer, or performance of service, as the Court deems just and appropriate;

H.      For such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

> **ANSWER:**  Counter Defendants deny that DDS is entitled to any of the relief it seeks.  Except as expressly admitted herein, the allegations of this paragraph are denied.

## COUNT TEN
## BREACH OF DIGITAL MILLENNIUM COPYRIGHT ACT
## AGAINST ACCELERATED MARKETING SOLUTIONS,
## LLC

249.    Counter Plaintiff repeats all the above allegations of this Second Amended Countercomplaint as if more fully set forth herein.

> **ANSWER:**  Counter Defendants incorporate their answers to the corresponding paragraphs as if set forth herein.

250.    The Eclipse Circumvention was taken, in whole or in part, at the direction, request, authority, or instruction of AMS and older versions of DDS's GAP Protocol, including SAS Engine software, was installed on electronic gaming machines owned and/or operated by AMS. Such wrongful acts circumvented the DDS License Verification measure.

> **ANSWER:**  Counter Defendants Admit that Eclipse rolled back some copies of SAS Engine from version 4.22.609.10 to version 4.22.607.0 on certain gaming machines to avoid the time bomb. Counter Defendants admit that Eclipse has used the SAS Engine in accordance with its rights and pursuant to the parties' licensing agreement thereto.  Except as expressly admitted herein, the allegations of this paragraph are denied.

251.    AMS's act of directing, requesting, authorizing, or instructing the Eclipse Circumvention is an act to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of DDS as described at 17 U.S.C. 1201 (a)(3)(A).

**ANSWER:** Denied.

252.    AMS's actions constitute an act which infringes upon the exclusive rights owned by DDS in its copyrighted software and constitutes an act of infringement in violation of the Copyright Act.

**ANSWER:** Denied.

253.    Copying, installing, or using a software program without a license constitutes copyright infringement.

**ANSWER:** Denied.

254.    Counter Defendant, AMS, is liable for copyright infringement for any unlicensed use, duplication, or distribution of DDS's software and such violations, under the circumstances described herein, also constitute circumvention under the DMCA.

**ANSWER:** Denied.

255.    AMS's actions circumvented the technological measure protecting DDS's software from unauthorized use. The Eclipse Circumvention was unauthorized since the Counter Defendant, AMS, did not have a license for such copying and because such conduct violated the express agreement of ECLIPSE as set forth in the MLA – not to remove such a mechanism.

**ANSWER:** Denied.

256.    Counter Defendant's unauthorized access resulted in the infringement of DDS's copyrighted software because the Counter Defendant, AMS, used or unlawfully copied DDS's software including the GAP-Game API Protocol and/or the SAS Engine software.

**ANSWER:** Denied.

257.    That AMS's actions, as alleged herein, caused substantial financial damage to DDS while at the same time AMS has earned substantial revenues and profits from its unlawful

actions.

**ANSWER:** Denied.

**WHEREFORE,** Plaintiff, Digital Dynamics Software, Inc. respectfully prays that is Honorable Court enter judgment in its favor and against the Defendant, Accelerated Marketing Solutions, LLC, as follows:

A.      That this Honorable Court permanently enjoin and restrain **Accelerated Marketing Solutions, LLC**, including its agents, employees, successors, assigns, and all other persons acting in concert with or affiliation with it, from copying, reproducing, manufacturing, duplicating, disseminating, distributing, or otherwise using any Digital Dynamics Software, Inc. software programs which are the subject of this Complaint, including any user instructions, reference manuals and other associated documents relative to such software, and to otherwise grant temporary and permanent injunctions on such terms are reasonable to prevent or restrain a violation of the Digital Millennium Copyright Act;

B.      That this Honorable Court enter an order impounding, on such terms as it deems reasonable, any **device** or product that is in the custody or control of **Accelerated Marketing Solutions, LLC** and that the Court has reasonable cause to believe was involved in a violation of the DMCA;

C.      That the Defendant, **Accelerated Marketing Solutions, LLC**, be ordered to file, within 30 days of the injunction's issuance and/or order of impound, a sworn report setting forth in detail the manner in which Defendant has complied with the injunction and order of impoundment;

D.      That Defendant, **Accelerated Marketing Solutions, LLC**, be ordered to conduct an accounting of all revenues and/or profits derived from making, using, marketing or selling

unlicensed copies of the software which is the subject of this Complaint;

      E.      For an award sufficient to compensate Plaintiff for its actual damages plus the

profits derived by **Accelerated Marketing Solutions**, LLC from its violation of the DMCA

and as established by the proofs offered at the time of trial or entry of judgment;

      F.      For an award of reasonable attorney's fees as this Court deems just and appropriate

under the circumstances;

      G.      For an award of statutory damages for each violation of §1201 of the Digital

Millennium Copyright Act and in the sum of not less than $200 or more than $2,500 per

act of circumvention, **device**, product, component, offer, or performance of service, as the Court

deems just and appropriate;

      H.      For such other and further relief as this Honorable Court deems just and

appropriate under the circumstances.

      **ANSWER:**  Counter Defendants deny that DDS is entitled to any of the relief it
seeks.  Except as expressly admitted herein, the allegations of this paragraph are
denied.

## **AFFIRMATIVE DEFENSES**

  Counter Defendants give notice that they may rely upon one or more of the following

defenses to the extent that they bear the legal burden of pleading and proving such defenses as an

affirmative matter. In further factual support of their Affirmative Defenses, Counter Defendants

incorporate the allegations in *Eclipse Gaming Systems, LLC v. Antonucci*, Complaint (ECF No. 1),

Case No. 17-cv-00196 (N.D. Ill., Jan. 10, 2017) and Counter-Defendants' Answer to

Counterclaims (ECF No. 34), Case No. 17-cv-00196 (N.D. Ill., Sep. 12, 2017), as if fully stated

herein.

### FIRST AFFIRMATIVE DEFENSE

Counter Plaintiffs have failed, in whole or in part, to state a cognizable claim under the DMCA in Counts VIII-X upon which relief can be granted because DDS is not the owner of the asserted copyright.

### SECOND AFFIRMATIVE DEFENSE

Counter Plaintiffs have failed, in whole or in part, to state a cognizable claim under the DMCA in Counts VIII-X upon which relief can be granted because DDS's copyright is invalid.

### THIRD AFFIRMATIVE DEFENSE

Counter Plaintiffs have failed, in whole or in part, to state a cognizable claim under the DMCA in Counts VIII-X upon which relief can be granted because even if Counter Defendants' actions violated the DMCA in any way, which they did not, any such violation was unknowing an unintentional and therefore fall under the innocent violator provision set forth in 17 U.S.C. § 1203(c)(5).

### FOURTH AFFIRMATIVE DEFENSE

Counter Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

### FIFTH AFFIRMATIVE DEFENSE

Counter Plaintiffs' claims are barred, in whole or in part, because Counter-Plaintiffs' alleged work was not properly registered with the United States Copyright Office.

### SIXTH AFFIRMATIVE DEFENSE

Counter Plaintiffs' claims are barred, in whole or in part, because Counter Defendants' use of the work was *de minimis*.

## SEVENTH AFFIRMATIVE DEFENSE

Counter Plaintiffs' claims are barred, in whole or in part, under the doctrine of fair use.

## EIGHTH AFFIRMATIVE DEFENSE

Counter Plaintiffs' claims are barred, in whole or in part, due to copyright misuse.

## NINTH AFFIRMATIVE DEFENSE

Counter Plaintiff granted permission to Counter Defendants to use the alleged work via license.

## TENTH AFFIRMATIVE DEFENSE

Counter Plaintiffs are barred, in whole or in part, under the doctrine of unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

Counter Plaintiffs' claims are barred, in whole or in part, because Counter Plaintiffs consented to the use of the alleged work by Counter Defendants.

## TWELFTH AFFIRMATIVE DEFENSE

Based on the facts alleged in Eclipse Gaming LLC's complaint, Counter Plaintiffs' claims are barred, in whole or in part, under the doctrines of laches and/or equitable estoppel.

Additionally, Antonucci is estopped from seeking relief for the allegations he alleges in Counts I and II insofar as the actions about which he complains were done with his knowledge while he was employed by Eclipse Gaming Systems LLC.

## THIRTEENTH AFFIRMATIVE DEFENSE

Counter Plaintiffs' claims are barred, in whole or in part, under the doctrine of waiver.

## FOURTEENTH AFFIRMATIVE DEFENSE

Count II of Counter Plaintiffs' Second Amended Counterclaim is barred because Antonucci was terminated as an employee "for cause" under the Employment Agreement and

because he interfered with Eclipse Gaming LLC's business relationships with Gemalto and attempted to sabotage Eclipse's business by tampering with software used in Eclipse Gaming LLC's gaming machines.

## FIFTEENTH AFFIRMATIVE DEFENSE

Count I of Counter Plaintiffs' Second Amended Countercomplaint is barred by the business judgment rule because the actions about which Antonucci complains were proper exercises of Counter Defendants' business judgment and legally justified.

## PRAYER FOR RELIEF

**WHEREFORE,** Counter Defendants pray for judgment dismissing Counter Plaintiffs' Second Amended Countercomplaint on the merits, in its entirety, and with prejudice, and awarding Counter Defendants their fees, costs, and disbursements incurred in this action, and awarding such additional relief as the Court may deem just and appropriate.


DATED:  February 21, 2019                Respectfully submitted,

                                          ECLIPSE GAMING SYSTEMS, LLC;
                                          ELITE GAMES, LLC; ACCELERATED
                                          MARKETING SOLUTIONS, LLC; GREG
                                          DREW; and DAVID LAWRENCE

                                          By:  _/s/ Suyash Agrawal_____
                                               Suyash Agrawal


                                          Suyash Agrawal
                                          Constance Grieves
                                          Massey & Gail LLP
                                          50 E. Washington Street, Suite 400
                                          Chicago, Illinois 60602
                                          sagrawal@masseygail.com
                                          cgrieves@masseygail.com
                                          (312) 379-0949 office

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 21, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Suyash Agrawal

Suyash Agrawal
